Melanie Sloan
D.C. Bar No. 454584
Anne L. Weismann
D.C. Bar No. 298190
Citizens for Responsibility
and Ethics in Washington
11 Dupont Circle, N.W.
2nd Floor
Washington, D.C.  20036
202-588-5565

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
CITIZENS FOR RESPONSIBILITY AND      :
ETHICS IN WASHINGTON                 :
11 Dupont Circle, N.W.               :
Washington, D.C.  20036              :
                                     :
            Plaintiff,               :
                                     :
      v.                             :  Civil Action No.
                                     :
U.S. DEPARTMENT OF HOMELAND          :
SECURITY                             :
Washington, D.C.  20528             :
                                     :
            Defendant.               :
_____:

**COMPLAINT FOR
DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

1.  This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. §552, as

amended, as well as agency FOIA regulations, challenging the failure of the Federal Emergency

Management Agency ("FEMA"), a component of the U.S. Department of Homeland Security

("DHS"), to expedite and fulfill the request of Plaintiff for documents relating to FEMA's

response to hurricane Katrina.

2.  This case seeks declaratory relief that Defendant is in violation of the FOIA and agency regulations for failing to expedite Plaintiff's FOIA request, declaratory relief that Defendant is in violation of the FOIA for failing to fulfill Plaintiff's request for records, and injunctive relief that Defendant immediately and fully comply with Plaintiff's request under the FOIA.

## JURISDICTION AND VENUE

3.  This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §552(a)(4)(B).  This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331.  Venue lies in this district under 5 U.S.C. §552(a)(4)(B).

4.  Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code.  CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials.  CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the governmental decision-making process.  CREW uses a combination of research, litigation, and advocacy to advance its mission.

5.  CREW has invested considerable organizational resources in pushing the U.S. government to take ethical issues seriously.  CREW monitors closely the laws and rules applicable to government agencies.

6.  CREW is harmed by FEMA's failure to comply with the FOIA, because that failure

harms CREW's ability to provide full, accurate, and current information to the public on a matter of great public interest and urgency.  5 U.S.C. §552(a)(6)(C).

7.  Defendant DHS is an agency within the meaning of 5 U.S.C. §552(f).  Defendant is the federal agency with possession and control of the requested records and is responsible for fulfilling Plaintiff's FOIA request.

## STATUTORY FRAMEWORK

### The Freedom of Information Act

8.  The FOIA, 5 U.S.C. §552, requires agencies of the federal government to release requested records to the public unless one or more specific statutory exemptions apply.

9.  An agency must respond to a party making a FOIA request within 20 working days, notifying that party of at least the agency's determination whether or not to fulfill the request, and of the requester's right to appeal the agency's determination to the agency head.  5 U.S.C. §552(a)(6)(A)(i).

10.  An agency must respond to a FOIA appeal within 20 working days, notifying the appealing party of the agency's determination to either release the withheld records or uphold the denial.  5 U.S.C. §552(a)(6)(A)(ii).

11.  In "unusual circumstances," an agency may delay its response to a FOIA request or appeal, but must provide notice and must also provide "the date on which a determination is expected to be dispatched."  5 U.S.C. §552(a)(6)(B).

12.  This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."  5 U.S.C. §552(a)(4)(B).

13. The FOIA provides a mechanism for disciplinary action against agency officials who have acted inappropriately in withholding records. Specifically, when requiring the release of improperly withheld records, if the Court makes a written finding that "the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously," a disciplinary investigation is triggered. 5 U.S.C. §552(a)(4)(F).

14. The FOIA also requires agencies to promulgate regulations that provide for expedited processing of FOIA requests where the requester has demonstrated a "compelling need" as well as "other cases determined by the agency." 5 U.S.C. §552(a)(6)(E)(i). The statute defines "compelling need" as including requests "made by a person primarily engaged in disseminating information" where there is an "urgency to inform the public concerning actual or alleged Federal Government activity." Id. at §552(a)(6)(E)(v)(III).

15. Defendant DHS's regulations mirror these requirements by providing for expedition upon showing "an urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information." 6 CFR §5.5(d)(1)(ii). The regulations provide further that if the requester is "not a full-time member of the news media," the requester "must establish that he or she is a person whose main professional activity or occupation is information dissemination, though it need not be his or her sole occupation." 6 CFR §5.5(d)(3).

16. Agencies are required to make a determination on a request for expedition within 10 days "after the date of the request," 5 U.S.C. §552(a)(6)(E)(ii)(I), and to give "expeditious consideration" to administrative appeals of such determinations. Id. at §552(a)(6)(E)(ii)(II). DHS regulations also require the Defendant to act on appeals of denials of expedition

"expeditiously."  6 CFR §5.5(d)(4).

17.  Agency decisions to deny or affirm denial of a request for expedition are subject to judicial review "based on the record before the agency at the time of the determination." 5 U.S.C. §552(a)(6)(E)(iii).

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

18.  In the aftermath of hurricane Katrina, myriad news reports concluded that FEMA's reaction to the hurricane was, and continues to be, grossly inadequate.  *See, e.g.*, Spencer S. Hsu, Aide Says FEMA Ignored Warning, *The Washington Post*, October 21, 2005 (attached as Exhibit A); Lara Jakes Jordan, Memo: FEMA Had Problems Before Katrina, *The Associated Press*, October 17, 2005 (attached as Exhibit B).

19.  The gravity of the government's inadequate response to hurricane Katrina prompted both the Senate Homeland Security and Governmental Affairs Committee and the House Committee on Government Reform to investigate the matter.  The preliminary findings of the Committee's members echo media reports that the government failed miserably in dealing with hurricane Katrina and its aftermath.  As Representative Christopher Shays (R-CT), a member of the House Committee, stated recently, "When you have a natural disaster, the president needs to be hands-on, and if anyone in his staff gets in the way, he needs to push them away . . . The response was pathetic."  Eric Lipton, White House Declines to Provide Storm Papers, *The New York Times*, January 25, 2006 (attached as Exhibit C).

20.  E-mails FEMA provided to Congress document a "shocking" disconnect between what actually happened to the flood walls in New Orleans and when it happened as a result of hurricane Katrina, and what the President and top cabinet officials, including DHS Secretary

Michael Chertoff, were told.  Hsu, *The Washington Post*, Oct. 21, 2005.

21.   Those e-mails also reflect a shocking and callous disregard by FEMA officials to the unfolding disaster of hurricane Katrina.  For example, on August 31, 2005, Marty Bahamonde, a FEMA public affairs officer who was the only FEMA representative in New Orleans when hurricane Katrina hit, was sending desperate e-mails to Michael Brown, then-acting director of FEMA, describing a situation "past critical" as "thousands gather[ed] in the streets with no food or water" and "hundreds still being rescued from homes."  E-mail from Marty Balhamonde to Michael D. Brown, August 31, 2005 (attached as Exhibit D).  At the same time, an aide to Michael Brown was scheduling Mr. Brown's appearance on Joe Scarborough's cable television show and stressing that "it is very important that time is allowed for Mr. Brown to eat dinner.  Given that Baton Rouge is back to normal, restaurants are getting busy.  He needs much more that [sic] 20 or 30 minutes."  E-mail from Cindy Taylor to Marty Bahamonde and Michael Widomski, August 31, 2005 (attached as Exhibit E).

22.   Equally disturbing is the detailed evidence DHS and FEMA had before hurricane Katrina hit that the storm's likely impact would be catastrophic.  For example, DHS's National Infrastructure Simulation and Analysis Center prepared a 41-page assessment, which it delivered to the White House in the 48 hours before Katrina hit, that warned that "a storm of Katrina's size would 'likely lead to severe flooding and/or levee breaching' and specifically noted the potential for levee failures along Lake Pontchartrain."  Joby Warrick, White House Got Early Warning on Katrina, *The Washington Post*, January 24, 2006 (attached as Exhibit F).  In that same time period, FEMA presented a computer slide presentation that warned that the approaching storm could "destroy nearly 90 percent of city structures" and displace more than one million residents.

Id.

23.    The urgency to address FEMA's grossly inadequate response to hurricane Katrina was underscored by the series of hurricanes that followed Katrina, including hurricane Rita, which also caused massive damage.  As of November 30, 2005, the "official" close of the hurricane season, there were a record 26 named storms, of which 14 were hurricanes.  As the National Oceanic and Atmospheric Administration ("NOAA") has noted, "[t]he season has been remarkable for its early beginning and number of storms as well as the intensity of the hurricanes, including the most intense hurricane [Katrina] on record for the Atlantic."  NOAA Satellite and Information Service, Climate of 2005 Atlantic Hurricane Season, available at http://lwf.ncdc.noaa.gov/oa/climate/research/2005/hurricanes05.html.  Given that the 2006 Atlantic hurricane season starts on June 1, the congressional committees are rushing to complete their investigations – the House by February 15 and the Senate by mid-March.  Lipton, *The New York Times*, January 25, 2006.

24.    While Congress is laboring to get to the bottom of what went wrong and why, the Bush administration has put obstacles in their path that threaten to undermine Congress's search for the truth.  Senator Joseph Lieberman (D-CT), a member of the Senate committee, described a "near total lack of cooperation that has made it impossible . . . to do the thorough investigation that we have a responsibility to do."  Id.  The White House has refused to turn over many storm-related documents requested by Congress and, according to many committee members, the agencies' responses have been "slow or incomplete."  Id.  Senator Lieberman, along with fellow-committee member Susan Collins (R-ME),  have also complained that they are hampered by the "gag order" that the White House has placed on many agency officials to prevent them from

talking to the committee.  Lara Jakes Jordan, White House slowing Katrina inquiry, senators say,

*The Associated Press*, January 25, 2006 (attached as Exhibit G).  And Senator Lieberman has

singled out DHS as particularly delinquent, producing "too little, too late."  Sen. Lieberman Says

Devastation of Katrina was Predicted 'Over and Over Again,' *U.S. Fed News*, January 24, 2006

(attached as Exhibit H).  Indeed, Senator Lieberman has indicated his agreement with the

assessment of his staff that "DHS has engaged in a conscious strategy of slow walking [the

Committee's] investigation in the hope that we would run out of time to follow the investigation's

natural progression to where it leads."  Id.

### Plaintiff's FOIA Request and Follow-Up

25.  By letter dated September 7, 2005, pursuant to the Freedom of Information Act,

Plaintiff requested that DHS produce all records discussing or mentioning the following:

(i) what portion of the $3.1 billion appropriated to DHS in fiscal year 2005 for emergency
preparedness to "support the Nation's ability to prepare for, mitigate against, respond to and
recover from natural and man manmade disasters" was spent to prepare for potential hurricanes
on the Gulf Coast of the United States and on potential flooding in New Orleans;

(ii) the amount of money diverted from emergency preparedness for and response to
natural disasters to emergency preparedness for and response to acts of terrorism and the
rationale behind any such diversion;

(iii) studies, assessments, presentations, or scenarios of the potential devastation a
powerful hurricane could wreak on the Gulf Coast, including, but not limited to, the eight-day
tabletop exercise conducted in July 2004 and intended to prepare FEMA for a catastrophic
hurricane in New Orleans;

(iv) plans created regarding the federal government's response to any such scenarios;

(v) the potential breaching of the levees that would lead to Lake Pontchartrain flooding
New Orleans and the response to such breaches; and

(vi) communications from anyone employed by or associated with the Army Corps of
Engineers regarding the problems with and weakness of the levees surrounding New Orleans,

the potential breaching of the levees and the consequences of such breaches, as well as proposed repairs or other construction to the levees.

Letter from Melanie Sloan to Jeff Ovall, FOIA/PA Specialist, Office of General Counsel,

FEMA, September 7, 2005 (attached as Exhibit I).

26. CREW's September 7, 2005 FOIA request also sought all documents that discuss or mention:

(i) requests for emergency assistance from local government officials in Mississippi and Louisiana in response to hurricane Katrina;

(ii) requests from local government officials in Mississippi and Louisiana for assistance in preparing for hurricane Katrina, including, but not limited to communications requesting assistance in evacuating residents of Mississippi and Louisiana from the areas in the hurricane's path;

(iii) communications between the White House and FEMA regarding the preparation for and response to the damage caused by hurricane Katrina;

(iv) communications regarding the conditions in the New Orleans Convention Center;

(v) communications regarding the need for transportation to evacuate victims of the hurricane from the city of New Orleans as well as communications regarding the need for food and water for victims stranded in New Orleans;

(vi) communications from Congressman Charles W. Boustany, Jr. (R-LA) requesting federal assistance and any response to Cong. Boustany;

(vii) communications regarding offers by corporations and foreign governments to assist the victims of hurricane Katrina and FEMA's responses to such offers;

(viii) communications between FEMA director Michael Brown and cabinet officials either before or after the hurricane regarding the potential and actual devastation wrought by the hurricane and the federal government's response to the devastation;

(ix) communications regarding the plan to evacuate victims of the hurricane to Charleston, South Carolina and the misrouting of the plane carrying the evacuees to Charleston, West Virginia;

(x) communications regarding the deployment of the National Guard to New Orleans to assist in evacuation and relief efforts;

9

(xi) communications regarding the inclusion of Operation Blessing, a Virginia-based charity run by evangelist and Christian Coalition founder Pat Robertson, on FEMA's primary list of charities to which people were asked to donate money to assist hurricane relief efforts; and

(xii) communications regarding the limitations placed on journalists and photographers including, but not limited to, efforts to prevent photographers from taking pictures of the corpses of hurricane victims in Louisiana and Mississippi.

Id.

27.   In addition, CREW requested that DHS  expedite the processing of CREW's request in light of the compelling need for the requested information.  Id.  As CREW explained, "[t]here is a particular urgency in informing the public about the circumstances surrounding FEMA's response to hurricane Katrina.  Myriad news reports have concluded that FEMA's reaction to the hurricane was, and continues to be, inadequate.  The public, as well as the numerous congressional committees that are considering this matter, have a need to know the true facts underlying the government's response to hurricane Katrina."  Id.

28.   CREW also explained in its request for expedition that "CREW is a non-profit corporation engaged primarily in disseminating information it gathers from a variety of sources, including the Freedom of Information Act, and seeks the information requested in this FOIA for the express purpose of disseminating it to the public."  Id.  As CREW pointed out, like other organizations that the courts have found to satisfy the criteria for expedition, "CREW 'gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience.'"  Id., American Civil Liberties Union v. U.S. Dep't of Justice, 321 F.Supp.2d 24, 30 n.5 (internal quotations omitted).

29.   CREW also requested a waiver of fees associated with processing its request, pursuant to 5 U.S.C. §552(a)(4)(A)(iii).  Id.  CREW explained that the subject of its request

concerns "the operations of the federal government," "the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way," and CREW is making the request "primarily and fundamentally for non-commercial purposes." Id.

30. By letter dated September 20, 2005, Jeffery Ovall, FOIA Specialist, FEMA Office of General Counsel, advised CREW that its request for expedition was denied. Letter from Jeffery Ovall to Melanie Sloan, September 20, 2005 (attached as Exhibit J). The only explanation for FEMA's decision not to grant expedition was that CREW's request "did not specifically address or establish an imminent threat to the life or physical safety of an individual," – a basis for expedition on which CREW did not rely – "or a particular urgency to inform the public beyond the public's right to know about government activity generally." Id.

31. On October 24, 2005, CREW appealed FEMA's decision to deny CREW's request for expedition. Letter from Anne L. Weismann to Freedom of Information Act/Privacy Act Appeals, DHS, October 24, 2005 (attached as Exhibit K). CREW set forth multiple reasons why DHS's decision on expedition was wrong as a matter of law and fact, including how CREW had established a "particular urgency in informing the public about the circumstances surrounding FEMA's response to hurricane Katrina." Id. As CREW explained, the urgency of CREW's need for the information "is underscored by the fact that hurricane Katrina was followed by hurricane Rita, which also caused massive damage," and at that time Florida was bracing for hurricane Wilma. Id. CREW further stated, "If we are to learn from the government's past mistakes and hope to avoid, or at least minimize, the horrendous impact of hurricanes like Katrina and Rita, the public must have immediate access to the kinds of documents CREW has

requested." Id.  Moreover, CREW noted that the documents that have been disclosed as a result of congressional inquiries into hurricane Katrina demonstrate the government's extensive mishandling of, and perhaps even wrongdoing in, its response to the storm, and fully justify CREW's request for expedition.  Id.

32.  Finally, CREW explained that it is "primarily engaged in disseminating information," pursuant to the requirements of 6 CFR §5.5(d)(ii), and that it has published reports and disseminated information "to bring greater attention to the conduct of public officials so that the public will have a more effective voice," citing its website and reports it has issued.  Id. CREW noted that as with the Electronic Privacy Information Center and the American Civil Liberties Union, two organizations that the courts have found satisfy this criteria for expedition, "CREW 'gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience.'" Id. (citations omitted).

33.  By letter dated December 21, 2005, DHS advised CREW that DHS was affirming FEMA's initial decision to deny CREW's request for expedited treatment.  Letter from Maureen Cooney to Anne L. Weismann, December 21, 2005 (attached as Exhibit L).  According to DHS, while hurricane Katrina was "catastrophic, the immediate exigency . . . has passed." Id.  DHS's decision was also based on Ms. Cooney's lack of awareness of any "significant recognized interest of the public that is being compromised in this instance, particularly in view of the Congressional hearings that are taking place on the Federal response to the hurricane." Id. Without categorizing their amount or substance, Ms. Cooney also relied on "materials that are already otherwise publicly available" to justify DHS's decision on expedition.  Id.  DHS also

12

made express that it was not basing its decision on any failure of CREW to demonstrate that it is "'primarily engaged in disseminating information.'" Id.

34.  On the substance of CREW's request, DHS has yet to respond beyond a letter from FEMA on November 9, 2005, noting the agency's need for more time to respond to the request (attached as Exhibit M), and a letter of December 28, 2005, noting that CREW's request "has been merged with the existing requests in this Directorate" (attached as Exhibit N).  Notably absent from this letter was any reference to, much less explanation for, the 300,000 pages of documents FEMA has claimed it produced to Congress.  *See* Lipton, *The New York Times*, January 25, 2006.

35.  CREW has now exhausted its administrative remedies with respect to its request for expedition and with the processing of CREW's FOIA request.  *See*, *e.g*., Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 65 (D.C. Cir. 1990).

## PLAINTIFF'S CLAIMS FOR RELIEF

## CLAIM ONE

### (Failure to Produce Records)

36.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

37.  Plaintiff properly asked for records within DHS's control.

38.  Plaintiff is entitled by law to access to the records requested under the FOIA, unless Defendant makes an explicit and justified statutory exemption claim.

39.  Therefore, Defendant violated FOIA's mandate to release agency records to the public by failing to release the records as Plaintiff specifically requested.  5 U.S.C. §§552(a)(3)(A), 552(a)(4)(B).

## CLAIM TWO

### (Failure to Respond)

40. Plaintiff realleges and incorporates by reference all preceding paragraphs.

41. On September 7, 2005, Plaintiff properly filed a FOIA request with DHS.

42. To date, Plaintiff has not received a substantive response from DHS, and DHS has exceeded the 20-working-day statutory time limit for such a response. 5 U.S.C. §552(a)(6)(A)(I).

43. Therefore, DHS has violated the FOIA's mandate to respond to Plaintiff's FOIA request within the statutory time period.

## CLAIM THREE

### (Improper Denial of Expedition)

44. Plaintiff realleges and incorporates by reference all preceding paragraphs.

45. Plaintiff has demonstrated that it is entitled to expedition of its FOIA request because there is a compelling need for the requested information and because plaintiff is engaged primarily in disseminating information, as contemplated by DHS's regulations, 6 CFR §5.5(d).

46. Therefore, DHS violated FOIA's mandate to expedite Plaintiff's FOIA request and DHS's own regulations when it denied Plaintiff's request for expedition. 5 U.S.C. §552(a)(6)(E); 22 CFR §171.12(b)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Declare that DHS has violated the Freedom of Information Act by failing to lawfully satisfy Plaintiff's FOIA request of September 7, 2005;

(2) Order DHS to respond immediately to Plaintiff's FOIA request;

(3) Declare that DHS violated the Freedom of Information Act and agency regulations when it determined that Plaintiff is not entitled to expedition of its FOIA request and Declare that Plaintiff is entitled to expedition;

(4) Order DHS to expedite immediately its processing of Plaintiff's request;

(5) Award Plaintiff its reasonable attorney fees and litigation costs in this action, pursuant to 5 U.S.C. §552(a)(4)(E); and

(6) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

_____
Melanie Sloan
(D.C. Bar No. 434584)
Anne L. Weismann
(D.C. Bar No. 298190)
Citizens for Responsibility and
  Ethics in Washington
11 Dupont Circle, N.W.
Washington, D.C.  20036
Phone: (202) 588-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated January 30, 2006

15