EXHIBIT A



Copyright 2005 The Washington Post

# The Washington Post

## washingtonpost.com

The Washington Post

October 21, 2005 Friday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 976 words

**HEADLINE: Aide Says FEMA Ignored Warnings**;
Testimony Covers Communication as Levees Breached

**BYLINE:** Spencer S. Hsu, Washington Post Staff Writer

**BODY:**

For 16 critical hours, Federal Emergency Management Agency officials, including former director Michael D. Brown, dismissed urgent eyewitness accounts by FEMA's only staffer in New Orleans that Hurricane Katrina had broken the city's levee system the morning of Aug. 29 and was causing catastrophic flooding, the staffer told the Senate yesterday.

Marty Bahamonde, sent to New Orleans by Brown, said he alerted Brown's assistant shortly after 11 a.m. that Monday with the "worst possible news" for the city: The Category 4 hurricane had carved a 20-foot breach in the 17th Avenue Canal levee.

Five FEMA aides were e-mailed Bahamonde's report of "water flow 'bad' " from the broken levees designed to hold back Lake Pontchartrain. Bahamonde said he called Brown personally after 7 p.m. to warn that 80 percent of New Orleans was underwater and that he had photographed a 200-foot-wide breach.

"FEMA headquarters knew at 11 o'clock. Mike Brown knew at 7 o'clock. Most of FEMA's operational staff knew by 9 o'clock that evening. I don't know where that information went," said Bahamonde, a 12-year FEMA staffer who has worked full time since 2002 as a public affairs official.

Testifying to a bipartisan Senate panel investigating the response to the hurricane, Bahamonde said his accounts were discarded by officials in Baton Rouge and Washington headquarters amid conflicting information.

His disclosures add significantly to public knowledge of how much information Brown and FEMA officials had about the damage Katrina caused, and how soon they were aware of it. The federal government has been widely criticized for its slow, uncoordinated response to the hurricane, which left

1,053 people dead in Louisiana, most of them in New Orleans.

President Bush, Homeland Security Secretary Michael Chertoff, Defense Secretary Donald H. Rumsfeld and Richard B. Myers, then chairman of the Joint Chiefs of Staff, have all said they were told that the city's flood walls did not fail until Aug. 30. They said they assumed that the worst was over during a day-long window when operations could have been launched to rush aid to the Louisiana Superdome or rescue more than 50,000 residents and tourists before streets and homes were flooded.

"This disconnect . . . is beyond disturbing. It's shocking," said Sen. Joseph I. Lieberman (Conn.), the senior Democrat on the Senate Homeland Security and Governmental Affairs Committee, which is leading the investigation.

Bahamonde said he found it "amazing" that New Orleans officials continued to let thousands gather at the Superdome, even though they knew that the area around it was going to flood. Ten people later died at the Superdome.

"Urgent reports did not appear to prompt an urgent response," said panel Chairman Susan M. Collins (R-Maine). She asked "why the city continued to send people to the Superdome, when it appears they should have evacuated the Superdome?"

As recently as this week, Chertoff told a House Katrina investigation, "The report -- last report I got on Monday [Aug. 29] was that the levees -- there had not been a significant breach in the levees. It appeared that the worst was over."

In contrast, Bahamonde, who was dressed in a dark suit and spoke somberly to senators for nearly three hours, said: "I believed at the time and still do today, that I was confirming the worst-case scenario that everyone had always talked about regarding New Orleans."

In a series of increasingly dire, angry e-mails and phone calls, Bahamonde updated Brown, aides and top spokesmen for FEMA beginning Aug. 28 from the New Orleans emergency operations center and then from the Superdome across the street.

"Issues developing at the Superdome. The medical staff at the dome says they will run out of oxygen in about two hours and are looking for alternative oxygen," Bahamonde wrote to FEMA Region VI spokesman David Passey on Aug. 28.

That night, 25,000 people were inside including 400 people with special medical needs and 45 who required hospitalization. The center was short of toilet paper, water and food, the last of which was adequate through Tuesday only because a Coast Guard helicopter crew found and broke into five abandoned FEMA trailer trucks at Bahamonde's direction, Bahamonde said yesterday.

About 7 p.m. Aug. 29, Bahamonde said, he called Brown and warned him of "massive flooding," that 20,000 people were short of food and water at the Superdome and that thousands of people were standing on roofs or balconies seeking rescue.

Brown replied only: "Thank you. I'm going to call the White House," Bahamonde said.

It is unclear what Brown told his superiors or the president's aides. He has testified to receiving "conflicting information" about 10 a.m. Monday that the levees had broken and at noon or 1 p.m. that "the levees had only been topped. So we knew something was going on between 10 and noon on Monday."

Bahamonde contradicted accounts by Brown that FEMA had positioned 12 staffers in the Superdome before the storm, that Bahamonde's reports Monday were "routine" and that FEMA medical personnel were on hand before Tuesday.

At 11:20 a.m. Aug. 31, Bahamonde e-mailed Brown, "Sir, I know that you know the situation is past critical . . . thousands gathering in the streets with no food or water . . . estimates are many will die within hours."

At 2:27 p.m., however, Brown press secretary Sharon Worthy wrote colleagues to schedule an interview for Brown on MSNBC's "Scarborough Country" and to give him more time to eat dinner because Baton Rouge restaurants were getting busy: "He needs much more that 20 or 30 minutes."

Bahamonde e-mailed a friend to "just tell [Worthy] that I just ate an MRE . . . along with 30,000 other close friends so I understand her concern."

Staff researcher Julie Tate contributed to this report.

**LOAD-DATE:** October 21, 2005

EXHIBIT B



Copyright 2005 Associated Press
All Rights Reserved
Associated Press Online

These materials may not be republished without the express written consent of The Associated Press

October 17, 2005 Monday

**SECTION:** WASHINGTON DATELINE

**LENGTH:** 932 words

**HEADLINE:** Memo: **FEMA Had Problems Before Katrina**

**BYLINE:** LARA JAKES JORDAN; Associated Press Writer

**DATELINE:** WASHINGTON

**BODY:**
FEMA struggled to locate food, ice, water and even body bags in the days following Hurricane Katrina, a frantic effort punctuated by bureaucratic chaos, infighting and concerns about media coverage, according to memos obtained Monday by The Associated Press.

"Biggest issue: resources are far exceeded by requirements," wrote William Carwile, the top Federal Emergency Management Agency official in Mississippi in a Sept. 3 e-mail to a state official. "Getting less than 25 percent of what we have been requesting from HQ daily."

The memos underscore how FEMA was overwhelmed and underprepared for Katrina. The e-mails - 25 pages in all - represent a partial response to a request for documents by a House panel investigating the government's slow response to the storm.

Homeland Security Secretary Michael Chertoff is to appear in front of the House panel at a Wednesday hearing. FEMA is an arm of the Homeland Security Department.

Five days after the storm hit on Aug. 29, Michael Brown, then FEMA director, e-mailed an aide saying there had been "no action from us" to evacuate storm victims using planes that airlines had made available.

"This is flat wrong. We have been flying planes all afternoon and evening," FEMA deputy operations director Michael Lowder e-mailed in reply less than 30 minutes later.

A day earlier, a FEMA official in Mississippi received an e-mail asking for Brown's satellite phone number so a senior Pentagon official on the Gulf Coast could call him. "Not here in MS (Mississippi). Is in LA (Louisiana) as far as I know," Carwile e-mailed back, seemingly uncertain on the whereabouts of the government's point man for responding to the disaster. Carwile recently retired from FEMA.

Battling their own difficulties, FEMA officials were less than complimentary of Louisiana officials.

"This one really has me worried," Brown confided in an Aug. 27 e-mail, as the storm bore down on the Gulf Coast. "I wish a certain governor was from Louisiana ... and his emergency manager," Brown e-mailed Craig Fugate, emergency manager in Florida, where Jeb Bush is governor.

A few hours later, Patrick Rhode, FEMA's acting deputy director, e-mailed Brown, "I'm hoping they get serious about evacuating New Orleans."

Florida pitched in with supplies, according to a Sept. 1 e-mail that showed just how badly FEMA needed them two days after the storm inflicted widespread damage across several states and led to flooding in New Orleans.

"Food is also critical. Need MRE (ready to eat meals) and/or heater meals if you have any. Water, ice, food in eastern counties should be your priority. ...

"Also know FL is providing law enforcement. Need all you can send. Public safety major concern (looting etc.) Have used Dixie Co. body bags (250) got more?" Carwile e-mailed Fugate.

Responding, FEMA spokeswoman Natalie Rule said the agency had supplies positioned throughout the Southeast before the storm hit.

"No single e-mail is going to give a clear or accurate picture of the largest federal response mobilization in history," Rule said.

In an interview Monday, Brown said the memos "in general, will show that this was a disaster of catastrophic proportions where communications were difficult at best, and communications were nonexistent at other times."

"It shows at a minimum, for a disaster like that, you don't always have the best information," said Brown, who announced his resignation under fire Sept. 12 and left the agency last week.

In his Aug. 27 e-mail to Fugate, Brown appeared to recognize the disaster's potential, noting: "Look at this scenario compared to the ... planning we did for New Orleans, and well, you get the picture." He was referring to a 2004 FEMA exercise known as Hurricane Pam, a fictional Category 3 storm that planners said would have devastated New Orleans. Katrina was a Category 4 storm.

As Katrina approached, FEMA officials bristled at pressure from the White House to activate a group of strategy advisers as outlined in the National Response Plan that was issued by Homeland Security in January.

"This is the job of long-term recovery ... in the NRP and FEMA is the lead," wrote FEMA deputy chief of staff Brooks Altshuler in an Aug. 28 e-mail to Rhode, which was forwarded to Brown.

"Let them play their raindeer (sic) games as they are not turning around and tasking us with their stupid questions," Altshuler wrote. "None of them have a clue about emergency management or economic impacts for that matter."

Brown said Monday that FEMA officials were concerned the strategy advisers - otherwise known as the interagency incident management group - would be another layer of bureaucracy to cut through.

"We didn't want to deal with it at that point," Brown said.

"The last thing I needed was people tracking down minutiae - 'Was X at Y?' - when we were dealing with much larger issues," he said.

At one point, however, Brown dispatched Carwile to help an employee for an Oklahoma-based food service company find the employee's elderly mother. Brown is from Oklahoma. At another, Brown worked on a staffing organization chart.

The e-mails also show how Brown and his top deputies worried about the media's portrayal of the federal response.

"I know that the media will be out in full force, on the ground, in boats, and in the air, but so will we," Lowder wrote Brown shortly before midnight on Aug. 29.

Two days later, Rhode gave his boss a boost after a news conference with reporters.

"You did a hell of a job on the press conf (sic) this evening!" Rhode wrote in the Sept. 1 e-mail to Brown.

**LOAD-DATE:** October 17, 2005

EXHIBIT C



Copyright 2006 The New York Times Company
The New York Times

January 25, 2006 Wednesday
Correction Appended
Late Edition - Final

**SECTION:** Section A; Column 3; National Desk; Pg. 1

**LENGTH:** 1272 words

**HEADLINE: White House Declines to Provide Storm Papers**

**BYLINE:** By ERIC LIPTON; Adam Nossiter contributed reporting from New Orleans for this article.

**DATELINE:** WASHINGTON, Jan. 24

**BODY:**

The Bush administration, citing the confidentiality of executive branch communications, said Tuesday that it did not plan to turn over certain documents about Hurricane Katrina or make senior White House officials available for sworn testimony before two Congressional committees investigating the storm response.

The White House this week also formally notified Representative Richard H. Baker, Republican of Louisiana, that it would not support his legislation creating a federally financed reconstruction program for the state that would bail out homeowners and mortgage lenders. Many Louisiana officials consider the bill crucial to recovery, but administration officials said the state would have to use community development money appropriated by Congress.

The White House's stance on storm-related documents, along with slow or incomplete responses by other agencies, threatens to undermine efforts to identify what went wrong, Democrats on the committees said Tuesday.

"There has been a near total lack of cooperation that has made it impossible, in my opinion, for us to do the thorough investigation that we have a responsibility to do," Senator Joseph I. Lieberman, Democrat of Connecticut, said at Tuesday's hearing of the Senate committee investigating the response. His spokeswoman said he would ask for a subpoena for documents and testimony if the White House did not comply.

In response to questions later from a reporter, the deputy White House spokesman, Trent Duffy, said the administration had declined requests to provide testimony by Andrew H. Card Jr., the White House chief of staff; Mr. Card's deputy, Joe Hagin; Frances Fragos Townsend, the domestic security adviser; and her deputy, Ken Rapuano.

Mr. Duffy said the administration had also declined to provide storm-related e-mail correspondence and

other communications involving White House staff members. Mr. Rapuano has given briefings to the committees, but the sessions were closed to the public and were not considered formal testimony.

"The White House and the administration are cooperating with both the House and Senate," Mr. Duffy said. "But we have also maintained the president's ability to get advice and have conversations with his top advisers that remain confidential."

Yet even Senator Susan Collins, Republican of Maine, objected when administration officials who were not part of the president's staff said they could not testify about communications with the White House.

"I completely disagree with that practice," Ms. Collins, chairwoman of the Senate Homeland Security and Governmental Affairs Committee, said in an interview Tuesday.

According to Mr. Lieberman, Michael D. Brown, the former director of the Federal Emergency Management Agency, cited such a restriction on Monday, as agency lawyers had advised him not to say whether he had spoken to President Bush or Vice President Dick Cheney or to comment on the substance of any conversations with any other high-level White House officials.

Nevertheless, both Ms. Collins and Representative Thomas M. Davis III, a Virginia Republican who is leading the House inquiry, said that despite some frustration with the administration's response, they remained confident that the investigations would produce meaningful results.

Other members of the committees said the executive branch communications were essential because it had become apparent that one of the most significant failures was the apparent lack of complete engagement by the White House and the federal government in the days immediately before and after the storm.

"When you have a natural disaster, the president needs to be hands-on, and if anyone in his staff gets in the way, he needs to push them away," said Representative Christopher Shays, a Connecticut Republican and member of the House investigating committee. "The response was pathetic."

Even before the House and Senate investigations began, Democrats called for the appointment of an independent commission, like the one set up after the attacks of Sept. 11, 2001, to investigate the response to the most costly natural disaster in United States history. The 9/11 Commission, after extensive negotiations, questioned Mr. Bush and Mr. Cheney and received sworn testimony from Condoleezza Rice, then the national security adviser.

"Our fears are turning out to be accurate," Representative Henry A. Waxman, Democrat of California, said Tuesday. "The Bush administration is stonewalling the Congress."

Mr. Duffy, along with officials from the Departments of Defense and Homeland Security, said that although not every request had been met, the administration had provided an enormous amount of detailed information about nearly every aspect of the federal response to Hurricane Katrina.

The Department of Defense, for example, has provided 18 officials for testimony, and 57 others have been interviewed by Congressional staff members, said Maj. Paul Swiergosz, a Pentagon spokesman. It has also turned over an estimated 240,000 pages of documents.

Russ Knocke, a spokesman for the Homeland Security Department, said his agency, which oversees FEMA, had been similarly responsive, providing 60 officials as witnesses and producing 300,000 pages of documents.

But the White House and other federal agencies have been less helpful, members of the investigating committees said, particularly the Pentagon and Secretary of Defense Donald H. Rumsfeld, who is the subject of the sole subpoena issued so far.

"We have been trying -- without success -- to obtain Secretary Rumsfeld's cooperation for months," Representative Charlie Melancon, Democrat of Louisiana, said in a letter to Representative Davis on Monday. "The situation is not acceptable."

Mr. Davis, in a written response to Mr. Melancon on Tuesday, said he felt that the Pentagon, after the subpoena, had largely honored the committee's requests.

The Congressional investigations began in September, shortly after Hurricane Katrina struck the Gulf Coast, flooding New Orleans, devastating much of the rest of the region and causing more than $100 billion in damage.

Both of the committees are rushing to try to complete their investigations -- the House by Feb. 15, and the Senate by the middle of March -- in part because of the approaching Atlantic hurricane season, which starts on June 1.

The separate action this week by the Bush administration to oppose an effort to create what would have been called the Louisiana Recovery Corporation evoked great disappointment among state officials.

Mr. Baker's bill would have bought out owners of ruined homes, offering them at least 60 percent of their pre-storm equity, while also giving mortgage companies 60 percent of their loans on damaged properties. The bonds needed for the project would have been paid off by selling developers federally acquired land.

"The Baker bill as a tool was very efficient in terms of helping people sell out, or clear title to the land," said Sean Reilly, a member of the Louisiana Recovery Authority. "We're going to have to go back to the drawing board and do the best with the tools we have."

Donald E. Powell, the Bush administration's Gulf Coast recovery coordinator, said in a statement that the government was prepared to help victims in other ways.

"We share the common vision, the common objective of Congressman Baker, to assist uninsured homeowners outside the flood plain," Mr. Powell said.

Mr. Powell's spokeswoman, D. J. Nordquist, said the administration was open to discussion if the community development money turned out to be insufficient.

**URL:** http://www.nytimes.com

**CORRECTION-DATE:** January 28, 2006

**CORRECTION:**

A front-page article on Wednesday about the Congressional investigation of the response to Hurricane Katrina referred incorrectly to testimony sought from Andrew H. Card Jr., the White House chief of staff, and Frances Fragos Townsend, the homeland security adviser. While Democrats on a House

committee asked that the two be called to testify, the committee did not make such a request.

**LOAD-DATE:** January 25, 2006

EXHIBIT D

EXHIBIT 817

**Bahamonde, Marty**

| | |
|---|---|
| **From:** | **Bahamonde. Marty** |
| **Sent:** | **Wednesday, August 31, 2005 11:20 AM** |
| **To:** | 'michael.d.brown@dhs.gov' |
| **Subject** | New orleans |

Sir, I know that you know the situation is past **critical**. Here some things you might not know.
Hotels **are** kicking **people** out, thousands gathering in **the streets** with no food or water. Hundreds still being rescued from homes.

The dying patients at the DMAT tent being medivac. **Estimates** are many will die within **hours.** Evacuation in process. Plans developing for dome evacuation but hotel situation **adding** to problem. **We are** out of food and running out of water **at the** dome, plans in works to address the critical need.

FEMA staff is OK **and holding** own. DMAT staff working in deplorable conditions. **The** sooner **we** can get the medical patients out, the sooner **wecan** get them out.

Phone connectivity impossible

More later

Sent from my BlackBerry Wireless Handheld

EXHIBIT E

## Taylor, Cindy

| | |
|---|---|
| **From:** | Taylor. Cindy |
| **Sent:** | Wednesday, August 31, 2005 2 27 PM |
| **To:** | Bahamonde, Marly; Widomski, Michael |
| **Subject:** | **FW: Scarborough** |

Let me preface by saying I know he needs downtime, but ummm...how much time do each of you need for dinner, including travel time to the restaurants of your choice?

-_--Original Message-----
From: Worthy, Sharon [mailto:Sharon.Worthy@dhs.govl
Sent: Wednesday. August 31, 2005 2:00 PM
To: 'Valerie.Smith@DHS.GOV'
Cc: 'natalie.rule@dhs.gov'; Andrews, Nicol D - Public Affairs; 'cindy.taylor@dhs.gov'
Subject: Scarborough

Please schedule Joe Scarborough this evening for 9pmCST period. Spoke with his producer and told him to call you. Mr. Brown wants to do this one.

Also, it is very important that time is allowed for Mr. Brown to eat dinner. Gievn that Baton Rouge is back to normal, restaurants are getting busy. He needs much more that 20 or 30 minutes. We now have traffic to encounter to get to **and** from **a** location of his choise, followed by wait service from the restaurant staff, eating, etc. Thank you.

Sharon Worthy
Press Secrtary

EXHIBIT F

Case 1:06-cv-00173-RJL     Document 1-2     Filed 01/31/2006     Page 19 of 43



Copyright 2006 The Washington Post

# The Washington Post

## washingtonpost.com

The Washington Post

January 24, 2006 Tuesday
Final Edition

**SECTION:** A Section; A02

**LENGTH:** 700 words

**HEADLINE: White House Got Early Warning on Katrina**

**BYLINE:** Joby Warrick, Washington Post Staff Writer

**BODY:**

In the 48 hours before Hurricane Katrina hit, the White House received detailed warnings about the storm's likely impact, including eerily prescient predictions of breached levees, massive flooding, and major losses of life and property, documents show.

A 41-page assessment by the Department of Homeland Security's National Infrastructure Simulation and Analysis Center (NISAC), was delivered by e-mail to the White House's "situation room," the nerve center where crises are handled, at 1:47 a.m. on Aug. 29, the day the storm hit, according to an e-mail cover sheet accompanying the document.

The NISAC paper warned that a storm of Katrina's size would "likely lead to severe flooding and/or levee breaching" and specifically noted the potential for levee failures along Lake Pontchartrain. It predicted economic losses in the tens of billions of dollars, including damage to public utilities and industry that would take years to fully repair. Initial response and rescue operations would be hampered by disruption of telecommunications networks and the loss of power to fire, police and emergency workers, it said.

In a second document, also obtained by The Washington Post, a computer slide presentation by the Federal Emergency Management Agency, prepared for a 9 a.m. meeting on Aug. 27, two days before Katrina made landfall, compared Katrina's likely impact to that of "Hurricane Pam," a fictional Category 3 storm used in a series of FEMA disaster-preparedness exercises simulating the effects of a major hurricane striking New Orleans. But Katrina, the report warned, could be worse.

The hurricane's Category 4 storm surge "could greatly overtop levees and protective systems" and destroy nearly 90 percent of city structures, the FEMA report said. It further predicted "incredible search and rescue needs (60,000-plus)" and the displacement of more than a million residents.

The NISAC analysis accurately predicted the collapse of floodwalls along New Orleans's Lake Pontchartrain shoreline, an event that the report described as "the greatest concern." The breach of two canal floodwalls near the lake was the key failure that left much of central New Orleans underwater and accounted for the bulk of Louisiana's 1,100 Katrina-related deaths.

The documents shed new light on the extent on the administration's foreknowledge about Katrina's potential for unleashing epic destruction on New Orleans and other Gulf Coast cities and towns. President Bush, in a televised interview three days after Katrina hit, suggested that the scale of the flooding in New Orleans was unexpected. "I don't think anybody anticipated the breach of the levees. They did anticipate a serious storm," Bush said in a Sept. 1 interview on ABC's "Good Morning America."

The reports echo warnings given around the same time by Max Mayfield, head of the National Hurricane Center, who began sounding the alarm when forecasters first placed Katrina on a collision with the Gulf Coast on the evening of Aug. 26. But the FEMA and NISAC reports provided much more detail and covered a wider range of possible consequences, from damaged ports and oil terminals to spikes in energy prices.

The White House declined to comment yesterday on the specifics of the reports but noted that the president has repeatedly acknowledged his displeasure with preparations for Katrina. "No one was pleased with the response by the government -- federal, state or local," spokesman Trent Duffy said. "We have already taken steps to be better prepared for future hurricanes, as you saw in the response to the hurricanes that followed Katrina."

The disclosure of the reports comes as the Senate Homeland Security and Governmental Affairs Committee prepares to convene new hearings today into the federal government's performance during Katrina. Sen. Joseph I. Lieberman (Conn.), the committee's ranking Democrat, responded to the documents in a statement saying the administration's failure to fully heed the warnings of its analysts "compounded the tragedy."

"Two to three days before Katrina hit the Gulf Coast, it became clear that it would be the 'Big One' everyone has been talking about for years," Lieberman said.

**LOAD-DATE:** January 24, 2006

EXHIBIT G

Case 1:06-cv-00173-RJL     Document 1-2     Filed 01/31/2006     Page 22 of 43



Copyright 2006 Associated Press
All Rights Reserved
The Associated Press State & Local Wire

**January** 25, 2006 Wednesday 1:38 AM GMT

**SECTION:** STATE AND REGIONAL

**LENGTH:** 821 words

**HEADLINE:** White House slowing **Katrina inquiry,** senators say

**BYLINE:** By LARA JAKES JORDAN, Associated Press Writer

**DATELINE:** WASHINGTON

**BODY:**


The White House is crippling a Senate inquiry into the government's sluggish response to Hurricane Katrina by barring administration officials from answering questions and failing to hand over documents, senators leading the investigation said Tuesday.

In some cases, staff at the White House and other federal agencies have refused to be interviewed by congressional investigators, said the top Republican and Democrat on the Senate Homeland Security and Governmental Affairs Committee. In addition, agency officials won't answer seemingly innocuous questions about times and dates of meetings and telephone calls with the White House, the senators said.

A White House spokesman said the administration is committed to working with separate Senate and House investigations of the Katrina response but wants to protect the confidentiality of presidential advisers.

"No one believes that the government responded adequately," said Sen. Joe Lieberman, D-Conn. "And we can't put that story together if people feel they're under a gag order from the White House."

Sen. Susan Collins of Maine, the committee's Republican chair, said she respects the White House's reluctance to reveal advice to President Bush from his top aides, which is generally covered by executive privilege.

Still, she criticized the dearth of information from agency officials about their contacts with the White House.

"We are entitled to know if someone from the Department of Homeland Security calls someone at the White House during this whole crisis period," Collins said. "So I think the White House has gone too far in restricting basic information about who called whom on what day."

She added, "It is completely inappropriate" for the White House to bar agency officials from talking to

the Senate committee.

White House spokesman Trent Duffy said the administration's deputy homeland security adviser, Ken Rapuano, has briefed House and Senate lawmakers on the federal response. A "lessons learned" report from Homeland Security Adviser Frances Fragos Townsend also is expected in coming weeks, Duffy said.

But he defended the administration's decision to prohibit White House staffers or other presidential advisers from testifying before Congress.

"There is a deliberate process, and the White House has always said it wants to cooperate with the committee but preserve any president's ability to get advice from advisers on a confidential basis," Duffy said. "And that's a critical need for any U.S. president and that is continuing to influence how we cooperate with the committees."

Collins and Lieberman sidestepped questions about whether they plan to subpoena the White House to get the information they seek, though Collins said she does not believe subpoenaing the Homeland Security Department is necessary.

The Senate inquiry is scheduled to conclude in March with a report detailing steps the federal government took and didn't take to prepare for the Aug. 29 storm.

Investigators have interviewed about 260 witnesses from federal, state and local governments and the private sector. Additionally, the committee has received an estimated 500,000 documents including e-mails, memos, supply orders and emergency operation plans outlining Katrina-related communications among all levels of government.

But Lieberman said the Justice and Health and Human Services departments "have essentially ignored our document requests for months" while HHS has refused to allow interviews of its staff. He described the Homeland Security response as "too little, too late."

Christina Pearson, spokeswoman for Health and Human Services, disputed Liberman's characterization of the agency's response. "We've produced an extensive range of documents in response to the committee's request, well over 40,000 pages," she said. As for witnesses, Pearson was vague. "We're working with them," she said.

Collins offered a rosier view of Homeland Security's cooperation, noting that Deputy Secretary Michael Jackson and department chief of staff John Wood were scheduled to talk to investigators later this week.

A special House committee created to review the government's readiness for Katrina is to release its findings by Feb. 15. Although Rep. Tom Davis, R-Va., the panel's chairman, earlier considered subpoenaing the White House, the panel backed away after the Rapuano briefing.

The panel ultimately did subpoena the Pentagon for Katrina documents, but one lawmaker, Rep. Charlie Melancon, D-La., said he believes Defense Secretary Donald H. Rumsfeld has not handed over enough to fully comply with the legal order.

But in a letter to Melancon on Tuesday, Davis said he is satisfied the Pentagon has complied with the subpoena, which yielded "massive mounds of documents," including classified materials from Rumsfeld.

On the Net:

Homeland Security Department: http://www.dhs.gov

Health and Human Services Department: http://www.hhs.gov

Justice Department: http://www.usdoj.gov

**LOAD-DATE:** January 25, 2006

EXHIBIT H



Copyright 2006 HT Media Ltd.
All Rights Reserved
US Fed News

January 24, 2006 Tuesday 5:11 AM EST

**LENGTH:** 1620 words

**HEADLINE: SEN. LIEBERMAN SAYS DEVASTATION OF KATRINA** WAS PREDICTED 'OVER AND OVER AGAIN'

**BYLINE:** US Fed News

**DATELINE:** WASHINGTON

**BODY:**


The ranking Democratic member of the Senate Committee on Homeland Security and Governmental Affairs issued the following statement:

Homeland Security and Governmental Affairs Committee Ranking Member Joe Lieberman, D-Conn., delivered the following statement today at the Committee's opening round of investigative hearings.

Hearing Statement Prepared for Sen. Joseph Lieberman

"Preparing for a Catastrophe: The Hurricane Pam Exercise"

January 24, 2006

Washington, DC

Thank you Madam Chairman. Today we begin an intensified series of hearings that will continue over the next three weeks into government's preparations before Hurricane Katrina hit the Gulf Coast on Aug. 29 of last year - and government's response in the hours, days, weeks and now months that followed.

The title of today's hearing is "Preparing for a Catastrophe: The Hurricane Pam Exercise."

"Preparing for Catastrophe." The phrase makes a mournful sound when said against the backdrop of the misery and destruction the world saw on television last year and that members of this committee still saw last week when we toured the Gulf Coast.

Katrina was a very powerful storm, but it would have caused much less misery and destruction had we prepared for it better.

This August 30th headline in the New Orleans Times-Picayune says it all: "Katrina: The Storm We've Always Feared."

The storm we've always feared! The storm people knew would hit one day. The storm they actually practiced for in the Hurricane Pam exercise during 2004 that is the topic of this hearing.

In the 10 committee hearings on Katrina we have already held, in our staff interviews of more than 200 witnesses, in our review of tens of thousands of documents, we have already learned enough to be not just disappointed, but infuriated by the poor performance of all levels of government in Katrina.

These conclusions should compel us to achieve top-to-bottom reform of the way we prepare for and respond to disasters.

Katrina was not just predictable. It was predicted over and over again. As the FEMA Coordinator for the Hurricane Pam exercise told our investigative staff last Friday, Katrina was a "replication" of Pam.

And Pam itself was staged in response to the flooding in Biloxi, Mississippi, in 1998, caused by Hurricane Georges that made state and local officials of the Gulf Coast realize they could be overwhelmed if and when "the big one" hit.

The Hurricane Pam exercise in the spring and summer of 2004, actually and eerily predicted the emergency response crises and devastation that occurred last August and September, when Katrina hit the Gulf Coast.

Today we will hear from four witnesses who participated in the Hurricane Pam exercise who will tell us that the problems we saw last August and September were known long before Katrina hit the Gulf Coast and even long before Pam predicted them.

The fictional hurricane of the Pam exercise was a slow moving Category 3 hurricane, quite similar to Hurricane Katrina, except that in the fictional exercise, Pam hit New Orleans directly and Katrina ultimately blew about 15 miles to the east of the city.

Had Katrina hit New Orleans dead on, the Pam exercise predicted 67,000 deaths. That gives us some idea of how much more catastrophic Katrina could have been and how urgent disaster preparations should have been.

The Pam exercise also put state and local governments, and FEMA and its parent, the Department of Homeland Security, on notice that the people of New Orleans would experience exactly the problems that we all witnessed with anguish last August and early September, including:

The inability to evacuate 100,000 people, who were left behind in the City after landfall;

The desperate and horrific problems at the Superdome;

The breakdown in the supply chain;

The over-reliance on too few to accomplish search and rescue missions with inadequate equipment;

The inability of leaders at every level of government to maintain accurate and current situational awareness.

The Hurricane Pam exercise also predicted widespread flooding throughout New Orleans, hospitals and nursing homes under water, hundreds of thousands of people displaced, and local first responders

incapacitated.

The Pam exercise gave DHS and FEMA explicit notice that state and local governments would be overwhelmed when New Orleans got hit with a catastrophic hurricane, and that comprehensive federal assistance would be necessary.

But despite these dire warnings from Pam, preparations for Katrina were shockingly poor.

Two to three days before Katrina hit the Gulf Coast, it became clear that it would be catastrophic.

In fact, as Katrina approached the Gulf Coast two days before landfall - Saturday, August 27 - FEMA issued a briefing document at 9 a.m. declaring that the Pam "Exercise projection is exceeded by Hurricane Katrina real life impacts."

The failure to heed the fictional Pam's many warnings compounded the tragedy when Katrina hit in real time and with full fury. That is the sad story our committee's hearings will tell in detail in the three weeks ahead.

Before closing, and as we embark on this stage of the investigation, I feel compelled to say a few words about the conduct of this investigation.

First, I want to thank Chairman Collins and her staff for working with me and my staff to conduct an aggressive and thoroughly bi-partisan investigation.

This has been our norm on the Committee and I don't want the Chairman to think I take it for granted. We have worked together as all investigative committees should, without partisan division and with a united view that our goal is to uncover what happened with respect to Hurricane Katrina so we can make sure our government is much better prepared the next time disaster strikes.

Unfortunately, though, I cannot give the same high marks to the Executive branch for its response to our investigation.

The problems begin at the White House, where there has been a near total lack of cooperation that has made it impossible, in my opinion, for us to do the thorough investigation we have a responsibility to do.

Why does this matter? Here is an example:

The Committee has found that on the evening before Katrina made landfall, DHS circulated to federal agencies sitting in the Homeland Security Operations Center a report that the storm had been upgraded to Category 5 and that:

"Any storm rated Category 4 or greater . . . will likely lead to severe flooding and/or levee breaching. This could leave the New Orleans metro area submerged for weeks or months."

The White House received this report at 1:47 a.m. on Monday - several hours before Katrina made landfall.

What happened to that report? Why was the President left so uninformed that he said four days later: "I don't think anyone anticipated the breech of the levees."

At this point we can't answer that critical question because the White House has produced just a very

small portion of the documents we requested.

They have opposed efforts to interview their personnel. And they have hindered our ability to obtain information from other federal agencies regarding White House actions in response to Katrina.

Almost every question our staff has asked federal agency witnesses regarding conversations with, or involvement of, the White House has been met with a response that they could not answer on direction of the White House. There's been no assertion of executive privilege; just a refusal to answer.

Indeed, at yesterday's staff interview of former FEMA Director Michael Brown, agency lawyers advised Mr. Brown not to say whether he spoke to the President or the Vice President, or comment on the substance of conversations he had with any other high level White House officials.

This assertion of a kind of virtual immunity for the White House from inquiry has frustrated our Committee's ability to learn - and tell - the full story of Katrina and it is unacceptable.

While some agencies, like FEMA and the United States Coast Guard have been cooperative, a number of other executive agencies - including the Department of Justice and the Department of Health and Human Services - essentially ignored our document and information requests for months and to this day have produced much less than half the information we asked for.

HHS has not produced a single requested witness for an interview.

The Department of Homeland Security, which is at the center of our investigation because it has overall responsibility for national disaster preparedness and response, has produced too little, too late.

Repeated requests for critical witnesses and documents have been ignored or delayed.

It took until two weeks ago for DHS to give us a single witness the Committee requested outside of FEMA or the Coast Guard to interview.

My staff believes that DHS has engaged in a conscious strategy of slow walking our investigation in the hope that we would run out of time to follow the investigation's natural progression to where it leads.

At this point, I cannot disagree.

I hope the Committee will continue to pursue all these unanswered questions asked of the Executive branch until we have the information to answer the questions that must be answered.

In the meantime, because hurricane season begins again in June and the threat of a terrorist attack persists, these hearings must go forward and the Committee's report must be written with a sense of urgency to help America's government be better prepared to protect America's people from disasters - natural or unnatural - history tells us will come.

In that spirit, I look forward to today's witnesses and those that will follow in the three weeks ahead.

Contact: Leslie Phillips, 202/224-2627.

**LOAD-DATE:** January 26, 2006

EXHIBIT I

September 7, 2005

Jeff Ovall
FOIA/PA Specialist
Office of the General Counsel
Federal Emergency Management Agency
500 C Street, S.W., Room 840
Washington, D.C. 20472

**BY FAX:     202-646-3958**

Dear Mr. Ovall:

Citizens for Responsibility and Ethics in Washington ("CREW") makes this request for records, regardless of format, medium, or physical characteristics, and including electronic records and information, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. §552, et seq, and U.S. Department of Homeland Security ("DHS") regulations, 6 CFR Part 5.

This request is for any and all records relating to the Federal Emergency Management Agency's ("FEMA") response to hurricane Katrina. Specifically, CREW seeks all memoranda, communications and records of any kind and from any source, regardless of format, medium, or physical characteristics, from January 1, 2001 to the present, discussing or mentioning in any way:

1) what portion of the $3.1 billion appropriated to DHS in fiscal year 2005 for emergency preparedness to "support the Nation's ability to prepare for, mitigate against, respond to and recover from natural and man manmade disasters"[1] was spent to prepare for potential hurricanes on the Gulf Coast of the United States and on potential flooding in New Orleans;

2) the amount of money diverted from emergency preparedness for and response to natural disasters to emergency preparedness for and response to acts of terrorism and the rationale behind any such diversion;

3) studies, assessments, presentations, or scenarios of the potential devastation a powerful hurricane could wreak on the Gulf Coast, including, but not limited to the eight-day tabletop exercise conducted in July 2004 and intended to prepare FEMA a catastrophic hurricane in New Orleans;

4) plans created regarding the federal government's response to any such scenarios;

5) the potential breaching of the levees that would lead to Lake Pontchartrain flooding New Orleans and the response to such breaches; and

---

[1] DHS Fact Sheet; www.dhs.gov/dhspublic/display?content=4065.

Mr. Jeff Ovall
September 7, 2005
Page Two

6) communications from anyone employed by or associated with the Army Corps of Engineers regarding the problems with and weakness of the levees surrounding New Orleans, the potential breaching of the levees and the consequences of such breaches, as well as proposed repairs or other construction to the levees.

CREW further seeks all memoranda, communications and records of any kind and from any source, regardless of format, medium, or physical characteristics, from August 26, 2005 through to the present, discussing or mentioning in any way:

1) requests for emergency assistance from local government officials in Mississippi and Louisiana in response to hurricane Katrina;

2) requests from local government officials in Mississippi and Louisiana for assistance in preparing for hurricane Katrina, including, but not limited to communications requesting assistance in evacuating residents of Mississippi and Louisiana from the areas in the hurricane's path;

3) communications between the White House and FEMA regarding the preparation for and response to the damage caused by hurricane Katrina;

4) communications regarding the conditions in the New Orleans Convention Center;

5) communications regarding the need for transportation to evacuate victims of the hurricane from the city of New Orleans as well as communications regarding the need for food and water for victims stranded in New Orleans;

6) communications from Congressman Charles W. Boustany Jr. (R-LA) requesting federal assistance and any response to Cong. Boustany;

7) communications regarding offers by corporations and foreign government's to assist the victims of the hurricane Katrina and FEMA's responses to such offers;

8) communications between FEMA director Michael Brown and cabinet officials either before or after the hurricane regarding the potential and actual devastation wrought by the hurricane and the federal government's response to the devastation;

9) communications regarding the plan to evacuate victims of the hurricane to Charleston, South Carolina and the misrouting of the plane carrying the evacuees to Charleston, West Virginia;

Mr. Jeff Ovall
September 7, 2005
Page Three

10) communications regarding the deployment of the National Guard to New Orleans to assist in evacuation and relief efforts;

11) communications regarding the inclusion of Operation Blessing, a Virginia based charity run by evangelist and Christian Coalition founder Pat Robertson, on FEMA's primary list of charities to which people were asked to donate money to assist hurricane relief efforts; and

12) communications regarding the limitations placed on journalists and photographers, including, but not limited to, efforts to prevent photographers from taking pictures of the corpses of hurricane victims in Louisiana and Mississippi.

We seek records of any and all kind, including electronic records, audiotapes, videotapes, and photographs. Our request includes any telephone messages, voice mail messages, daily agenda and calendars, information about scheduled meetings and/or discussions, whether in-person or over the telephone, agendas for those meetings and/or discussions, participants included in those meetings and/or discussions, minutes of any such meetings and/or discussions, the topics discussed at those meetings and/or discussions, e-mail regarding meetings and/or discussions, e-mail or facsimiles sent as a result of those meetings and/or discussions, and transcripts or notes of any such meetings and/or discussions.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide it with an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 949 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for each withholding it must discuss the consequences of supplying the sought-after information." King v. U.S. Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224 (citing Mead Data Central v. U.S. Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. §552(b). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt, and how the material is dispersed throughout the document. Mead Data Central, 566 F.2d at 261. Claims

Mr. Jeff Ovall
September 7, 2005
Page Four

of nonsegregability must be made with the same degree of detail as required for claims of exemptions in a <u>Vaughn</u> index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

## Request for Expedition

Pursuant to 5 U.S.C. §552(a)(6)(E)(I) and Department of Homeland Security, 6 CFR §5.5(d), CREW requests that FEMA expedite the processing of this request in light of the compelling need for the requested information. CREW is a non-profit corporation engaged primarily in disseminating information it gathers from a variety of sources, including the Freedom of Information Act, and seeks the information requested in this FOIA request for the express purpose of disseminating it to the public. CREW's website, www.citizensforethics.org, contains numerous examples of its efforts, including a link to a site, prepared by CREW, that details the many activities of Jack Abramoff, a Washington lawyer and lobbyist currently under criminal investigation, and the many powerful individuals linked to Abramoff through such things as campaign contributions. CREW recently published a report, *Addicted to Porn: How Members of Congress Benefit from Pornography*, that details the campaign contributions that members of Congress had received from corporations involved in pornography. It is CREW's hope that by disseminating this type of information, the public will be better able to evaluate the actions of our public officials and will have a more effective voice, including in the voting booth.

As with the Electronic Privacy Information Center and the ACLU, two organizations that the courts have found satisfy the criteria necessary to qualify for expedition,[2] CREW "'gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience.'" <u>ACLU</u>, 321 F.Supp.2d. at 30 n.5, *quoting* <u>EPIC</u>, 241 F.Supp.2d at 11.

There is a particular urgency in informing the public about the circumstances surrounding FEMA's response to hurricane Katrina. Myriad news reports have concluded that FEMA's reaction to the hurricane was, and continues to be, inadequate. The public, as well as the numerous congressional committees that are considering this matter, have a need to know the true facts underlying the government's response to hurricane Katrina. Accordingly, CREW requests that this request be expedited.

## Fee Waiver Request

In accordance with 5 U.S.C. §552(a)(4)(A)(iii), CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the

---

[2] *See* ACLU v. U.S. Dep't of Justice, 321 F.Supp.2d 24, 30 (D.D.C. 2004); EPIC v. Dep't of Defense, 241 F.Supp.2d 5, 11 (D.D.C. 2003).

Mr. Jeff Ovall
September 7, 2005
Page Five

operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the individuals and organizations that influence or attempt to influence the litigating position of the United States of America in a lawsuit of major and far-reaching consequences.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to the protection of the citizen's right to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. CREW uses a combination of research, litigation, and advocacy to advance its mission. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memorandums, reports or press releases.

Under these circumstances, CREW fully satisfied the criteria for a fee waiver.

If you have any questions about this request or foresee any problems in releasing fully the requested records on an expedited basis, please call either Melanie Sloan or Anne Weismann at (202) 588-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact our office immediately upon making such determination. Please send the requested documents to Melanie Sloan, Citizens for Responsibility and Ethics in Washington, 11 Dupont Circle, N.W., 2nd Floor, Washington, D.C. 20036.

Sincerely,

Melanie Sloan
Executive Director

EXHIBIT L



Privacy Office
**U.S. Department of**
**Homeland Security**
Washington, DC 20528

December 21, 2005

Anne L. Weismann, Chief Counsel
Citizens for Responsibility and Ethics in Washington
11 DuPont Circle, N.W., 2nd Floor
Washington, DC  20036                      Re:  Appeal No. 06-13

Dear Ms. Weismann:

I am writing in response to your appeal from the action of the Federal Emergency
Management Agency (FEMA) denying expedited access to documents requested under
the Freedom of Information Act (FOIA) by Citizens for Responsibility and Ethics in
Washington (CREW).  CREW'S FOIA request sought all of FEMA records relating to its
response to Hurricane Katrina.

As you know, under the FOIA, a party may seek expedited processing and release of
requested records rather than awaiting processing under the standard "first-in, first-out"
procedure in cases where a compelling need is demonstrated or in other cases as
determined by the agency.  See 5 U.S.C. § 552(a)(6)(E)(i)(I)-(II). The Department of
Homeland Security's rules for expedited access can be found at 6 C.F.R. § 5.5, and allow
for expedition where there is "an urgency to inform the public about an actual or alleged
federal government activity, if made by a person primarily engaged in disseminating
information" DHS rules require that an individual meeting this condition for expedition
"establish a particular urgency to inform the public about the government activity
involved in the request, beyond the public's right to know about government activity
generally." CREW's justification for its request for expedited treatment relies upon the
need "a full airing of what happened at FEMA, and elsewhere in the federal government
as a result of, and in response to, hurricane Katrina."

After carefully considering your appeal, I have decided to affirm FEMA's initial decision
denying your request for expedited treatment.  The standard of "urgency to inform"
requires that the information requested should pertain to a matter of a current exigency to
the American public and that a reasonable person might conclude that the consequences
of delaying a response to a FOIA request would compromise a significant recognized
interest.  According to the legislative history of this FOIA provision, the public's right to
know, although a significant and important value, would not, by itself, be sufficient to

satisfy this standard. H.R. Rep. No. 104-795, at 26 (1996).   Although catastrophic, the immediate exigency of Hurricane Katrina has passed.  Additionally, I am aware of no significant recognized interest of the public that is being compromised in this instance, particularly in view of the Congressional hearings that are taking place on the Federal response to the hurricane.

As an overarching principle, the pertinent legislative history of the expedited access provision counsels that "[t]he specified categories for compelling need are intended to be narrowly applied." H.R. Rep. No. 104-795, at 26 (1996).   In light of the materials that are already otherwise publicly available, the orderly production of materials about Hurricane Katrina pursuant to FOIA's standard first in, first-out procedure, so as not to prejudice other, more senior FOIA requesters, is warranted.  My decision is not based on whether CREW has adequately demonstrated that it is "primarily engaged in disseminating information."

If you are dissatisfied with my action on your appeal, you are entitled to seek judicial review consistent with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Maureen Cooney
Acting Chief Privacy Officer

2

EXHIBIT M

U.S. Department of Homeland Security
500 C Street, SW
Washington, DC 20472



November 9, 2005

Ms. Melanie Sloan
Citizens for Responsibility and Ethics in Washington
11 DuPont Circle, NW, 2nd Floor
Washington, DC 20036

RE:  Freedom of Information Act Request
      FOIA Case No.:  05-263

Dear Ms. Sloan:

This is to provide you with an update on the status of your Freedom of Information Act (FOIA) request dated September 7, 2005.

The Department of Homeland Security (DHS)/Federal Emergency Management Agency (FEMA) have been inundated with FOIA requests related to our preparation and response efforts to Hurricanes Katrina, Rita and Wilma.  These are in addition to the many requests we receive on a regular basis.  All requests require thorough research and legal analysis at various levels prior to final action.  These are time-intensive but necessary procedures.

The responsive records for many of these requests are complex and extremely voluminous in nature, requiring search and review of thousands of pages.  In addition, the search for responsive documents involves the need to search in multiple FEMA offices located in Washington, DC and various Joint Field Offices and Regional Offices set up in multiple locations.  As stated in my initial acknowledgment letter, many of our employees who conduct searches for responsive records have been deployed to the Gulf Coast to aid in the aftermath of Hurricanes Katrina and Rita.  Consequently, with limited personnel resources and a large number of complex requests continuing to stream in, we have developed a backlog of pending FOIAs.

To ensure that the Department makes consistent FOIA releases of Hurricane Katrina related documents with maximum information released equitably to all FOIA requesters, and due to the heightened interest in Hurricane Katrina documents, the review process necessitates a final review by the DHS Disclosure Office.

It remains our policy to process FOIA requests in the order in which they are received in accordance with FOIA law.  As of November 9, 2005, our records indicate there are 175 open FOIA requests in our non-expedited queue.  Your request is number 55 of 175.  An extension of time to respond to your request is required in order to ensure the orderly processing of your request.

Please be assured, however, that we are making every effort to complete your request as soon as practicable, and will provide you with additional updates as necessary. Where possible, we will provide interim releases while we continue to forge through the remaining responsive records.

Thank you for your interest in FEMA's programs and policies.


Sincerely,


Jeff Ovall
FOIA Specialist
Office of General Counsel

EXHIBIT N

U.S. Department of Homeland Security
Washington, DC 20528



**Homeland Security**

December 28, 2005

Ms. Melanie Sloan
CREW
11 Dupont Circle, N.W. 2nd Floor
Washington, D.C. 20036

Re: DHS/OS/PO 05-776

Dear Ms. Sloan:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS) requesting any and all records relating to DHS's response to Hurricane Katrina for the specified time frames of January 1, 2001, to the present and August 26, 2005 to the present located within the offices of State and Local Coordination and the Office of Domestic Preparedness (ODP). Your request was received by the Preparedness Directorate on December 12, 2005.

Your request has been merged with the existing requests in this Directorate. Please be assured that your request will still be processed in the order that it was originally received by DHS Headquarters and not the date it was received in this office.

In order to maintain continuity, we will still refer to the identifier that DHS assigned to your request, DHS/OS/PO 05-776. Please refer to this identifier in any future correspondence. Our address is: Preparedness Directorate – Disclosure Office, 3801 Nebraska Avenue, NW, Nebraska Avenue Complex, Building 81, Washington, DC 20528.

If you would like further information, please contact me at 202-282-8522 or by email at sandy.ford@dhs.gov.

Sincerely,

Sandy Ford Page

Sandy Ford Page, CIPP
Director, Disclosure Office
Preparedness Directorate