## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND | ) | |
| ETHICS IN WASHINGTON, | ) | |
| 11 Dupont Circle, N.W. | ) | |
| Washington, D.C. 20036 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-173 (RJL) |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF HOMELAND SECURITY, | ) | |
| Washington, DC 20528 | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### AND MEMORANDUM OF POINTS AND AUTHORITIES IN
### SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO (D.C. Bar 418925)
Peter M. Bryce (NY and IL Bars)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6138
Washington, D.C. 20001
Telephone: (202) 616-8335
Fax: (202) 616-8470
peter.bryce@usdoj.gov
Attorneys for Defendant

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND )
ETHICS IN WASHINGTON, )
11 Dupont Circle, N.W. )
Washington, D.C. 20036 )
)
         Plaintiff, )
)   Civil Action No. 06-173 (RJL)
         v. )
)
UNITED STATES DEPARTMENT )
OF HOMELAND SECURITY, )
Washington, DC 20528 )
)
         Defendant. )
_____)

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the United States

Department of Homeland Security hereby respectfully moves this Court for judgment as a matter

of law. The reasons for this motion are set forth in defendant's Memorandum of Points and

Authorities in Support of the Motion for Summary Judgment filed herewith.


Dated: February 20, 2007         Respectfully submitted,

                               PETER D. KEISLER
                               Assistant Attorney General

                               JEFFREY A. TAYLOR
                               United States Attorney

                               ELIZABETH J. SHAPIRO (D.C. Bar 418925)
                               Assistant Director

                                /s/ Peter M. Bryce_____
                               Peter M. Bryce (NY and IL Bars)
                               Trial Attorney

U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6138
Washington, D.C.  20001
Telephone: (202) 616-8335
Fax: (202) 616-8470
peter.bryce@usdoj.gov
Attorneys for Defendant

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND      )
ETHICS IN WASHINGTON,                )
11 Dupont Circle, N.W.               )
Washington, D.C. 20036               )
                                     )
            Plaintiff,               )
                                     )     Civil Action No. 06-173 (RJL)
        v.                           )
                                     )
UNITED STATES DEPARTMENT             )
OF HOMELAND SECURITY,                )
Washington, DC 20528                 )
                                     )
            Defendant.               )
_____)

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This case arises out of a Freedom of Information Act ("FOIA") request that plaintiff

Citizens for Responsibility and Ethics in Washington ("plaintiff" or "CREW") submitted to the

defendant United States Department of Homeland Security, and specifically to its component,

the Federal Emergency Management Agency ("FEMA" or "defendant"), on September 7, 2005.

Plaintiff's request sought eighteen categories of documents relating to FEMA's preparation for

and response to Hurricane Katrina.  Defendant conducted a thorough search for responsive

documents, and released, in whole or in part, approximately 7,468 pages of records to the

plaintiff.  The only remaining issue in this case is the propriety of defendant's withholdings

under FOIA Exemption 5.  As demonstrated extensively below, and in the detailed declarations

and Vaughn index submitted herewith, defendant's Exemption 5 withholdings are sound, and all

reasonably segregable non-exempt information has been released to plaintiff.  Accordingly, this

Court should grant summary judgment in favor of defendant.

## BACKGROUND

**I.    Background**

**A.    FEMA and the Emergency Response Process**

FEMA is the federal agency responsible for administering and coordinating the Federal government's response to Presidentially-declared disasters and emergencies under the Robert T. Stafford Disaster Relief and Emergency Assistance Act.  Declaration of Adrian Sevier ("Sevier Decl.") ¶¶ 4-7.[1]  In responding to a disaster, FEMA must act quickly to assess the situation and the needs of the State and local governments so that it can deploy disaster workers to set up an infrastructure capable of coordinating the response and recovery effort.  <u>Id.</u> ¶ 8.  Every disaster is unique, and the manner in which FEMA coordinates its response efforts is tailored to the demands of each specific disaster.  <u>Id.</u>  Even prior to a disaster or emergency declaration, FEMA may deploy federal resources for transportation, communications, public works, hazardous materials response, engineering, firefighting, emergency management, mass care, public health, urban search and rescue, energy and public safety in the disaster area.  <u>Id.</u> ¶ 9.  Once a disaster has been declared, FEMA may establish Joint Field Offices ("JFOs"), which are multi-agency coordination centers designed to enable effective and efficient coordination of federal disaster efforts.  <u>Id.</u> ¶ 10.  FEMA also may establish Disaster Recovery Centers ("DRCs"), which are one-stop centers for FEMA, other federal agencies, state and local governments, and voluntary organizations to provide information for disaster victims.  <u>Id.</u> ¶ 11.

In the initial stages of a disaster response, coordinating the response and recovery efforts

---

[1]  The Declaration of Adrian Sevier, Acting Deputy Chief Counsel in FEMA's Office of Chief Counsel is attached to this memorandum as Exhibit A.  All further references will be to the Declaration itself.

is intense and extremely fast-paced. FEMA personnel must make virtually instantaneous decisions under pressure regarding a wide variety of issues often requiring quick discussion and deliberation.  Id. ¶ 12.  Based on the communications available, these deliberations and decisions may occur person-to-person, by telephone or via electronic mail (e-mail) sent or received using either personal computers or portable electronic mail devices such as Blackberrys.  Id.  Because the entire process is focused on problem-solving during an emergency, the manner in which such decisions are made can be highly informal.  Id.  Conversations may be initiated in one form and then expanded to include other personnel as needed.  Id.  For example, a phone conversation between FEMA personnel may lead to an expanded e-mail discussion to get additional information and input from other personnel.  Id.  Further, in some instances, issues will be raised and deliberations will take place which, for any number of reasons, will not result in any sort of final agency decision on a particular issue.  Id.

### B.    Hurricane Katrina

On August 29, 2005, Hurricane Katrina struck Louisiana, Mississippi, Alabama, and Florida, causing massive and overwhelming flood conditions and severe damage.  Id. ¶ 13.  That same day, the President of the United States declared numerous counties and parishes in these four States to be "major disasters," and also declared a state of "emergency" for the forty-four States and the District of Columbia that accepted Hurricane Katrina evacuees.  Id.  As a result of these declarations, Secretary Chertoff named then-FEMA Director and DHS Under Secretary Michael D. Brown the Principal Federal Official for incident management purposes.  Id. ¶ 14.

Hurricane Katrina presented FEMA with circumstances unlike any other faced by the Agency in its history.  Id. ¶ 15.  Congress appropriated $60 billion in two increments of emergency supplemental funding for FEMA to respond to Hurricane Katrina.  Id.  These two

emergency supplemental appropriations comprise the largest emergency supplemental funding that FEMA has ever received.  Hundreds of thousands of residents of Louisiana, Mississippi and Alabama evacuated or were evacuated from their homes in response to Hurricane Katrina, the largest group of persons displaced by a natural disaster in FEMA's history.  Id.  To respond to the disaster, FEMA hired more staff and opened more JFOs, DRCs and temporary call centers than it ever had for any one disaster.  Id.  FEMA also worked with a larger than usual number of Federal, state, local and private sector partners to coordinate response and recovery activities. Id.

Due to these extraordinary circumstances, and the heightened nature of the response, FEMA engaged in substantially more of the fast-paced and informal decision-making described above, supra at 4, than would take place in a typical disaster response.  Id. ¶ 16.  Recognizing that its traditional methods would not be satisfactory given the extraordinary degree of damage caused by Hurricane Katrina, FEMA exercised its statutory authority to develop unique programs to respond to the disaster, provide housing for evacuees, and disburse disaster assistance.  Id.  The significance of the disaster and magnitude of the damage engaged the active participation of high-level government officials, including those within the White House.  Id. Further, in the initial phases of the disaster, this decision-making process often took place via e-mail, in part because of the fast and informal nature of the discussions, and in part because of significant disruptions to communications across the Gulf Coast area.  Id.

## II    Procedural History

Due to the enormous public interest in Hurricane Katrina, and the federal government's response, FEMA found itself inundated by a massive and unprecedented amount of requests for information, including requests from investigating governmental bodies, as well as a deluge of

Katrina-related FOIA requests.  <u>Id.</u> ¶¶ 17-18.  Plaintiff submitted its FOIA request on September

7, 2005, to FEMA's Office of General Counsel.  <u>Id.</u> ¶ 19.  Plaintiff sought access to "any and all

records relating to the Federal Emergency Management Agency's ("FEMA") response to

hurricane Katrina.  Specifically, CREW seeks all memoranda, communications and records of

any kind and from any source, regardless of format, medium, or physical characteristics from

January 1, 2001 to the present, discussing or mentioning in any way," the following:

> 1) what portion of the $3.1 billion appropriated to DHS in fiscal year 2005 for emergency preparedness to "support the Nation's ability to prepare for, mitigate against, respond to and recover from natural and man manmade [sic] disasters" was spent to prepare for potential hurricanes on the Gulf Coast of the United States and on potential flooding in New Orleans;
>
> 2) the amount of money diverted from emergency preparedness for and response to natural disasters to emergency preparedness for and response to acts of terrorism and the rationale behind any such diversion;
>
> 3) studies, assessments, presentations, or scenarios of the potential devastation a powerful hurricane could wreak on the Gulf Coast, including, but not limited to the eight-day tabletop exercise conducted in July 2004 and intended to prepare FEMA a catastrophic hurricane [sic] in New Orleans;
>
> 4) plans created regarding the federal government's response to any such scenarios;
>
> 5) the potential breaching of the levees that would lead to Lake Pontchartain flooding New Orleans and the response to such breaches; and
>
> 6) communications from anyone employed by or associated with the Army Corps of Engineers regarding the problems with and weakness of the levees surrounding New Orleans, the potential breaching of the levees and the consequences of such breaches, as well as proposed repairs or other construction to the levees.

<u>Id.</u>

In addition, plaintiff sought access to "all memoranda, communications and records of

any kind and from any source, regardless of format, medium, or physical characteristics, from

August 26, 2005 through to the present, discussing or mentioning in any way:"

1) requests for emergency assistance from local government officials in Mississippi and Louisiana in response to hurricane Katrina;

2) requests from local government officials in Mississippi and Louisiana for assistance in preparing for hurricane Katrina, including, but not limited to communications requesting assistance in evacuating residents of Mississippi and Louisiana from the areas in the hurricane's path;

3) communications between the White House and FEMA regarding the preparation for and response to the damage caused by hurricane Katrina;

4) communications regarding the conditions in the New Orleans Convention Center;

5) communications regarding the need for transportation to evacuate victims of the hurricane from the city of New Orleans as well as communications regarding the need for food and water for victims stranded in New Orleans;

6) communications from Congressman Charles W. Boustany Jr. (R-LA) requesting federal assistance and any response to Cong. Boustany;

7) communications regarding offers by corporations and foreign government's [sic] to assist the victims of the hurricane Katrina and FEMA's responses to such offers;

8) communications between FEMA director Michael Brown and cabinet officials either before or after the hurricane regarding the potential and actual devastation wrought by the hurricane and the federal government's response to the devastation;

9) communications regarding the plan to evacuate victims of the hurricane to Charleston, South Carolina and the misrouting of the plane carrying the evacuees to Charleston, West Virginia;

10) communications regarding the deployment of the National Guard to New Orleans to assist in evacuation and relief efforts;

11) communications regarding the inclusion of Operation Blessing, a Virginia based charity run by evangelist and Christian Coalition founder Pat Robertson, on FEMA's primary list of charities to which people were asked to donate money to assist hurricane relief efforts; and

12) communications regarding the limitations placed on journalists and photographers, including but not limited to, efforts to prevent photographers from taking pictures of the corpses of hurricane victims in Louisiana and Mississippi.

Id. ¶ 20.

On September 20, 2005, FEMA acknowledged plaintiff's request in writing.  Id. ¶ 21. FEMA stated, inter alia, that it would comply with the request to the extent permissible by law and that any records not subject to an exemption would be forwarded promptly upon completion of FEMA's search and review process.  Id.  FEMA thereafter conducted a comprehensive search for documents responsive to Plaintiff's request.  Id. ¶ 22.  Ultimately, FEMA identified approximately 8100 pages of documents as responsive to this request.  Id.  Of the approximately 8100 total pages of documents processed in response to plaintiff's FOIA request, 2267 pages were released to Plaintiff in their entirety, and 5201 pages were redacted in part and released to plaintiff.  Id.

In processing plaintiff's request, FEMA made significant and organized efforts to segregate non-exempt portions of documents from exempt portions in order to provide plaintiff with all responsive information not subject to FOIA exemptions.  Id. ¶ 23.  Four attorneys and one FOIA Specialist participated in the review process.  Id.  They reviewed all responsive documents page by page, and line by line.  Id.  The documents were then redacted and the redacted versions released to Plaintiff as indicated in the table set out below.  Id.  Documents that contained no portions subject to FOIA exemptions were released in their entirety.  Id.  This review and redaction process was long and arduous, involving countless hours of review and consultation among the lawyers involved.  Id.  The process continued throughout the course of this litigation, and in the course of preparing for summary judgment.  Id.

As a result of this extensive review and processing of potentially responsive records, FEMA released, in whole or in part, 7468 pages of these documents to plaintiff in a series of sixteen releases from January 24, 2006 to February 17, 2007.  Id. ¶ 24.  These releases are

summarized in the following table.

| Date of Release | Total Pages Released | Status of Documents Released |
|---|---|---|
| January 24, 2006 | 748 | 734 released in their entirety<br>14 released in part |
| April 4, 2006 | 43 | 43  released in their entirety |
| April 26, 2006 | 5 | 2  released in their entirety<br>3 released in part |
| May 2, 2006 | 33 | 31  released in their entirety<br>2 released in part |
| May 2, 2006 | 441 | 424 released in their entirety<br>17 released in part |
| May 5, 2006 | 1326 | 406 released in their entirety<br>920 released in part |
| May 5, 2006 | 928 | 135 released in their entirety<br>793 released in part |
| June 2, 2006 | 3 | 3 released in their entirety |
| June 6, 2006 | 4 | 4 released in part |
| June 14, 2006 | 2 | 2 released in their entirety |
| June 14, 2006 | 23 | 13 released in their entirety<br>10 released in part |
| June 14, 2006 | 1151 | 1151 released in part |
| June 30, 2006 | 96 | 96 released in part |
| July 7, 2006 | 1786 | 154 released in their entirety<br>1632 released in part |

| Date of Release | Total Pages Released | Status of Documents Released |
| --- | --- | --- |
| January 12, 2007 | 327 | 293 released in their entirety<br>34 released in part |
| February 17, 2007 | 552 | 27  released in their entirety<br>525 released in part |

Id.

After plaintiff filed this lawsuit, the parties conferred and agreed to narrow the scope of the litigation.  Id. ¶ 26.  In particular, plaintiff agreed that it would only challenge defendant's decision to withhold materials in whole or in part under FOIA Exemption 5.  See 5 U.S.C. § 552(b)(5).  Id.  Plaintiff would not challenge the adequacy of defendant's search for records, or its decision to withhold materials under FOIA exemptions other than Exemption 5.[2]  Id. Accordingly, the only remaining issue in this litigation is the propriety of FEMA's withholdings under Exemption 5.  Id.  See also Joint Briefing Schedule Statement (D/E 8) filed July 26, 2006.

Of the approximately 8100 pages defendant processed in this litigation, 1503 were withheld in whole or in part on the basis of Exemption 5.  Id. ¶ 27. Of that number, 870 were redacted pursuant to Exemption 5 and released in part to the plaintiff, and 633 were withheld in full on the basis of that exemption.  Id.

## ARGUMENT

### I.  Standards for Summary Judgment In FOIA Cases

Most FOIA cases are properly resolved through summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See, e.g., Miscavige v. Internal Revenue Service, 2 F.3d

---

[2]  FEMA also withheld materials under Exemptions 2 and 6.  Sevier Decl. n. 5.

366, 369 (11th Cir. 1993) ("Generally, FOIA cases should be handled on motions for summary judgment, once the documents in issue are properly identified."). Summary judgment should be freely granted where, as in this case, there are no material facts at issue and the agency is entitled to judgment as a matter of law. See Alyeska Pipeline Serv. Co. v. Envir. Protection Agency, 856 F.2d 309, 314-15 (D.C. Cir. 1988).

The FOIA requires agencies to release documents responsive to a properly submitted request, except for those documents (or portions of documents) subject to any of nine statutory exemptions to the general disclosure obligation. See 5 U.S.C. §§ 552(a)(3), (b)(1)-(b)(9). In discharging its obligation, an agency must conduct a reasonable search for responsive documents, and, in withholding a document (or portions thereof) on the basis of one of the statutory exemptions, must release those portions of the document containing reasonably segregable non-exempt material. 5 U.S.C. § 552(b). A court reviews an agency's response to a FOIA request *de novo*. See 5 U.S.C. § 552(a)(4)(B). The government bears the burden of justifying its withholdings under one or more of the FOIA's nine exemptions. See Johnson v. Executive Office for U.S. Attorneys, 310 F.3d 771, 774 (D.C. Cir. 2002).

The government may satisfy this burden through submission of an agency declaration and/or index, describing the withheld material with reasonable specificity, explaining the reasons for non-disclosure, and demonstrating with reasonable specificity that reasonably segregable material has been released. See U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 753 (1989). An agency should prevail upon a motion for summary judgment if the declarations submitted are clear, specific, reasonably detailed, and describe the withheld information in a factual and nonconclusory manner. See Miller v. Casey, 730 F.2d 773, 776 (D.C. Cir. 1984); Hemenway v. Hughes, 601 F. Supp. 1002, 1004 (D.D.C. 1985)

10

(recognizing that in FOIA cases, summary judgment hinges not on the existence of genuine issue of material fact but rather on the sufficiency of agency affidavits).

## II.    Defendant Is Entitled To Summary Judgment

As noted, see supra at 9, the only remaining issue in this litigation is whether defendant properly withheld material pursuant to Exemption 5 of the FOIA.  Exemption 5 exempts from mandatory disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  In particular, it "exempts those documents . . . that are normally privileged in the civil discovery context." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975).  Put another way, Exemption 5 incorporates the common law privileges, including the deliberative process privilege, the attorney-client privilege, and the work product doctrine.  See Nat'l Labor Relations Bd. v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975).  Exemption 5 also has been held to incorporate the presidential communications privilege, which is rooted in separation of powers concerns.  See,, e.g., Judicial Watch v. Department of Justice, 365 F.3d 1108, 1113 (D.C. Cir. 2004).

In this case, defendant has withheld materials, in whole and in part, under Exemption 5 because they are protected under the deliberative process privilege, the presidential communications privilege, attorney-client privilege, and/or work product doctrine.  Descriptions of the withheld materials, as well as the factual predicates for the withholdings are set out in detail in the two attached declarations of Adrian Sevier and Joel B. Bagnal.  In addition, the Vaughn Index, attached as Exhibit 4 to the Sevier Declaration, provides more individualized descriptions and explanations of the Exemption 5 withholdings.  Finally, to the extent that much of this Exemption 5 material was released in part, additional information about the withheld materials can be gleaned from the redacted versions of the documents themselves, which are

attached to the Sevier Declaration as Exhibit 5.   As explained below, and as amply demonstrated in these supporting documents, defendant's Exemption 5 withholdings are sound, and it has released all reasonably segregable non-exempt responsive information to plaintiff.  Accordingly, the Court should enter summary judgment for defendant.

### A.     Defendant Has Properly Withheld Materials Under Exemption 5, The Deliberative Process Privilege

The bulk of Exemption 5 material is withheld because it is protected by the deliberative process privilege.  Documents covered by the deliberative process privilege and therefore exempt from release include those "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated."  NLRB, 421 U.S. at 150.  As the Supreme Court has explained:

> The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.

Department of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1,  9-10 (2001) (internal quotation marks and citations omitted).  "[E]fficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to 'operate in a fishbowl.'"  EPA v. Mink, 410 U.S. 73, 87 (1973) (abrogated by statute on other grounds, Pub. Law No. 93-502, 88 Stat. 1561 (1974)).

"In deciding whether a document should be protected by the privilege [courts] look to whether the document is 'predecisional' [–] whether it was generated before the adoption of an agency policy [–] and whether the document is 'deliberative' [–] whether it reflects the give-and-take of the consultative process."  Coastal States Gas Corp. v.

Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).  "To establish that the document is predecisional, the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role the documents at issue played in that process."  Judicial Watch v. Export-Import Bank, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (citing Formaldehyde Inst. v. HHS, 889 F.2d 1118, 1223 (D.C. Cir. 1989)).  In addition, "[t]here should be considerable deference to the [agency's] judgment as to what constitutes . . . 'part of the agency give-and-take – of the deliberative process – by which the decision itself is made.'"  Chemical Mfrs. Ass'n v. Consumer Prod. Safety Comm'n, 600 F. Supp. 114, 118 (D.D.C. 1984) (quoting Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975)).  The agency is best situated "to know what confidentiality is needed 'to prevent injury to the quality of agency decisions . . . .'"  Chemical Mfrs., 600 F. Supp. at 118 (quoting NLRB, 421 U.S. at 151).

In this case, defendant has identified four general categories of documents that are protected, in whole or in part, under the deliberative process privilege: (1) Hurricane Katrina E-mails; (2) Hurricane Preparedness Documents; (3) Transcripts of video teleconferences held by FEMA ("VTC Transcripts); and (4) documents relating to litigation brought by the Cable News Network ("CNN Litigation Documents").  Sevier Decl. ¶ 30.  Each of these categories of materials, and the corresponding bases for protection under the deliberative process privilege, is discussed below.

### 1.    *Hurricane Katrina E-mail*

This category of documents includes several hundred pages of e-mail, e-mail chains, and various attachments to e-mails that reflect discussions both within FEMA, and between FEMA and other entities within the federal Executive Branch, in the days

immediately before and after Hurricane Katrina struck the Gulf Coast of the United

States.  Sevier Decl. ¶ 31.  See Bates Nos. 1-6; 8-38; 40-64; 1203-1207; 1349-1431;

1436-1437; 1439; 1441-1499; 1504-1507; 1509-1524; 1526-1529; 1531-1550;

1553-1611 1615-1625; 1627-1646; 1650-1652; 1655-1658; 1660-1671; 1672-1696;

1703-1748; 1750-1758; 1771-1773; 1781; 1789-1793; 1804-1834; 1839-1840;

1845-1855; 1865-1879; 1883-1938.  These material reflect inter-agency and intra-agency

discussions of various issues bearing on the agency's preparation for and response to

Hurricane Katrina.  Sevier Decl. ¶ 31.  Participants in these discussions included various

FEMA officials involved in that response.  Id.  In addition, many of the e-mails reflect

communications among FEMA officials and officials from other participating federal

Executive Branch agencies, as well as communications between FEMA and senior

presidential advisors (or their staff) in the White House.  Id.

     The Hurricane Katrina E-mail materials withheld under Exemption 5, deliberative

process privilege, reflect deliberations within the agency, with other agencies, and with

officials at the White House regarding the government's response to Hurricane Katrina.[3]

Id. ¶ 33.  Issues addressed include, but are not limited to: (1) personnel and staffing

choices; (2) coordinating responses to specific emergency conditions caused by

Hurricane Katrina; (3) developing responses to Katrina-related inquiries from other

agencies, state and local officials, the media, private citizens, and others; (4) funding and

---

[3] Hurricane Katrina E-mail materials withheld or redacted pursuant to the deliberative process privilege include Bates Nos. 1-38; 40-47, 51-64, 116, 153, 1349-1385, 1387-1424, 1426-1431, 1436-1437, 1439, 1441-1446, 1450-1499, 1504-1507, 1509-1517.6, 1522, 1524, 1526-1529, 1531-1611, 1615-1619.18, 1623-1625, 1627-1646, 1655-1657, 1660-1671, 1672-1694, 1703-1748, 1750-1758, 1771-1773, 1774.1-1774.7, 1781, 1789-1793, 1804-1813, 1815-1834, 1839-1840, 1847-1855, 1865-1877, 1878-1879, 1883-1910, 1914-1925, 1926.1-1926.7, 1929-1938.

availability of monetary assistance to state and local governments and private citizens affected by Hurricane Katrina; (5) potential disaster and emergency declarations; (6) coordinating assistance from other federal agencies; (7) rescue and evacuation efforts; and (8) contracting for relief services.  Id.  All of these issues arose in the context of larger policy deliberations about how to most effectively respond to the extraordinarily difficult challenges that arose in the wake of Hurricane Katrina.  Id.

The e-mail deliberations reflected in the withheld material were a critical part of this larger deliberative process.  Id. ¶ 34.  The sheer magnitude and far-reaching effects of this disaster created the need for quick, efficient and highly flexible deliberations.  Id. The agency had to address countless issues as they arose in real-time, and do so while accounting for urgent and rapidly changing circumstances.  Id.  Due to the time constraints, the exigencies of the problems presented, and the sheer number of issues, the formalities of more typical agency deliberations could not always be observed. More formal procedural memoranda and analyses were seldom used, but rather replaced with fast-paced e-mail exchanges that often shifted rapidly from one topic to the next.  Id. This environment also created a particular need for free and unconstrained deliberations among all participating agency officials, superiors and subordinates alike.  Id.  E-mail communications in the affected disaster area were the most reliable in many areas due to communications disruptions and were especially conducive to the sorts of fast-paced, informal deliberations described above.  Id.  Indeed, e-mail deliberations often functioned as a surrogate for real-time conversations that occur in person or over the telephone.  Id.

These e-mail discussions are protected by the deliberative process privilege.  The discussions occurred while the decision-making process was ongoing, and are thus

predecisional to the final policy decisions made or, where no final decision was reached, to the ongoing and evolving decisionmaking process that occurred in the days immediately before and after Hurricane Katrina struck the Gulf Coast.  Id. ¶ 35.  E.g., Quarles v. Dep't of the Navy, 893 F.2d 390, 392 (D.C. Cir. 1990) (materials are pre-decisional where they are "prepared in order to assist in arriving at . . . decision[s]").  The redacted material is also deliberative because it constitutes part of the give-and-take of that consultative process.  Sevier Decl. ¶ 35.  They include recommendations, suggestions, opinions, debate, requests for advice, or otherwise preliminary evaluations bearing on the numerous issues arising out of that catastrophe.  Id.  As noted, these exchanges often acted as an effective substitute for, or supplement to, real-time conversations, reflecting precisely the sort of non-final assessments, impressions and exchanges that constitute the initial process whereby agencies make decisions and formulate policies.  Id.  See Hornbostel v. Department of the Interior, 305 F. Supp. 2d 21, 31 (D.D.C. 2003) (holding that "emails exchanging thoughts and opinions about various legal and policy decisions . . . are all part of the group thinking and preliminary actions encompassed by the policy making process in an agency" and are thus properly withheld under Exemption 5, the deliberative process privilege).

Release of these pre-decisional, deliberative materials would squarely implicate the concerns that the deliberative process privilege is meant to address.  Sevier Decl. ¶ 36.  As explained in the Sevier Declaration, release would have a chilling effect on deliberations that would undermine the quality of FEMA's (and other agencies') decision-making process in emergency response situations.  Id.  See Formaldehyde Inst. v. Dep't of Health and Human Serv., 889 F.2d 1118, 1122 (D.C. Cir. 1989) (disclosure of

documents "would expose an agency's decision making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions"); <u>Access Reports v. Dep't of Justice</u>, 926 F.2d 192, 195 (D.C. Cir. 1991) ("key question" in identifying deliberative material is whether disclosure would "discourage candid discussion within the agency") (citations and internal formatting omitted).  This concern is especially acute in emergency situations, where the exigencies of the situation often call for advice that is forcefully-worded or blunt, and for consideration of alternatives that might in retrospect seem ill-advised once all relevant facts are known.  Sevier Decl. ¶ 36.  In short, disclosure would impair and interfere with the deliberative process in situations where free and uninhibited deliberation is most important.  <u>Id.</u>

Disclosure also likely would lead to public confusion to the extent that the opinions, initial positions, and individual suggestions reflected in these emails would be perceived as official agency policy or otherwise final agency decisions.  <u>Id.</u> 37.  Public confusion is particularly likely here because of the necessarily informal nature of the discussions.  <u>Id.</u>  Due to the urgency and rapidly changing nature of the situation, e-mail deliberations at times would shift quickly from one topic to another, or address issues in a truncated or shorthand manner.  <u>Id.</u>  Sometimes e-mail exchanges would appear incomplete or out of context because such exchanges comprised only part of larger deliberations that also included real-time conversations via telephone or face-to-face meetings.  <u>Id.</u>  All of these factors combined to exacerbate the danger of public confusion that would occur if these pre-decisional deliberative materials were released.  <u>Id.</u>  <u>See</u> <u>Russell v. Dep't of the Air Force</u>, 682 F.2d 1045, 1049 (D.C. Cir. 1982) (en banc)

(Exemption 5 helps prevent the public from misconstruing the views of an individual agency official for the views of the agency as a whole).

### 2.    *Hurricane Preparedness Documents*

This category of documents includes approximately 485 pages of drafts, briefings, planning documents, notes and e-mails that were generated primarily by FEMA's Response Division and were withheld, in whole or in part, on the basis of Exemption 5, the deliberative process privilege. Sevier Decl. ¶ 47. See Bates Nos. 420-792; 796-798; 800-883; 885-911. Response Division activities encompass: (1) the coordination of all Federal emergency management response operations, response planning and logistics programs; and (2) the integration of Federal, State, Tribal and local response programs to ensure the efficient and effective delivery of immediate emergency assistance to individuals and communities impacted by major disasters, emergencies or acts of terrorism. Sevier Decl. ¶ 47.

Hurricane preparedness documents include the following categories: (1) Catastrophic Planning Section documents. Id. ¶ 48. In 2001, FEMA initiated steps to create a Catastrophic Planning Section within FEMA's Response Division; however, FEMA ultimately did not create such a section. Id. Some of the documents that were withheld were drafted in anticipation of creating this section. Id. (2) Southeast Louisiana Catastrophic Hurricane Planning Project documents. Id. In 2003, FEMA embarked on a "catastrophic planning" initiative and the initial focus for the project was Southeast Louisiana. Id. FEMA held several catastrophic planning workshops to frame discussions to identify and qualify the scale of requirements needed to build a plan for responding a catastrophic hurricane scenario (Hurricane "Pam"). Id. Some of the documents that were

withheld were drafted for this planning exercise and, for the majority of those documents that were withheld, FEMA has released a final version of the drafts. Id. (3) Miscellaneous Response Division documents. Id. Some of the activities of the planning section of the Response Division involve documents created to shape the goals and direction of the Division. Id. Some of the documents that FEMA withheld were drafted as part of these ongoing decision-making processes and include internal plans, goals and status updates. Id.

As further indicated in the Index, these hurricane preparedness materials are protected by the deliberative process privilege because they are both pre-decisional and deliberative. Id. ¶ 49. They are pre-decisional because they were created in the course of the above-described, ongoing decision-making processes, and because they predate, and relate to, decisions regarding what actions should be taken with respect to the various described initiatives. Id. Although some of these ongoing processes may never have resulted in a "final" decision — for example, no Catastrophic Planning Section was ever established — they all constitute part of the FEMA Response Division's decision-making processes and predate any final decision. Id. See Export-Import Bank, 108 F. Supp. 2d at 35. The materials are deliberative because they reflect the give-and-take of consultations that occurred in those decision-making processes. Sevier Decl. ¶ 49. See Coastal States, 617 F.2d 866. All of them reflect opinions, recommendations, analyses, and opinions of FEMA staff in connection with the various hurricane preparedness initiatives. Sevier Decl. ¶ 49.

Many of the withheld documents, for example, are drafts prepared by FEMA personnel in connection with hurricane preparedness exercises. Id. ¶ 50. See Bates Nos.

420-650. Such documents are protected under the deliberative process privilege because the process whereby FEMA develops a draft into a final version of a document is inherently predecisional and deliberative. E.g., Exxon Corp. v. Dep' t of Energy, 585 F. Supp. 690, 697 (D.D.C. 1983) ( "[d]raft documents by their very nature, are typically predecisional and deliberative"); Dudman Communications Corp. v. Dep't of the Air Force, 815 F.2d 1565, 1569 (D.C. Cir. 1987) (disclosure of "decisions to insert or delete material or to change a draft's focus or emphasis – would stifle the creative thinking and candid exchange of ideas necessary to produce good historical work"). Disclosure of the drafts at issue here would have a chilling effect on the drafting process and lead to public confusion. Sevier Decl. ¶ 50. E.g., Russell v. Dep't of the Air Force, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (recognizing that disclosure of draft manuscript could stifle candor in the drafting process and lead to confusion of the public). Moreover, because the drafting process revealed by these documents is itself deliberative, there is no reasonably segregable, non-exempt information that can be disclosed from the drafts. Sevier Decl. ¶ 50.

The materials also include various plans, briefings, and status reports prepared in connection with efforts to develop a Catastrophic Planning Section, the Catastrophic Planning exercises, and other ongoing initiatives at FEMA's Response Division. Id. ¶ 51. Bates Nos. 651-787; 812-883; 885-902; 911. These materials are both pre-decisional and deliberative to the formulation of policy decisions in connection with the developing the Response Division initiatives. Sevier Decl. ¶ 51. Most are "working" documents that evolved over time, as deliberations progressed. Id. Thus, like the draft documents, these materials reflect pre-decisional, preliminary ideas about how ultimately to best

20

implement these catastrophic planning initiatives.  Id.  Similarly, these sorts of materials

are an essential part of FEMA's deliberations in shaping final policies and procedures for

responding to emergencies.  Id.  In other words, the "documents contain[] the opinions,

speculations, suggestions, updates, corrections, and proposed plans involved in the

decision-making process behind defendant's project[s]."  Hornbostel v. Department of

the Interior, 305 F. Supp. 2d 21, 31 (D.D.C. 2003).  See also, e.g., id. (disclosure of

"work plans, status reports, briefings, opinion papers, and proposals" would "stifle the

candor necessary in an agency's policy making process"); Thompson v. Dep't of the

Navy, 1995 WL 527344, at *4 (D.D.C. 1997); Hunt v. U.S. Marine Corps, 935 F. Supp.

46, 52 (D.D.C. 1996) ("point papers" prepared in the "midst of [agency's] deliberative

process to assist officers in their formulation of a final decision" exempt from

disclosure); Klunzinger v. IRS, 27 F. Supp. 2d 1015, 1026-27 (W.D. Mich. 1998)

(briefing paper for Commissioner exempt).  There are no responsive non-exempt portions

of these documents.  Sevier Decl. ¶ 51.

Finally, the Hurricane Preparedness materials include e-mails reflecting the

preliminary deliberations, and thoughts and opinions of the authors.  Id. ¶ 52.  See Bates

Nos. 788-792; 796-798; 800-803; 806-811; 903-910.  These materials contain

handwritten notes and edits on e-mails and other documents, as well as e-mail exchanges

reflecting the preliminary ideas and deliberations on the catastrophic planning issues

addressed.  Sevier Decl. ¶ 52.  Such issues include, for example, funding and budgetary

issues, and issues relating to contracting, evacuation, and coordination with other federal

agencies.  Id.  These sorts of informal, very preliminary thoughts and exchanges are

pre-decisional to various policy issues bearing on catastrophic planning.  Id.  They are

also deliberative in that they reflect the opinions and recommendations of agency officials on these issues.  Id.  Like the Hurricane Katrina e-mail deliberations described above, supra at 13-14, these informal exchanges and notes function as a surrogate for extemporaneous reflection and conversations, and constitute an essential part of the individual and group thinking that make up the policy making process within the agency. Id.  See, e.g., Hornbostel, 305 F. Supp. 2d at 31 (holding that such email exchanges and notes are thus properly withheld under Exemption 5, the deliberative process privilege); Judicial Watch of Florida, Inc. v. U.S. Dep't of Justice, 102 F. Supp. 2d 6, 12-15 & n.7 (D.D.C. 2000) (handwritten notes appropriately withheld because notes are related to decisionmaking process) (citing cases).

### 3.    VTC Transcripts

This category of documents includes approximately 355 pages of transcripts of video teleconferences ("VTCs") held by FEMA during its response to Hurricane Katrina. Sevier Decl. ¶ 44.  See Bates Nos. 65-419.  Participants in the VTCs included FEMA officials and other responders to Hurricane Katrina, including representatives of other federal agencies and representatives from affected states.  Sevier Decl. ¶ 44.  In total, FEMA redacted only three lines on two separate pages of the hundreds of pages in this category, Bates Nos. 116 & 153, pursuant to Exemption 5, the deliberative process privilege.  Id.  The redacted portions reflect statements and input by FEMA officials regarding drafts of pending disaster declarations.  Id.  The disaster declaration process is invoked once FEMA receives a request from affected states for a formal disaster declaration.  Id.  FEMA subsequently analyzes any such request and prepares

recommendations regarding the request for consideration and review by the President and his advisors. Id.

The redacted portions are pre-decisional and deliberative and thus properly withheld under Exemption 5, the deliberative process privilege. Id. ¶ 45. The process by which a FEMA draft evolves into a final document is inherently pre-decisional and deliberative. Id. Further, comments made in the drafting process are also pre-decisional and deliberative because they reflect the agency's preliminary thoughts and opinions given in the course of developing a final version of the document. Id. Supra at 20. If FEMA staff believed that the drafting process and their contributions thereto were open to public scrutiny, it would chill deliberations in the emergency declarations process and ultimately jeopardize the quality of recommendations made to the White House. Id. See Exxon Corp., 585 F. Supp. at 697; Dudman Communications Corp., 815 F.2d at 1569; Russell, 682 F.2d at 1048.

### 4. *CNN Litigation Documents*

This category of documents includes approximately 133 pages of documents, including e-mails, e-mail chains and various attachments that were prepared in response to a federal lawsuit brought by the Cable News Network ("CNN") and were withheld in full on the basis of Exemption 5, the work product doctrine, and in part under Exemption 5, the attorney-client and deliberative process privileges. Sevier Decl. ¶ 54. See Bates 912-1044. On September 9, 2005, CNN filed a lawsuit against FEMA in the United States District Court for the Southern District of Texas (Case # CV H-05-3170). Sevier Decl. ¶ 54. CNN sought relief in the form of a temporary restraining order and preliminary injunction, arguing that FEMA had violated CNN's First Amendment rights.

Id. These e-mails were sent or received by FEMA's attorneys responding to this litigation, as well as attorneys for the United States Department of Homeland Security (DHS), the Department of Justice (DOJ) and the Department of Defense (Army) (DOD). Id.  The materials contain descriptions and discussions of the proceedings, as well as strategies and recommendations in responding to the litigation.  Id.

As explained below, these documents are properly withheld in full under Exemption 5, work product doctrine, and in part under Exemption 5, the attorney-client privilege, infra at 31, but they are also protected in part under the deliberative process privilege.  In particular, these documents contain material that is both pre-decisional and deliberative.  Sevier Decl. ¶ 56.  Such material is pre-decisional because it predates, and relates to decisions that were made about how to respond to the CNN litigation, which was on-going at the time the documents were prepared, and it is deliberative because it reflects the advice and opinions of the attorneys involved in formulating that response. Id.  See Cities Service Co.  v. Federal Trade Comm'n, 627 F. Supp. 827, 836 (D.D.C. 1984) (documents prepared in anticipation of litigation and thus protected under the work product privilege were also protected under the deliberative process privilege because they reveal "the authors's weighing and evaluation of matters considered significant" in litigation and settlement).

**B.    Defendant Has Properly Withheld Materials Under Exemption 5, The Presidential Communications Privilege**

The presidential communications privilege is "closely affiliated" with the deliberative process privilege.  In re Sealed Case, 121 F.3d 729, 745 (D.C. Cir. 1997). However, unlike the deliberative process privilege, which applies to decisionmaking of executive officials generally, the presidential communications privilege applies

specifically to decisionmaking of the President.  Id. at 745.  In particular, it applies "to

communications in performance of a President's responsibilities, . . . and made in the

process of shaping policies and making decisions."  Nixon v. Administrator of General

Services, 433 U.S. 425, 449 (1997) (internal citations and formatting omitted).  Although

the presidential communications privilege is in this sense more narrow than the

deliberative process privilege, the protection afforded by the presidential privilege is

broader.  Documents subject to the presidential communications privilege are shielded in

their entirety.  "Even though the presidential privilege is based on the need to preserve

the President's access to candid advice, none of the cases suggests that it encompasses

only the deliberative or advice portions of documents."  In re Sealed Case, 121 F.3d at

744.  In addition, the privilege covers final and post-decisional materials as well as

deliberative ones.  Id. at 745.

Moreover, although the privilege is based on Presidential decisionmaking, it

extends "beyond communications directly involving and documents actually viewed by

the President, to the communications and documents of the President's immediate White

House advisers and their staffs."  Judicial Watch, 365 F.3d at 1114 (citation omitted).  In

particular, it shields communications and documents authored by or solicited and

received by the President's immediate White House advisers — or members of their staff

— in the course of preparing advice for the President.  In re Sealed Case, 121 F.3d at

752.  This extension of the privilege to advisers who have "broad and significant

responsibility for investigating and formulating advice to be given to the President"

reflects "the need for confidentiality to ensure that presidential decision-making is of the

highest caliber, informed by honest advice and full knowledge." Judicial Watch, 365

F.3d at 1114, 1116 (quoting In re Sealed Case, 121 F.3d at 752).

In this case, defendant withheld, in whole and in part, certain of the Hurricane

Katrina E-mail materials, described generally supra at 13-14, pursuant to Exemption 5,

the presidential communications privilege.[4]  Sevier Decl. ¶ 42.  As explained in the

Declaration of Joel B. Bagnal ("Bagnal Decl.") ¶¶ 8-16,[5] the Hurricane Katrina E-mail

materials that were withheld as protected under the presidential communications

privilege were part of the larger set of communications between the President, his

immediate White House advisers, and their staffs, on the one hand, and various federal

officials responding to Hurricane Katrina, on the other, in the days immediately before

and after Hurricane Katrina's landfall.  The purpose of these communications was

ultimately to keep the President apprised of the situation on the ground, and to allow

advisers to formulate advice and recommendations to the President about how best to

accommodate and support requests for emergency assistance from FEMA as well as State

and local entities.  Bagnal Decl. ¶¶ 9-16.

The withheld materials, many of which are also subject to protection under the

deliberative process privilege, supra at 14-18, or the attorney-client privilege, infra at 30,

fall squarely within the scope of the presidential communications privilege.  Id.  ¶¶ 13-

---

[4]  Materials withheld or redacted pursuant to the presidential communications privilege include Bates nos. 4-5, 17, 48-50, 1362-1369, 1379, 1380 1386-1417, 1419-1425, 1429-1431, 1436-1437, 1441-1449, 1474-1480, 1482, 1484-1489, 1504-1507, 1520-1523, 1526-1529, 1531-1546, 1619-1622, 1627-1632, 1636-1641, 1650-1652, 1660-1670, 1675-1690, 1695-1696, 1703-1748, 1757-1758, 1814, 1816-1828, 1839-1840, 1845-1846, 1883, 1897-1904, 1911-1914, 1917-1924, 1926-1928.
[5]  The Declaration of Joel B. Bagnal, Deputy Assistant to the President for Homeland Security on the Homeland Security Council staff within the White House Office, is attached to this memorandum as Exhibit B.  All further references will be to the Declaration.

16.  The withheld communications were, in some instances, made by or to the President directly or, more commonly, were authored by or solicited and received by the President's immediate White House advisers and their respective staffs formally charged with providing advice and recommendations to the President.  Id. ¶¶ 13-16.  These advisers held broad and significant responsibilities for gathering information and formulating advice and recommendations to be transmitted to the President on issues related to preparation for and response to Hurricane Katrina.  Id. ¶ 14.  See Judicial Watch, 365 F.3d at 1114 (quoting In re Sealed,121 F.3d at 752).  These presidential communications relayed information regarding developments on the ground, and were predicates for advice and recommendations concerning possible action to be taken by the President in the fulfillment of his duties, and, specifically, to aid his decisions in responding to requests for Federal support.  Bagnal Decl. ¶ 14.  Indeed, the e-mail communications withheld were a critical part of the highly fluid process of investigating and formulating advice for the President in the wake of Hurricane Katrina.  Id.  Other than telephone or video teleconferences in which White House officials participated, the vast majority of communications - which were informal and largely unstructured - were conducted principally via electronic mail.  Id.

In particular, the withheld communications include:

(1)    internal communications between and among the President's immediate White House advisers and their respective staffs;

(2)    communications between and among Federal officials, including FEMA officials, who provided information updates, status reports, advice and recommendations, and the President's immediate White House advisors and their respective staffs;

(3)    communications and information of Federal officials, including FEMA officials, that were intended to be transmitted, and it can be fairly inferred ultimately were

transmitted, either to the President, or to the President's immediate White House advisers and their respective staffs;

(4)     communications between an individual outside the Federal Executive Branch who acted in a consulting capacity in this context and provided information, advice and guidance for the purpose of assisting the President, and his immediate advisers and their respective staffs;[6] and

(5)     communications of the President, his immediate White House advisers and their respective staffs referred to or reflected in internal FEMA communications.

Id. ¶ 15.  Additional information regarding these privileged presidential communications is set forth in the Vaughn Index.

Because these communications were made in the course of preparing and formulating advice for the President concerning possible action to be taken in the course of his duties and, specifically, to aid his decisions in responding to requests for Federal support, they are properly withheld under Exemption 5, the presidential communications privilege.  In re Sealed Case, 121 F.3d at 752.  Release of such material would implicate the core concerns underlying the presidential communication privilege because it would inhibit the fully informed and candid deliberation within the White House that is necessary to enable the President to fulfill his duties as Commander in Chief and as Chief Executive with supervisory responsibility with regard to the Executive Branch.  Bagnal Decl. ¶ 16.  Indeed, the concerns underlying this privilege are most acute in the emergency response context, because of the heightened need for "candid, objective, and even blunt or harsh opinions" and to "explore alternatives in a way many would be unwilling to express except privately."  United States v. Nixon, 418 U.S. 683, 708 (1974).

---

   [6] See Bates No. 1526-1529.

As with Hurricane Katrina E-mails withheld on the basis of other privileges incorporated in Exemption 5, FEMA made every effort to segregate and release non-exempt material to plaintiff.  Sevier Decl. ¶ 23.  Because documents protected by the presidential communications privilege are shielded from disclosure in their entirety, Judicial Watch, 365 F.3d at 1114, FEMA withheld certain e-mails, e-mail chains, and related attachments without releasing any portions thereof.  Sevier Decl. ¶ 43. Where e-mails within an e-mail chain were protected by the privilege, but the whole chain was not subject to the privilege, FEMA redacted the privileged e-mails from the chain and segregated the remainder.  Id.  In certain cases, where an e-mail was not itself subject to the privilege, but revealed communications protected under the privilege, FEMA redacted that portion of the e-mail while segregating and releasing any otherwise non-exempt portions.  Id.

### C.    Defendant Has Properly Withheld Materials Under Exemption 5, Pursuant To The Attorney-Client Privilege and Work Product Doctrine

The attorney-client privilege protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services.  See Upjohn Co.v. United States, 449 U.S. 383, 389 (1981); Fisher v. United States, 425 U.S. 391, 403 (1976); In re Sealed Case, 737 F.2d 94, 98-99 (D.C. Cir. 1984).  The attorney work-product doctrine protects information prepared in anticipation of litigation.  Federal Trade Comm'n v. Grolier, Inc., 462 U.S. 19, 20 (1983).  Exemption 5 applies with equal force to information protected under the attorney-client privilege and attorney work product doctrine.  See Coastal States Gas Corp. v. Deptartment of Energy, 617 F.2d 854, 862 (D.C. Cir. 1980).

There are two categories of materials withheld under Exemption 5, on the basis of the attorney-client privilege and/or work product doctrine. First, a number of the Hurricane Katrina E-mail materials, described <u>supra</u> at 13-14, were withheld in part on the basis of the attorney-client privilege.[7] As demonstrated in the Sevier Declaration and Index, these materials reflect confidential communications from, to, and among attorneys made for the purpose of rendering legal advice and services bearing on numerous issues arising in the wake of Hurricane Katrina. Sevier Decl. ¶ 40. Topics discussed include, but are not limited to: (1) federal-state cost share amounts; (2) drafting of documents; (3) private requests for security; (4) emergency declarations; (5) coordination with other agencies; (6) housing for evacuees, and (7) donations. <u>Id.</u> Disclosure of these materials would reveal confidential communications that would otherwise be subject to protection under the attorney-client privilege and would undermine FEMA's ability to seek and obtain candid legal advice and services from its counsel. <u>Id.</u> Accordingly, these materials were properly withheld under Exemption 5, the attorney-client privilege. <u>See</u> <u>Upjohn Co.</u>, 449 U.S. at 389.

Second, defendant withheld as both work product and attorney-client privileged material the various CNN Litigation Documents, further described supra at 23-24, that were prepared in response to CNN's September 9, 2005 litigation against FEMA. Sevier Decl. ¶¶ 54-56. <u>See</u> Bates Nos. 912-1044. The e-mails and related materials, which are also shielded in part under the deliberative process privilege, <u>supra</u> at 24, were specifically created by government attorneys in response to, and in anticipation of, the

_____

[7] Hurricane Katrina E-mail materials redacted pursuant to the attorney-client privilege include Bates nos. 18, 1369, 1418, 1483-1484, 1490-1499, 1551-1552, 1635, 1847-1855, 1907-1910, 1933.

CNN lawsuit.  Sevier Decl. ¶ 55.  They contain confidential discussions among attorneys from FEMA, DHS, DOD, and DOJ about how to respond to the litigation, reflect their thoughts and opinions on legal issues and strategy, and specifically discuss and analyze events in the ongoing litigation.  Id.  These e-mails and related materials contain confidential communications made for the purpose of furnishing legal advice and services in connection with the CNN litigation, and they are thus protected in part under the attorney-client privilege.  Id. ¶ 56.  Moreover, because the documents were created by attorneys in anticipation of litigation, they are protected in their entirety under the work product doctrine, which protects all parts of documents protected thereunder — including both factual and deliberative materials.  Id. ¶ 55.  Judicial Watch Inc. v. Department of Justice, 432 F.3d 366, 369-72 (D.C. Cir. 2005).  Thus, there are no non-exempt portions of these documents, and they are properly withheld in full as work product protected under Exemption 5.  Sevier Decl. ¶ 55.

## CONCLUSION

For the foregoing reasons, and for the reasons articulated in the supporting declarations and detailed <u>Vaughn</u> Index, defendant respectfully requests that this motion be granted and that summary judgment be entered in favor of defendant.

Dated: February 20, 2007                    Respectfully submitted,

                                            PETER D. KEISLER
                                            Assistant Attorney General
                                            JEFFREY A. TAYLOR
                                            United States Attorney
                                            ELIZABETH J. SHAPIRO (D.C. Bar
                                            418925)
                                            Assistant Director


                                             /s/ Peter M. Bryce
                                            Peter M. Bryce (NY and IL Bars)
                                            Trial Attorney
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Ave., N.W., Room 6138
                                            Washington, D.C.  20001
                                            Telephone: (202) 616-8335
                                            Fax: (202) 616-8470
                                            peter.bryce@usdoj.gov
                                            Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND | ) | |
| ETHICS IN WASHINGTON, | ) | |
| 11 Dupont Circle, N.W. | ) | |
| Washington, D.C. 20036 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-173 (RJL) |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF HOMELAND SECURITY, | ) | |
| Washington, DC 20528 | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 7(h), defendant Department of Justice ("DOJ" or "defendant") hereby submits the following statement of material facts as to which there is no genuine issue.

1.      FEMA is the federal agency responsible for administering and coordinating the Federal government's response to Presidentially-declared disasters and emergencies under the Robert T. Stafford Disaster Relief and Emergency Assistance Act.  Declaration of Adrian Sevier ("Sevier Decl.") ¶¶ 4-7.

2.      On August 29, 2005, Hurricane Katrina struck Louisiana, Mississippi, Alabama, and Florida, causing massive and overwhelming flood conditions and severe damage.  Id. ¶ 13. That same day, the President of the United States declared numerous counties and parishes in these four States to be "major disasters," and also declared a state of "emergency" for the forty-four States and the District of Columbia that accepted Hurricane Katrina evacuees.  Id.  As a result of these declarations, Secretary Chertoff named then-FEMA Director and DHS Under

1

Secretary Michael D. Brown the Principal Federal Official for incident management purposes.

Id. ¶ 14.

3.      Plaintiff submitted its FOIA request on September 7, 2005, to FEMA's Office of

General Counsel.  Id. ¶ 19.  Plaintiff sought access to "any and all records relating to the Federal

Emergency Management Agency's ("FEMA") response to hurricane Katrina.  Specifically,

CREW seeks all memoranda, communications and records of any kind and from any source,

regardless of format, medium, or physical characteristics from January 1, 2001 to the present,

discussing or mentioning in any way," the following:

> 1) what portion of the $3.1 billion appropriated to DHS in fiscal year 2005 for
> emergency preparedness to "support the Nation's ability to prepare for, mitigate
> against, respond to and recover from natural and man manmade [sic] disasters"
> was spent to prepare for potential hurricanes on the Gulf Coast of the United
> States and on potential flooding in New Orleans;
>
> 2) the amount of money diverted from emergency preparedness for and response
> to natural disasters to emergency preparedness for and response to acts of
> terrorism and the rationale behind any such diversion;
>
> 3) studies, assessments, presentations, or scenarios of the potential devastation a
> powerful hurricane could wreak on the Gulf Coast, including, but not limited to
> the eight-day tabletop exercise conducted in July 2004 and intended to prepare
> FEMA a catastrophic hurricane [sic] in New Orleans;
>
> 4) plans created regarding the federal government's response to any such
> scenarios;
>
> 5) the potential breaching of the levees that would lead to Lake Pontchartrain
> flooding New Orleans and the response to such breaches; and
>
> 6) communications from anyone employed by or associated with the Army Corps
> of Engineers regarding the problems with and weakness of the levees surrounding
> New Orleans, the potential breaching of the levees and the consequences of such
> breaches, as well as proposed repairs or other construction to the levees.

Id.

4.      In addition, plaintiff sought access to "all memoranda, communications and

2

records of any kind and from any source, regardless of format, medium, or physical

characteristics, from August 26, 2005 through to the present, discussing or mentioning in any

way:"

> 1) requests for emergency assistance from local government officials in Mississippi and Louisiana in response to hurricane Katrina;

> 2) requests from local government officials in Mississippi and Louisiana for assistance in preparing for hurricane Katrina, including, but not limited to communications requesting assistance in evacuating residents of Mississippi and Louisiana from the areas in the hurricane's path;

> 3) communications between the White House and FEMA regarding the preparation for and response to the damage caused by hurricane Katrina;

> 4) communications regarding the conditions in the New Orleans Convention Center;

> 5) communications regarding the need for transportation to evacuate victims of the hurricane from the city of New Orleans as well as communications regarding the need for food and water for victims stranded in New Orleans;

> 6) communications from Congressman Charles W. Boustany Jr. (R-LA) requesting federal assistance and any response to Cong. Boustany;

> 7) communications regarding offers by corporations and foreign government's [sic] to assist the victims of the hurricane Katrina and FEMA's responses to such offers;

> 8) communications between FEMA director Michael Brown and cabinet officials either before or after the hurricane regarding the potential and actual devastation wrought by the hurricane and the federal government's response to the devastation;

> 9) communications regarding the plan to evacuate victims of the hurricane to Charleston, South Carolina and the misrouting of the plane carrying the evacuees to Charleston, West Virginia;

> 10) communications regarding the deployment of the National Guard to New Orleans to assist in evacuation and relief efforts;

> 11) communications regarding the inclusion of Operation Blessing, a Virginia based charity run by evangelist and Christian Coalition founder Pat Robertson, on FEMA's primary list of charities to which people were asked to donate money to

assist hurricane relief efforts; and

12) communications regarding the limitations placed on journalists and photographers, including but not limited to, efforts to prevent photographers from taking pictures of the corpses of hurricane victims in Louisiana and Mississippi.

Id. ¶ 20.

5.      On September 20, 2005, FEMA acknowledged plaintiff's request in writing.  Id. ¶ 21. FEMA stated, inter alia, that it would comply with the request to the extent permissible by law and that any records not subject to an exemption would be forwarded promptly upon completion of FEMA's search and review process.  Id.

6.      FEMA searched for responsive documents and ultimately identified approximately 8100 pages of documents as responsive to plaintiff's request.  Id. ¶ 22.  Of the approximately 8100 total pages of documents processed in response to plaintiff's FOIA request, FEMA released in whole or in part a total of 7468 pages of documents, including 2267 pages, which were released to plaintiff in their entirety, and 5201 pages, which were redacted in part and released to plaintiff.  Id.  FEMA released these materials to plaintiff in a series of sixteen releases from January 24, 2006 to February 17, 2007.  Id. ¶ 24.

7.      These releases are summarized in the following table.

| Date of Release | Total Pages Released | Status of Documents Released |
|---|---|---|
| January 24, 2006 | 748 | 734 released in their entirety<br>14 released in part |
| April 4, 2006 | 43 | 43  released in their entirety |
| April 26, 2006 | 5 | 2  released in their entirety<br>3 released in part |
| May 2, 2006 | 33 | 31  released in their entirety<br>2 released in part |

| Date of Release | Total Pages Released | Status of Documents Released |
|---|---|---|
| May 2, 2006 | 441 | 424 released in their entirety<br>17 released in part |
| May 5, 2006 | 1326 | 406 released in their entirety<br>920 released in part |
| May 5, 2006 | 928 | 135 released in their entirety<br>793 released in part |
| June 2, 2006 | 3 | 3 released in their entirety |
| June 6, 2006 | 4 | 4 released in part |
| June 14, 2006 | 2 | 2 released in their entirety |
| June 14, 2006 | 23 | 13 released in their entirety<br>10 released in part |
| June 14, 2006 | 1151 | 1151 released in part |
| June 30, 2006 | 96 | 96 released in part |
| July 7, 2006 | 1786 | 154 released in their entirety<br>1632 released in part |
| January 12, 2007 | 327 | 293 released in their entirety<br>34 released in part |
| February 17, 2007 | 552 | 27  released in their entirety<br>525 released in part |

Id.

8.      Defendant's withholdings of documents in full or in part were made pursuant to FOIA exemptions 5 U.S.C. § 552(b)(2), (5), (6).  Id.  ¶¶ 26-27 & n. 5.

9.      After plaintiff filed this lawsuit, the parties conferred and agreed to narrow the scope of the litigation.  Id. ¶ 26.  In particular, plaintiff agreed that it would only challenge defendant's decision to withhold materials in whole or in part under FOIA Exemption 5.  See 5 U.S.C. 552(b)(5).  Id.  Plaintiff would not challenge the adequacy of defendant's search for records, or its decision to withhold materials under FOIA exemptions other than Exemption 5. Id. Accordingly, the only remaining issue in this litigation is the propriety of FEMA's withholdings under Exemption 5.  Id.  See also Joint Briefing Schedule Statement (Docket Entry 8-1) filed July 26, 2006.

10.     Of the approximately 8100 pages of documents defendant processed in this litigation, 1503 were withheld in whole or in part on the basis of Exemption 5.  Sevier Decl. ¶ 27. Of that number, 870 were redacted pursuant to Exemption 5 and released in part to the plaintiff, and 633 were withheld in full on the basis of that exemption.  Id.

11.     Defendant's declarations and Vaughn Index provide detailed explanation of the documents at issue in this case that defendant withheld in full or in part from plaintiff's FOIA requests.  See Declaration of Adrian Sevier & Exhibit 4; Declaration of Joel B. Bagnal.

Dated: February 20, 2007                    Respectfully submitted,

                                            PETER D. KEISLER
                                            Assistant Attorney General
                                            KENNETH L. WAINSTEIN
                                            United States Attorney
                                            ELIZABETH J. SHAPIRO (D.C. Bar
                                            418925)
                                            Assistant Director

                                             /s/ Peter M. Bryce
                                            Peter M. Bryce (NY and IL Bars)

Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6138
Washington, D.C.  20001
Telephone: (202) 616-8335
Fax: (202) 616-8470
peter.bryce@usdoj.gov
Attorneys for Defendant