# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND       )
ETHICS IN WASHINGTON,                 )
11 Dupont Circle, N.W.                )
Washington, D.C. 20036                )
                                      )
                  Plaintiff,          )
                                      )     Civil Action No. 06-173 (RJL)
            v.                        )
                                      )
UNITED STATES DEPARTMENT              )
OF HOMELAND SECURITY,                 )
Washington, DC 20528                  )
                                      )
                  Defendant.          )
_____)

## EXHIBIT A TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO (D.C. Bar
418925)
Peter M. Bryce (NY and IL Bars)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W., Room 6138
Washington, D.C.  20001
Telephone: (202) 616-8335
Fax: (202) 616-8470
peter.bryce@usdoj.gov
Attorneys for Defendant

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

CITIZENS FOR RESPONSIBILITY AND       :
ETHICS IN WASHINGTON                   :
11 Dupont Circle, N.W.                 :
Washington, D.C. 20036                 :
                                       :
          Plaintiff,                   :
                                       :
     v.                                : Civil Action No. 06cv0173 (RJL)
                                       :
U.S. DEPARTMENT OF HOMELAND            :
SECURITY                               :
Washington, D.C. 20528                 :
                                       :
          Defendant.                   :

---

## DECLARATION OF ADRIAN SEVIER

I, Adrian Sevier, declare as follows:

1. I am the Acting Deputy Chief Counsel of the Federal Emergency Management Agency (FEMA), United States Department of Homeland Security (DHS). As Acting Deputy Chief Counsel, I report directly to the Chief Counsel of FEMA and am responsible to assist him in directing and executing all FEMA legal activities. This includes managing and directing the activities of FEMA's Office of Chief Counsel (OCC), serving as principal legal advisor to the FEMA Director, providing legal guidance and direction to all FEMA senior leadership and program divisions, and providing counsel to other DHS directorates regarding FEMA authorities and responsibilities.

2. FEMA OCC's General Law Division manages FEMA's Freedom of Information Act (FOIA) program. The General Law Division processes, coordinates, advises, reviews, edits, and concurs on all of FEMA's responses to FOIA requests. In addition, the

1

General Law Division advises and serves as a liaison on FOIA issues with FEMA's

Headquarters program offices, ten Regional offices, and other facilities and offices.

3. I submit this declaration in support of defendant's motion for summary judgment in the above-captioned matter. The matters asserted below are based on my personal knowledge or on information furnished to me by staff members in connection with official duties.

## I.   LEGAL BACKGROUND – THE STAFFORD ACT

4. FEMA is responsible for administering and coordinating the Federal government's response to Presidentially-declared disasters pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act (Stafford Act). 42 U.S.C. §§ 5121 – 5206. Part of FEMA's mission is to provide State and local governments "Federal assistance programs for public and private losses and needs sustained in disasters." 42 U.S.C. § 5121(a)(5); 44 C.F.R. § 206.3(a), (e).

5. Stafford Act assistance is triggered when the President grants an affected State's request to declare the affected area a "major disaster" or "emergency." 42 U.S.C. § 5170 and 44 C.F.R. § 206.36(a). The governor's request must be based on a finding that "the disaster is of such severity and magnitude that effective response is beyond the capabilities of the State and the affected local governments and that Federal assistance is necessary." 42 U.S.C. § 5170; see 44 C.F.R. § 206.36(b).

6. An emergency is defined as "any occasion or instance for which, in the determination of the President, Federal assistance is needed to supplement State and local efforts and capabilities to save lives and to protect property and public health and safety, or to lessen or avert the threat of a catastrophe in any part of the United States." 42 U.S.C. § 5123(1).

7. The President's declaration of an emergency or disaster will designate the areas within a State where Federal assistance may be made available (counties, parishes, or tribal lands) and the specific types of Federal assistance that are authorized.

## II.    BACKGROUND - INITIAL DISASTER RESPONSE

8. In responding to a disaster, FEMA must act quickly to assess the situation and the needs of the State and local governments so that it can deploy disaster workers to set up an infrastructure capable of coordinating the response and recovery effort. Every disaster is unique, and the manner in which FEMA coordinates its response efforts is tailored to the demands of each specific disaster.

9. Even prior to a disaster or emergency declaration, FEMA may pre-stage federal resources for transportation, communications, public works, hazardous materials response, engineering, firefighting, emergency management, mass care, public health, urban search and rescue, energy and public safety in the disaster area.  For example, FEMA may move supplies of generators, water, ice and food into the region for immediate deployment once the event passes.

10. Once a disaster is declared, FEMA may establish Joint Field Offices (JFOs), which are multi-agency coordination centers designed to enable effective and efficient coordination of federal disaster efforts.  A JFO is a multi-agency coordination center staffed by a Federal Coordinating Officer, who is the lead FEMA official for the disaster response, and the State Coordinating Officer, who is the lead State official for disaster response.  A JFO is the base of operations for all of the federal agencies that work with FEMA responding to a disaster, as well as the base of operations for state officials working with the State Coordinating Officer.

3

11. FEMA, in coordination with State and local governments, may also establish Disaster Recovery Centers (DRCs) in areas that are affected by the disaster. A DRC is a one-stop center for FEMA, other federal agencies, state and local governments, and voluntary organizations to provide information for disaster victims. Before a DRC can open, however, FEMA must secure structurally-sound facilities, arrange for staff,[1] equip the facility with information technology infrastructure and telecommunications equipment, and provide security.

12. In the initial stages of a disaster response, coordinating the response and recovery efforts is intense and extremely fast-paced. FEMA personnel must make virtually instantaneous decisions under pressure regarding a wide variety of issues often requiring quick discussion and deliberation. Based on the communications available, these deliberations and decisions may occur person-to-person, by telephone or via electronic mail (e-mail) sent or received using either personal computers or portable electronic mail devices such as Blackberrys. Because the entire process is focused on problem-solving during an emergency, the manner in which such decisions are made can be highly informal. Conversations may be initiated in one form and then expanded to include other personnel as needed. For example, a phone conversation between FEMA personnel may lead to an expanded e-mail discussion to get additional information and input from other personnel. Further, in some instances, issues will be raised and deliberations will take place which, for any number of reasons, will not result in any sort of final agency decision on a particular issue.

---

1 FEMA is authorized to hire temporary personnel to perform disaster and emergency services for which it does not have adequate full-time employees. 42 U.S.C. § 5149(b). Personnel authorized by the special hiring authority in the Stafford Act are referred to as Disaster Assistance Employees (DAEs). DAEs are deployed intermittently to specific disasters and emergencies to work as long as FEMA needs them and then are discharged.

III.            **HURRICANE KATRINA PRESIDENTIAL DECLARATIONS**

13. On August 29, 2005, Hurricane Katrina struck Louisiana, Mississippi, Alabama, and Florida with high winds, causing massive and overwhelming flooding conditions and severe damage.   On August 29, 2005, the President of the United States declared numerous counties and parishes in these four States to be major disasters, pursuant to the governors' requests. See 70 Fed. Reg. 53264; 70 Fed. Reg. 53804; 70 Fed. Reg. 53801; 70 Fed. Reg. 53237.  Pursuant to 42 U.S.C. §5191, the President also declared a state of "emergency" for the forty-four States and the District of Columbia that accepted Hurricane Katrina evacuees.

14. As a result of the declarations, Secretary Chertoff named then-FEMA Director and DHS Under Secretary Michael D. Brown the Principal Federal Official for incident management purposes consistent with the National Response Plan (NRP).[2]

15. Hurricane Katrina presented FEMA with circumstances unlike any other faced by the Agency in its history.   Congress appropriated $60 billion in two increments of emergency supplemental funding for FEMA to respond to Hurricane Katrina.   These two emergency supplemental appropriations comprise the largest emergency supplemental funding that FEMA has ever received.   Hundreds of thousands of residents of Louisiana, Mississippi and Alabama evacuated or were evacuated from their homes in response to Hurricane Katrina, the largest group of persons displaced by a natural disaster in FEMA's history.   To respond to the disaster, FEMA hired more staff and

---

2  The NRP establishes a comprehensive approach to domestic incident management to prevent, prepare for, respond to, and recover from terrorist attacks, major disasters, and other emergencies. The NRP is an all-hazards plan built on the template of the National Incident Management System (NIMS). The NIMS provides a consistent doctrinal framework for incident management at all jurisdictional levels regardless of the cause, size, or complexity of the incident. The NRP, using the NIMS, provides the structure and mechanisms for national-level policy and operational direction for domestic incident management. The NRP can be partially or fully implemented in the context of a threat, anticipation of a significant event, or in response to an incident requiring a coordinated Federal response.

opened more JFOs, DRCs and temporary call centers than it ever had for any one disaster. FEMA also worked with a larger than usual number of Federal, state, local and private sector partners to coordinate response and recovery activities under the NRP.

16.  Due to these extraordinary circumstances, and the heightened level of the response, FEMA engaged in substantially more of the fast-paced and informal decision-making described above than would take place in a typical disaster response. FEMA exercised its statutory authority to develop unique programs to respond to the disaster, provide housing for evacuees and disburse disaster assistance, recognizing that traditional methods would not be satisfactory given the extraordinary degree of damage caused by Hurricane Katrina. The significance of the disaster and magnitude of the damage engaged the active participation of high-level government officials, including those within the White House. Further, in the initial phases of the disaster, this decision-making process often took place via e-mail, in part because of the fast and informal nature of the discussions, and in part because of significant disruptions to communications across the Gulf Coast area.

IV.  **REQUESTS FOR INFORMATION REGARDING HURRICANE KATRINA**

17. Hurricane Katrina and the federal government's response generated huge public interest. FEMA, in particular, was inundated with requests for massive amounts of information for Congressional and other investigations regarding FEMA's disaster response and recovery operations, including from the United States House of Representatives Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina (Select Committee) and the United States Senate Committee on Homeland Security and Governmental Affairs, from the Government Accountability Office (GAO), and from the DHS Inspector Office of General. FEMA gave these requests precedence

6

over all other requests for information.

18. In addition to the continuing efforts responding to Hurricane Katrina and gathering documents responsive to the requests from investigative bodies, FEMA also was inundated with Hurricane Katrina-related FOIA requests. From Fiscal Year ("FY") 1996 through FY 2004, FEMA averaged approximately 323 FOIA requests per year. In FY 2005, FEMA received 455 FOIA requests. Due in part to the enormous interested generated in response to Hurricane Katrina, 32% of the FY 2005 FOIA requests were received in the final month of the fiscal year that ended on September 30, 2005. FEMA received a total of 776 FOIA requests in FY 2006.

## V.    PLAINTIFF'S FOIA REQUEST

19. By letter dated September 7, 2005, Plaintiff submitted a FOIA request to FEMA that stated "This request is for any and all records relating to the Federal Emergency Management Agency's ("FEMA") response to hurricane Katrina.  Specifically, CREW seeks all memoranda, communications and records of any kind and from any source, regardless of format, medium, or physical characteristics from January 1, 2001 to the present, discussing or mentioning in any way," the following:

(i) what portion of the $3.1 billion appropriated to DHS in fiscal year 2005 for emergency preparedness to "support the Nation's ability to prepare for, mitigate against, respond to and recover from natural and man manmade disasters" was spent to prepare for potential hurricanes in the Gulf Coast of the United States and on potential flooding in New Orleans;

(ii) the amount of money diverted from emergency preparedness for and response to natural disasters to emergency preparedness for and response to acts of terrorism and the rationale behind any such diversion;

(iii) studies, assessments, presentations, or scenarios of the potential devastation a powerful hurricane could wreak on the Gulf Coast, including, but not limited to, the eight-day tabletop exercise conducted in July 2004 and intended to prepare FEMA for a catastrophic hurricane in New Orleans;

(iv) plans created regarding the federal government's response to any such scenarios;

(v) the potential breaching of the levees that would lead to Lake Pontchartrain flooding New Orleans and the response to such breaches; and

(vi) communications from anyone employed by or associated with the Army Corps of Engineers regarding the problems with and weakness of the levees surrounding New Orleans, the potential breaching of the levees and the consequences of such breaches, as well as proposed repairs or other construction to the levees.

See Exhibit 1.

20. CREW's September 7, 2005 FOIA request further sought "all memoranda, communications and records of any kind and from any source, regardless of format, medium, or physical characteristics, from August 26, 2005 through to the present, discussing or mentioning in any way:"

(i) requests for emergency assistance from local government officials in Mississippi and Louisiana in response to hurricane Katrina;

(ii) requests from local government officials in Mississippi and Louisiana for assistance in preparing for hurricane Katrina, including, but not limited to communications requesting assistance in evacuating residents of Mississippi and Louisiana from the areas in the hurricane's path;

(iii) communications between the White House and FEMA regarding the preparation for and response to the damage caused by hurricane Katrina;

(iv) communications regarding the conditions in the New Orleans Convention Center;

(v) communications regarding the need for transportation to evacuate victims of the hurricane from the city of New Orleans as well as communications regarding the need for food and water for victims stranded in New Orleans;

(vi) communications from Congressman Charles W. Boustany, Jr. (R-LA) requesting federal assistance and any response to Cong. Boustany;

(vii) communications regarding offers by corporations and foreign governments to assist the victims of hurricane Katrina and FEMA's responses to such offers;

(viii) communications between FEMA director Michael Brown and cabinet

8

officials either before or after the hurricane regarding the potential and actual devastation wrought by the hurricane and the federal government's response to the devastation;

(ix) communications regarding the plan to evacuate victims of the hurricane to Charleston, South Carolina and the misrouting of the plane carrying the evacuees to Charleston, West Virginia;

(x) communications regarding the deployment of the National Guard to New Orleans to assist in evacuation and relief efforts;

(xi) communications regarding the inclusion of Operation Blessing, a Virginia-based charity run by evangelist and Christian Coalition founder Pat Robertson, on FEMA's primary list of charities to which people were asked to donate money to assist hurricane relief efforts; and

(xii) communications regarding the limitations placed on journalists and photographers including, but not limited to, efforts to prevent photographers from taking pictures of the corpses of hurricane victims in Louisiana and Mississippi.

See id.  Plaintiff's September 7, 2005 letter also asked FEMA to expedite the processing of plaintiff's request for records.

## V.  FEMA'S RESPONSE TO PLAINTIFF'S REQUEST

21. On September 20, 2005, FEMA acknowledged plaintiff's request in writing.  FEMA also denied plaintiff's request for expedited processing, explaining that the request did not meet all of the statutory and regulatory criteria.  FEMA stated that it would comply with the request to the extent permissible by law and that any records not subject to an exemption would be forwarded promptly upon completion of FEMA's search and review process.  See Exhibit 2.

22. FEMA conducted a comprehensive search for documents responsive to Plaintiff's request.  Ultimately, FEMA identified approximately 8100 pages of documents as responsive to this request.[3]  Of the approximately 8100 total pages of documents

---

3 Because Plaintiff has agreed not to challenge the adequacy of FEMA's search, this declaration does contain any extensive

9

processed in response to plaintiff's FOIA request, 2267 pages were released to Plaintiff in their entirety, and 5201 pages were redacted in part and released to Plaintiff.

23. In processing plaintiff's request, FEMA made significant and organized efforts to segregate non-exempt portions of documents from exempt portions in order to provide plaintiff with all responsive information not subject to FOIA exemptions. Four attorneys and one FOIA Specialist participated in the review process. They reviewed all responsive documents page by page, and line by line. The documents were then redacted and the redacted versions released to Plaintiff as indicated in the table set out in Paragraph 24 below. Documents that contained no portions subject to FOIA exemptions were released in their entirety as indicated in the table set out in Paragraph 24 below. This review and redaction process was long and arduous, involving countless hours of review and consultation among the lawyers involved. The process continued throughout the course of this litigation, and in the course of preparing for summary judgment.

---

description of that search.

24. As a result of this extensive review and processing of potentially responsive records, FEMA released to Plaintiff these documents as follows:

| Date of Release | Total Pages Released | Status of Documents Released |
|---|---|---|
| January 24, 2006 | 748 | 734 released in their entirety<br>14 released in part |
| April 4, 2006 | 43 | 43 released in their entirety |
| April 26, 2006 | 5 | 2 released in their entirety<br>3 released in part |
| May 2, 2006 | 33 | 31 released in their entirety<br>2 released in part |
| May 2, 2006 | 441 | 424 released in their entirety<br>17 released in part |
| May 5, 2006 | 1326 | 406 released in their entirety<br>920 released in part |
| May 5, 2006 | 928 | 135 released in their entirety<br>793 released in part |
| June 2, 2006 | 3 | 3 released in their entirety |
| June 6, 2006 | 4 | 4 released in part |
| June 14, 2006 | 2 | 2 released in their entirety |
| June 14, 2006 | 23 | 13 released in their entirety<br>10 released in part |
| June 14, 2006 | 1151 | 1151 released in part |
| June 30, 2006 | 96 | 96 released in part |
| July 7, 2006 | 1786 | 154 released in their entirety<br>1632 released in part |
| January 12, 2007 | 327[4] | 293 released in their entirety<br>34 released in part |
| February 17, 2007 | 552 | 27 released in their entirety<br>525 released in part |

25. Attached hereto as Exhibit 3 are FEMA's letters that detail the various releases to plaintiff.

26. After plaintiff filed this lawsuit, the parties conferred and agreed to narrow the scope of

---

4  Due to a clerical error, the release letter states that there were 328 pages released in part.  The actual number of released pages is 327, 293 released in their entirety and 34 released in part.

11

the litigation.  In particular, plaintiff agreed that it would only challenge defendant's decision to withhold materials in whole or in part under FOIA Exemption 5.  See 5 U.S.C. 552(b)(5).  Plaintiff would not challenge the adequacy of defendant's search for records, or its decision to withhold materials under FOIA exemptions other than Exemption 5.  Accordingly, this declaration only discusses those materials defendant withheld in whole or in part under Exemption 5 of the FOIA.[5]

27. Of the approximately 8100 pages defendant processed in this litigation, 1503 were withheld in whole or in part on the basis of Exemption 5.  Of that number, 870 were redacted pursuant to Exemption 5, and 633 were withheld in full on the basis of that exemption.

28. The next section describes the materials withheld pursuant to Exemption 5 and explains the basis for withholding such material.  In addition, the Vaughn Index (the "Index") attached as Exhibit 4 provides more individualized descriptions and explanations of the Exemption 5 withholdings. The materials discussed in the Index have been numbered and the corresponding Index Bates Number for each page of each document is referenced in the Index. Finally, to the extent that much of this Exemption 5 material was released in part, additional information about the withheld materials can be gleaned from the redacted versions of the documents themselves, which are attached hereto as Exhibit 5.  The pages of redacted material are numbered to correspond to the Bates Numbers referenced in the Index.

## VI.    EXPLANATION AND JUSTIFICATION FOR RECORDS WITHHELD

29. Exemption 5, 5 U.S.C. § 552(b)(5), allows FEMA to protect information contained in

---

[5]    In addition to Exemption 5, defendant withheld portions of materials in this case pursuant to FOIA Exemptions 2 and 6. See 5 U.S.C. §§ 552(b)(2) & (6).

"inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." This exemption has been construed to exempt records normally privileged in the civil discovery context. The exemption incorporates various discovery privileges, including the deliberative process privilege, the presidential communications privilege, the attorney-client privilege, and the attorney work product doctrine.

30. For purposes of this litigation, FEMA has identified four general categories of records that contain materials subject to protection under one or more of these privileges, and are thus properly withheld in whole or in part on the basis of FOIA Exemption 5.

| Document Category | Index Bates No. Range |
|---|---|
| Hurricane Katrina E-mail | 1-6; 8-38; 40-64; 1203-1207; 1349-1431; 1436-1437; 1439; 1441-1499; 1504-1507; 1509-1524; 1526-1529; 1531-1550; 1553-1611 1615-1625; 1627-1646; 1650-1652; 1655-1658; 1660-1671; 1672-1696; 1703-1748; 1750-1758; 1771-1773; 1781; 1789-1793; 1804-1834; 1839-1840; 1845-1855; 1865-1879; 1883-1938 |
| Video Teleconference ("VTC") Transcripts | 65-419 |
| Hurricane Preparedness Documents | 420-792; 796-798; 800-883; 885-911 |
| CNN Temporary Restraining Order (TRO) Litigation | 912-1044 |

Each of these categories, and the basis or bases for withholding material within each category, is discussed further below.

**A.    Hurricane Katrina E-Mail**

31. This category of documents includes several hundred pages of e-mail, e-mail chains, and

various attachments to e-mails that reflect, for the most part, discussions both within FEMA, and between FEMA and other entities within the federal Executive Branch, in the days immediately before and after Hurricane Katrina struck the Gulf Coast of the United States.[6] See pages 1-6; 8-38; 40-64; 1203-1207; 1349-1431; 1436-1437; 1439; 1441-1499; 1504-1507; 1509-1524; 1526-1529; 1531-1550; 1553-1611 1615-1625; 1627-1646; 1650-1652; 1655-1658; 1660-1671; 1672-1696; 1703-1748; 1750-1758; 1771-1773; 1781; 1789-1793; 1804-1834; 1839-1840; 1845-1855; 1865-1879; 1883-1938. These materials reflect inter-agency and intra-agency discussions of various issues bearing on the agency's preparation for and response to Hurricane Katrina. Participants in these discussions included Michael Brown, DHS Undersecretary and FEMA Director; Michael Jackson, DHS Deputy Secretary; Patrick Rhode, FEMA Acting?Deputy Director; William Lokey, FEMA Federal Coordinating Officer; Michael Lowder, FEMA Deputy Division Director; Edward Buikema, FEMA Regional Director; Michael Heath, FEMA Special Assistant to the Undersecretary; Brooks Altshuler, FEMA Deputy Chief of Staff; and various other FEMA officials involved in the response to this disaster. In addition, many of the e-mails reflect communications among FEMA officials and officials from other participating federal Executive Branch agencies, as well as communications between FEMA and Presidential advisers (or their staff) in the White House.

32. These materials are subject to various privileges and have been withheld, in whole or in

---

6  This Category also includes a five-page draft situation report that was withheld in full on the basis of Exemption 5, the deliberative process privilege. See pages 1203-1207. During a response to an event, components within the Federal government will prepare periodic situation reports designed to summarize the actions taken to respond to the disaster. As a draft version of such a report, this document is by its very nature a pre-decisional, preliminary version of what is intended to become a final document. The process by which FEMA staff review, edit, and modify a draft document, and ultimately transform it into a final document is inherently deliberative. Consequently, there are no, non-exempt portions of the draft, and it is properly being withheld in full under Exemption 5, deliberative process privilege.

part, under Exemption 5 because they are protected from disclosure under one or more privileges, including the deliberative process privilege, the presidential communications privilege and the attorney-client privilege. Although much of the withheld material is protected under more than one of these privileges, each is discussed separately below. Additional discussion of the material withheld pursuant to Exemption 5, presidential communications privilege, is contained in the declaration of Joel B. Bagnal, Deputy Assistant to the President for Homeland Security, which also is submitted in support of defendant's motion for summary judgment.

### 1.    *Deliberative Process Privilege*

33. The Hurricane Katrina E-mail materials withheld under Exemption 5, deliberative process privilege, reflect deliberations within the agency, with other agencies, and with officials at the White House regarding the government's response to Hurricane Katrina.[7] Issues addressed include, but are not limited to: (1) personnel and staffing choices; (2) coordinating responses to specific emergency conditions caused by Hurricane Katrina; (3) developing responses to Katrina-related inquiries from other agencies, state and local officials, the media, private citizens, and others; (4) funding and availability of monetary assistance to state and local governments and private citizens affected by Hurricane Katrina; (5) potential disaster and emergency declarations; (6) coordinating assistance from other federal agencies; (7) rescue and evacuation efforts; and (8) contracting for relief services. All of these issues arose in the context of larger policy deliberations about how to most effectively respond to the extraordinarily difficult challenges that

---

7 Materials redacted pursuant to the deliberative process privilege include index bates nos. 1-38; 40-47, 51-64, 116, 153, 1349-1385, 1387-1424, 1426-1431, 1436-1437, 1439, 1441-1446, 1450-1499, 1504-1507, 1509-1517.6, 1522, 1524, 1526-1529, 1531-1611, 1615-1619.18, 1623-1625, 1627-1646, 1655-1657, 1660-1671, 1672-1694, 1703-1748, 1750-1758, 1771-1773, 1774.1–1774.7, 1781, 1789-1793, 1804-1813, 1815-1834, 1839-1840, 1847-1855, 1865-1877, 1878-1879, 1883-1910, 1914-1925, 1926.1-1926.7, 1929-1938.

arose in the wake of Hurricane Katrina.

34. The e-mail deliberations reflected in the withheld material were a critical part of this larger deliberative process. The sheer magnitude and far-reaching effects of this disaster created the need for quick, efficient and highly flexible deliberations. The agency had to address countless issues as they arose in real-time, and do so while accounting for urgent and rapidly changing circumstances. Due to the time constraints, the exigencies of the problems presented, and the sheer number of issues, the formalities of more typical agency deliberations could not always be observed. More formal procedural memoranda and analyses were seldom used, but rather replaced with fast-paced e-mail exchanges that often shifted rapidly from one topic to the next. This environment also created a particular need for free and unconstrained deliberations among all participating agency officials, superiors and subordinates alike. E-mail communications in the affected disaster area were the most reliable in many areas due to communications disruptions and were especially conducive to the sorts of fast-paced, informal deliberations described above. Indeed, e-mail deliberations often functioned as a surrogate for real-time conversations that occur in person or over the telephone.

35. As the Index and supporting documents confirm, these e-mail discussions are protected by the deliberative process privilege because they are both pre-decisional and deliberative. The discussions occurred while the decision-making process was ongoing, and are thus pre-decisional to the final policy decisions made or, where no final decision was reached, to the ongoing and evolving decision-making process that occurred in the days immediately before and after Hurricane Katrina struck the Gulf Coast. The redacted material is also deliberative because it constitutes part of the give-and-take of that consultative process. Redacted materials include recommendations, suggestions,

opinions, debate, requests for advice, or otherwise preliminary evaluations bearing on the numerous issues arising out of that catastrophe. These exchanges reflect precisely the sort of non-final assessments, impressions and exchanges that constitute the initial give-and-take of the process whereby agencies make decisions and formulate policies.

36. Release of these pre-decisional, deliberative materials would squarely implicate the concerns that the deliberative process privilege is meant to address. In particular, release would have a chilling effect on deliberations that would undermine the quality of FEMA's (and other agencies') decision-making process in emergency response situations. Agency officials who believe that their pre-decisional, deliberative discussions during ongoing emergencies will be subject to post hoc public scrutiny and criticism would likely sacrifice candor or speed in offering or seeking advice. In some situations, such officials might not seek or offer advice at all. This concern is especially acute in emergency situations, where the exigencies of the situation often call for advice that is forcefully-worded or blunt, and for consideration of alternatives that might in retrospect seem ill-advised once all relevant facts are known. In short, disclosure of these deliberative materials would likely impair and interfere with the deliberative process in situations where free and uninhibited deliberation is most important.

37. Disclosure also likely would lead to public confusion to the extent that the opinions, initial positions, and individual suggestions reflected in these emails would be perceived as official agency policy or otherwise final agency decisions. Public confusion is particularly likely here because of the necessarily informal nature of the discussions. Due to the urgency and rapidly changing nature of the situation, e-mail deliberations at times would shift quickly from one topic to another, or address issues in a truncated or shorthand manner. Sometimes e-mail exchanges would appear incomplete or out of

context because such exchanges comprised only part of larger deliberations that also included real-time conversations via telephone or face-to-face meetings. All of these factors combined to exacerbate the danger of public confusion that would occur if these pre-decisional deliberative materials were released.

38. FEMA did not withhold any e-mails or e-mail chains in their entirety solely on the basis of the deliberative process privilege.

### 2.    *Attorney-Client Privilege*

39. The attorney-client privilege protects confidential communications made between clients and their attorneys when the communications are made for the purpose of securing legal advice or services. Some of the Katrina E-mail materials were withheld on the basis of attorney-client privilege.[8]

40. As confirmed in the Index and supporting documents, the materials withheld under Exemption 5, attorney-client privilege, reflect confidential communications from, to, and among attorneys made for the purpose of rendering legal advice bearing on numerous issues arising in the wake of Hurricane Katrina. Topics discussed include, but are not limited to: (1) federal-state cost share amounts; (2) drafting of documents; (3) private requests for security; (4) emergency declarations; (5) coordination with other agencies; (6) housing for evacuees, and (7) donations. Disclosure of these materials would reveal confidential communications that would be protected under the attorney-client privilege and would undermine FEMA's ability to seek and obtain candid legal advice and services from its counsel. Accordingly, these materials were properly withheld under Exemption 5, the attorney-client privilege.

---

8 Materials redacted pursuant to the attorney-client privilege include index bates nos. 18, 1369, 1418, 1483-1484, 1490-1499, 1551-1552, 1635, 1847-1855, 1907-1910, 1933.

41. FEMA did not withhold any documents in their entirety solely on the basis of the attorney-client privilege.

### 3. Presidential Communications Privilege

42. After consultation within the Executive Branch, FEMA also has withheld, in whole or in part, Hurricane Katrina E-mail materials under Exemption 5 because they are subject to protection under the presidential communications privilege. The withheld materials, and factual predicates justifying their withholding, are set forth more fully in the Index and the declaration of Joel B. Bagnal, Deputy Assistant to the President for Homeland Security.[9] I understand as a general matter that disclosure of the advice, opinions, recommendations, and other information in these documents could inhibit the frank and candid deliberation of ideas and expression of views within the White House that are necessary in order for the President to fulfill his constitutional duties. In the specific fast-paced context of Hurricane Katrina, this principle would apply with equal or greater force. The disclosure of such communications would effectively inhibit candor in the quick deliberations necessary to respond to future disasters.

43. Because documents protected by the presidential communications privilege are shielded from disclosure in their entirety, FEMA withheld certain e-mails, e-mail chains, and related attachments without releasing any portions in redacted form. Where e-mails within an e-mail chain were protected by the privilege, but the whole chain was not subject to the privilege, FEMA redacted the privileged e-mails from the chain and segregated the remainder. In certain cases, where an e-mail was not itself subject to the

---

9 Materials withheld or redacted pursuant to the presidential communications privilege include index bates nos. 4-5, 17, 48-50, 1362-1369, 1379, 1380 1386-1417, 1419-1425, 1429-1431, 1436-1437, 1441-1449, 1474-1480, 1482, 1484-1489, 1504-1507, 1520-1523, 1526-1529, 1531-1546, 1619-1622, 1627-1632, 1636-1641, 1650-1652, 1660-1670, 1675-1690, 1695-1696, 1703-1748, 1757-1758, 1814, 1816-1828, 1839-1840, 1845-1846, 1883, 1897-1904, 1911-1914, 1917-1924, 1926-1928.

privilege, but revealed communications protected under the privilege, FEMA redacted that portion of the e-mail while segregating and releasing any otherwise non-exempt portions.

**B.      VTC Transcripts**

44. This category of documents includes approximately 355 pages of transcripts of video teleconferences ("VTCs") held by FEMA during its response to Hurricane Katrina.  See pages 65-419.  Participants in the VTCs included FEMA officials and other responders to Hurricane Katrina, including representatives of other federal agencies and representatives from affected states.  In total, FEMA redacted only three lines on two separate pages of the hundreds of pages in this category, see pages 116 & 153 (excerpts attached in Exhibit 5).  These redactions were made pursuant to Exemption 5, the deliberative process privilege.  The redacted portions reflect statements and input by FEMA officials regarding drafts of pending disaster declarations. The disaster declaration process is invoked once FEMA receives a request from affected states for a formal disaster declaration. FEMA subsequently analyzes any such request and prepares recommendations regarding the request for consideration and review by the President and his advisors.

45. The redacted portions are pre-decisional and deliberative and thus properly withheld under Exemption 5, the deliberative process privilege.  The process by which a draft evolves into a final document is inherently pre-decisional and deliberative.  Further, comments made in the drafting process are also pre-decisional and deliberative because they reflect the agency's preliminary thoughts and opinions given in the course of developing a final version of the document, assuming any such final version exists.  If FEMA staff believed that the drafting process and their contributions thereto were open

20

to public scrutiny, it would chill deliberations in the emergency declarations process and ultimately jeopardize the quality of recommendations made to the White House.

46. FEMA has released all segregable non-exempt material in the VTC transcripts.

## C.  Hurricane Preparedness Documents

47. This category of documents includes approximately 485 pages of drafts, briefings, planning documents, notes and e-mails that were generated primarily by FEMA's Response Division and were withheld, in whole or in part, on the basis of Exemption 5, the deliberative process privilege. See pages 420-792; 796-798; 800-883; 885-911. Response Division activities encompass: (1) the coordination of all Federal emergency management response operations, response planning and logistics programs; and (2) the integration of Federal, State, Tribal and local response programs to ensure the efficient and effective delivery of immediate emergency assistance to individuals and communities impacted by major disasters, emergencies or acts of terrorism.

48. Hurricane preparedness documents include the following categories: (1) Catastrophic Planning Section documents. In 2001, FEMA initiated steps to create a Catastrophic Planning Section within FEMA's Response Division; however, FEMA ultimately did not create such a section. As indicated in the Vaughn index, some of the documents that were withheld were drafted in anticipation of creating this section. (2) Southeast Louisiana Catastrophic Hurricane Planning Project documents. In 2003, FEMA embarked on a "catastrophic planning" initiative and the initial focus for the project was Southeast Louisiana. FEMA held several catastrophic planning workshops to frame discussions to identify and qualify the scale of requirements needed to build a plan for responding to a catastrophic hurricane scenario (known as Hurricane "Pam"). As indicated in the Vaughn index, some of the documents that were withheld were drafted

21

for this planning exercise and, for the majority of those documents that were withheld, FEMA has released a final version of the drafts. (3) Miscellaneous Response Division documents. Some of the activities of the planning section of the Response Division involve documents created to shape the goals and direction of the Division. As indicated in the <u>Vaughn</u> index, some of the documents that FEMA withheld were drafted as part of these ongoing decision-making processes and include internal plans, goals and status updates.

49. As further indicated in the Index, these hurricane preparedness materials are protected by the deliberative process privilege because they are both pre-decisional and deliberative. They are pre-decisional because they were created in the course of the above-described, ongoing decision-making processes, and because they predate, and relate to, decisions regarding what actions should be taken with respect to the various described initiatives. Although some of these ongoing processes may never have resulted in a "final" decision --- for example, no Catastrophic Planning Section was ever established --- they all constitute part of the FEMA Response Division's decision-making processes and predate any final decision. The materials are deliberative because they reflect the give-and-take of consultations that occurred in those decision-making processes. All of them reflect opinions, recommendations, analyses, and opinions of FEMA staff in connection with the various hurricane preparedness initiatives.

50. Many of the documents are drafts prepared by FEMA personnel in connection with hurricane preparedness exercises. <u>See</u> 420-650. By their very nature as drafts, these documents are pre-decisional, preliminary versions of what is intended to become a final document. The process by which FEMA staff review, edit, and modify a draft document, and ultimately transform it into a final document is inherently deliberative.

As a result, there is no reasonably segregable, non-exempt information that can be disclosed from the drafts. If FEMA staff believed that the drafting process and their contributions to that process were open to public scrutiny, they would be much more circumspect about their suggestions and edits, and as a result, the quality of the final product would suffer.

51. The materials also include various plans, briefings, and status reports prepared in connection with efforts to develop a Catastrophic Planning Section and other ongoing initiatives at FEMA's Response Division. See 651-787; 812-883; 885-902; 911. These materials are both pre-decisional and deliberative to the formulation of policy decisions in connection with developing the Response Division initiatives. Most are "working" documents that evolved over time, as deliberations progressed. Like the draft documents described above, these materials reflect pre-decisional, preliminary ideas about how ultimately to best implement these catastrophic planning initiatives. Also like the drafts, these sorts of materials are an essential part of FEMA's deliberations in shaping final policies and procedures for responding to emergencies. Disclosure would impair the quality and candor of these deliberations and ultimately, the quality of the agency's emergency preparedness policies would suffer. There are no responsive non-exempt portions of these documents.

52. Finally, the Hurricane Preparedness materials include e-mails reflecting the preliminary deliberations, and thoughts and opinions of the authors. See 788-792; 796-798; 800-803; 806-811; 903-910. These materials contain handwritten notes and edits on e-mails and other documents, and e-mail exchanges reflecting the preliminary ideas and deliberations on the catastrophic planning issues addressed. Such issues include, for example, funding and budgetary issues, and issues relating to contracting, evacuation,

23

and coordination with other federal agencies. These sorts of informal, very preliminary thoughts and exchanges are pre-decisional to various policy issues bearing on catastrophic planning. They are also deliberative in that they reflect the opinions and recommendations of agency officials on these issues. Like the e-mail deliberations in the wake of Hurricane Katrina, described above, these informal exchanges and notes function as a surrogate for extemporaneous reflection and conversations, and constitute an essential part of the individual and group thinking that make up the policy making process within the agency. Disclosure would chill these deliberations and thus impair FEMA's decision-making process.

53. FEMA provided all information that could reasonably be segregated from exempt portions to Plaintiff.

**D.    CNN LITIGATION**

54. This category of documents includes approximately 133 pages of documents, including e-mails and e-mail chains that were prepared in response to a federal lawsuit brought by the Cable News Network ("CNN") and were withheld in full on the basis of Exemption 5, the work product privilege, and in part under Exemption 5, attorney-client and deliberative process privileges. See pages 912-1044. On September 9, 2005, CNN filed a lawsuit against FEMA in the United States District Court for the Southern District of Texas (Case # CV H-05-3170). CNN sought relief in the form of a temporary restraining order and preliminary injunction, arguing that FEMA had violated CNN's First Amendment rights. As demonstrated in the Index, these e-mails were sent or received by FEMA's attorneys responding to this litigation, as well as attorneys for the United States Department of Homeland Security (DHS), the Department of Justice (DOJ) and the Department of Defense (Army) (DOD). The materials contain

descriptions and discussions of the proceedings, as well as strategies and recommendations in responding to the litigation.

55. These documents are subject to protection under the Attorney Work-Product Doctrine and are being withheld in full on that basis under Exemption 5.[10] The e-mails were specifically created by attorneys in response to, and in anticipation of, the lawsuit brought by CNN on September 9, 2005. They contain confidential discussions among attorneys from FEMA, DHS, DOD, and DOJ about how to respond to the litigation, reflect their thoughts and opinions on legal issues and strategy, and specifically discuss and analyze events in the ongoing litigation. Disclosure of these materials would reveal FEMA's litigation strategy and the opinions and mental impressions of its counsel. Such disclosure would undermine the adversarial process because government attorneys would not feel free to discuss litigation or to memorialize important thoughts and strategies for fear that they might be disclosed to the public and to adversaries. Disclosure would interfere with FEMA's confidential preparations for litigation and are subject to withholding in their entirety under the Attorney Work-Product privilege. Because these documents were created by attorneys in anticipation of litigation, they are protected in their entirety under the work product doctrine, which protects all parts of documents protected thereunder --- including both factual and deliberative material. Thus, there are no non-exempt portions of these documents, and they are properly withheld as work product protected under Exemption 5.

56. These documents are also subject to protection under the attorney-client[11] and deliberative process privileges[12] and are being withheld in part on that basis under

---

10 CNN Litigation materials withheld pursuant to the work product privilege include index bates nos. 912-1044.
11 CNN Litigation materials redacted in part pursuant to the attorney-client privilege include index bates nos. 912-1044.

Exemption 5. These documents contain confidential communications among attorneys within FEMA, DHS, DOJ, and DOD, which were made for the purpose of providing legal services and formulating legal advice about how to handle the CNN litigation and the federal government's response.  Such materials would be protected under the attorney-client privilege.  In addition, much of the material is pre-decisional and deliberative.  Such material is pre-decisional because the decision-making process regarding FEMA's response to the CNN litigation was on-going at the time the documents were prepared, and is also deliberative because it reflects the advice and opinions of the involved attorneys regarding FEMA's response to the CNN litigation. Release of such material would have a chilling effect on FEMA's decision-making processes in litigation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

_____
ADRIAN SEVIER

Executed on: _Feb 2, 2007_

---

12  CNN Litigation materials redacted in part pursuant to the deliberative process privilege include index bates nos. 912-1044.