UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
SEP 2 6 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Civil Case No. 06-0173 (RJL)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION
(September 25, 2007) [# 12]

Plaintiff, Citizens for Responsibility and Ethics in Washington ("CREW"), brings this action against the United States Department of Homeland Security ("DHS"), and specifically against its component, the Federal Emergency Management Agency ("FEMA"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, seeking records pertaining to FEMA's preparation for and response to Hurricane Katrina. Currently before the Court is defendant's Motion for Summary Judgment. After reviewing the parties' submissions and upon consideration of the entire record herein, the defendant's motion for summary judgment is GRANTED in part and DENIED in part.

### BACKGROUND

On August 29, 2005, Hurricane Katrina struck Louisiana, Mississippi, Alabama, and

Florida.[1] In response to the massive flooding and damage that ensued, the President declared certain counties and parishes along the Gulf Coast to be disaster areas pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5206 ("Stafford Act"). FEMA, the federal agency responsible for administering and coordinating the federal government's response to presidentially-declared disasters and emergencies under the Stafford Act, may, in responding to a disaster, establish Joint Field Offices and Disaster Recovery Centers and work with state and local governments to assess the emergency and deploy the appropriate federal resources to aid in the recovery effort. (Sevier Decl. ¶¶ 10-11.)

On September 7, 2005, pursuant to FOIA, plaintiff requested eighteen categories of documents from FEMA's Office of General Counsel. (*Id.* at ¶ 19.) Plaintiff sought access to "any and all records relating to [FEMA's] response to hurricane Katrina, including "all memoranda, communications and records of any kind and from any source . . . from January 1, 2001 to the present." (*Id.*) Specifically, plaintiff requested information from January 1, 2001 to the present regarding, *inter alia*, appropriations to DHS in 2005 for emergency preparedness for natural and man-made disasters; the portion of DHS appropriations diverted from preparedness for natural disasters to preparedness for terrorist attacks; studies of the potential devastation a powerful hurricane could inflict upon the Gulf Coast; the federal

---

[1] See *Association of Community Organizations for Reform Now v. Federal Emergency Management Agency*, 463 F. Supp. 2d 26, 28 n.2 (D.D.C. 2006), for a brief description of the devastation caused by one of the worst natural disasters in United States history.

government response plans to such a scenario; the potential breaching of the New Orleans levees; and communications to and from the Army Corps of Engineers regarding the New Orleans levees. (*Id.*) Additionally, plaintiff sought documents from August 26, 2005 to the present regarding, *inter alia* : local government requests for emergency assistance; communications to, from, and within FEMA regarding FEMA's response to such requests for assistance; and communications regarding FEMA's general administration and coordination of the hurricane recovery effort. (*Id.* at ¶ 20.)

FEMA ultimately identified approximately 8100 pages of documents responsive to plaintiff's request. (*Id.* at ¶ 21-22.) FEMA released 7468 pages of those documents to plaintiff in a series of sixteen releases from January 24, 2006 to February 17, 2007. (*Id.* ¶ 24.) FEMA redacted or withheld in full 1503 pages pursuant to FOIA Exemption 5. (*Id.* ¶ 26-27.) The plaintiff has confined its challenge to FEMA's reliance on Exemption 5 to withhold these documents.

## DISCUSSION

### I.   Standard of Review

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court draws all reasonable inferences regarding

the assertions made in a light favorable to the non-moving party, *Biodiversity Conservation Alliance v. U.S. Bureau of Land Mgmt.*, 404 F. Supp. 2d 212, 216 (D.D.C. 2005) (citing *Flynn v. Dick Corp.*, 384 F. Supp. 2d 189, 192-93 (D.D.C. 2005)). "[W]hen ruling on cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." *Barr Labs., Inc. v. Thompson*, 238 F. Supp. 2d 236, 244 (D.D.C. 2002) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975)).

In a FOIA case, an agency is entitled to summary judgment where it demonstrates that documents are not subject to FOIA's disclosure requirements. *Exxon Corp. v. FTC*, 663 F.2d 120, 126 (D.C. Cir. 1980). The withholding agency bears the burden of justifying its exemptions. *Summers v. U.S. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). In a FOIA case, "the Court may award summary judgment solely on the basis of information provided by the department or agency in affidavits or declarations." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Our Circuit Court has noted that "in the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by the FOIA." *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982). Although there is no set form for a *Vaughn* index compiled in response to a FOIA request, our Circuit Court has identified three important components: "(1) that the index is one document; (2) the index must adequately describe the withheld documents or deletions; and (3) the index must state the particular FOIA exemption and

explain why the exemption applies." *Founding Church of Scientology of Wash., D.C., Inc. v. Bell*, 603 F.2d 945, 949 (D.C. Cir. 1979). In support for its Motion for Summary Judgment, FEMA submitted declarations by Adrian Sevier, the acting Deputy Chief Counsel of FEMA ("Sevier declaration") and Joel B. Bagnal, the Deputy Assistant to the President for Homeland Security on the Homeland Security Counsel staff within the White House ("Bagnal declaration"), and a *Vaughn* index.

## II.    FOIA Exemption 5

CREW challenges FEMA's decision to withhold certain documents pursuant to FOIA Exemption 5, 5 U.S.C. § 552(b)(5). Exemption 5 exempts from disclosure "inter-agency or intra-agency memorand[a] or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Under this exemption, documents "that are normally privileged in the civil discovery context" are exempted. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). Accordingly, documents that are subject to the deliberative process privilege, the attorney-client privilege, and attorney work product are exempt from disclosure. *See NLRB v. Sears, Roebuck & Co*, 421 U.S. 132, 149 (1975); *EPA v. Mink*, 410 U.S. 73, 86 (1973); *Coastal States Gas Corp. v. U.S. Dept. of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). In addition, Exemption 5 applies to materials protected by the presidential communications privilege, a privilege derived from the separation of powers between the branches of government. *See, e.g., Judicial Watch v. Dep't of Justice*, 365 F.3d

1108, 1113 (D.C. Cir. 2004). FEMA relies primarily [2] on the deliberative process and presidential communications privileges as the basis to withhold the majority of the documents in question. For the following reasons, the Court concludes that FEMA has made the requisite showing as to the deliberative process privilege, but not to all of the documents for which it asserts the presidential communications privilege.

### A. *The Deliberative Process Privilege*

The deliberative process privilege exempts from FOIA disclosure documents containing deliberations comprising part of a process by which governmental decisions and policies are formulated. *See Dep't of the Interior v. Klamath Water Users Protective Ass'n,*

---

[2] FEMA additionally seeks to withhold a small number of documents pursuant to the work product and attorney-client privileges. Exemption 5, of course, does protect documents that are protected by the attorney-client privilege. *Coastal States*, 617 F.2d at 863. Indeed, "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice" are clearly exempt. *Mead Data*, 566 F.2d 242, 252 (D.C. Cir. 1977.) However, where the legal opinion represents authoritative interpretations of agency law, those communications are not protected from disclosure. *Tax Analysts v. IRS*, 117 F.3d 607, 619-20 (D.C. Cir. 1997); *see also Coastal States*, 617 F.2d at 863.
    Here, Sevier states in his affidavit that FEMA exempted documents subject to the attorney client privilege, such as communications "made for the purpose of rendering legal advice bearing on numerous issues arising in the wake of Hurricane Katrina." (Sevier Decl. ¶ 40.) Contrary to CREW's assertion (Pl. Opp'n at 18-19), in FEMA's *Vaughn* index, any documents withheld pursuant to the attorney-client privilege are described as "confidential communications," regardless of the number of recipients. (*See, e.g.*, Doc. 1418 (containing "confidential communications made for the purpose of rendering legal advice").) Absent a specific showing that these communications were not kept confidential, FEMA has met its burden in establishing a basis for withholding the documents under Exemption 5.
    Moreover, the Court finds that there is no indication that the material withheld pursuant to the attorney-client privilege consisted of authoritative interpretations of agency law. (*See, e.g.*, Doc. 1369 (email "rendering legal advice" from FEMA Office of Chief Counsel to FEMA staff regarding "federal-state cost share for Hurricane Katrina"); Doc. 1490-99 (email from Office of Chief Counsel providing "advice" regarding submitting housing requests and emergency declarations).) Therefore, FEMA properly withheld the material as protected by the attorney-client privilege pursuant to Exemption 5.

532 U.S. 1, 8 (2001); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866-67 (D.C. Cir. 1980). As our Circuit has explained, "[t]wo requirements are essential to the deliberative process privilege: the material must be predecisional and it must be deliberative." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citing *Army Times Publ'g Co. v. Dep't of the Air Force*, 998 F.2d 1067, 1070 (D.C. Cir. 1993); *Wolfe v. Dep't of Health and Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (*en banc*)). A document is predecisional if "it was generated before the adoption of an agency policy." *Coastal States*, 617 F.2d at 868. A document is deliberative if it "reflects the give-and-take of the consultative process." *Id.* at 866. Documents such as drafts, recommendations, proposals, and suggestions that reflect personal opinions of the author rather than the policy of the agency are thus protected under this privilege. *Coastal States*, 617 F.2d at 866. As explained by our Circuit Court, the purpose of the deliberative process privilege is "to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism . . . and to protect against confusing the issues and misleading the public by the dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Coastal States*, 617 F.2d at 866; *see also Sears, Roebuck & Co.*, 421 U.S. at 150. If the disclosure of material would tend to "discourage candid discussion within an agency," it is often found to be deliberative. *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991) (internal citations omitted). Plaintiff here contends that Exemption 5 does not apply to

certain documents either because the documents were shared with non-agency consultants or were not "deliberative." For the following reasons, I disagree.

*1. Whether Withheld Documents Were Intra/Inter-Agency*

First, CREW contends that FEMA improperly withheld certain materials pursuant to Exemption 5 because it shared those materials with individuals or entities outside federal government agencies.[3] (Pl. Opp'n at 7.) Not so! Documents and communications may qualify as "intra-agency" materials when they "ha[ve] been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity other than on behalf of another agency-*e.g.*, in a capacity as an employee or consultant to the agency." *Dep't of the Interior & Bureau of Indian Affairs v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9-10 (2001) (citation omitted). Indeed, when an agency solicits opinions from and recommendations by temporary, outside consultants, those materials are considered "intra-agency" for FOIA purposes. *See Ryan v. Dep't of Justice*, 617 F.2d 781, 789-90 (D.C. Cir. 1980) (upholding exemption for Senators' responses to questionnaire from the Department of Justice regarding judicial nominations). Conversely, when an outside group communicates its views to an agency that are "necessarily adverse to the interests of competitors," the outside group does not act in a consulting capacity.

---

[3] CREW's challenge regarding two particular documents is now moot. Document No. 1547-48, a communication with a member of Congress, has been released. Document No. 1703-48 initially was improperly labeled as involving a director of a corporation, when it actually involved only Executive Branch officials. (Supp. Decl. Sevier ¶ 3.) This predecisional material regarding selecting information for a briefing is exempt pursuant to the deliberative process privilege.

*Klamath*, 532 U.S. at 15 (finding Klamath Tribes acted in non-consulting capacity when pressing their views and interests to the agency).

Here, FEMA withheld material drafted by contractors made in connection with researching and developing FEMA's "catastrophic planning" initiatives. (Docs. 645-50, 885-902; Sevier Decl. ¶ 48-53.) [4] Nothing in the *Vaughn* index, nor the Sevier declaration, indicates that the contractors acted in an adversarial capacity, such that they negated the consulting relationship. *See Public Citizen v. Dep't of Justice*, 111 F.3d 168, 171 (D.C. Cir. 1997) (finding potential for adversarial relationship between President and the Archives insufficient to negate the consultation relationship); *cf. Klamath*, 532 U.S. at 15 (tribes had interests adversarial to those with rival land claims). As the documents prepared by the contractors provided proposals and evaluations related to FEMA's catastrophic planning initiatives, the material withheld is more like the questionnaire responses in *Ryan*, where the Attorney General sought to solicit Senators' input regarding judicial nominee procedures. *See* 617 F.2d at 784. Likewise, the withheld communication involving the former Congressman, which concerned "a recommendation for the federal response to the damage caused by Hurricane Katrina," was part of the process by which FEMA gathered information regarding the response to Hurricane Katrina from consultants; since nothing indicates the

---

[4] Upon review, two documents challenged as including communications with outside contractors actually only redacted notes by FEMA officials. (Docs. 903-10, 796-98.) As the *Vaughn* index indicates, the redacted material were handwritten notes by a FEMA official and were properly redacted. *See Hornbostel v. U.S. Dep't of the Interior*, 305 F. Supp. 2d 21, 31 (D.D.C. 2003) (notes from meetings or on documents indicating employees' impressions and opinions exempt).

9

potential for an adversarial relationship with the former Congressman (Doc. 1526-29), this document was also properly withheld.

Lastly, the meeting minutes, with handwritten notes, involving "representatives from emergency management officials from Mississippi and Louisiana" to "coordinate evacuation plans among the state and federal responders" (Doc. 812-20) also involved extra-agency personnel acting in a consulting capacity. The state officials worked with FEMA to make and inform agency decisions regarding evacuation (Sevier Decl. ¶ 47-48 (explaining some withheld documents pertained to meetings regarding coordination of the state and federal response)), as participants in FEMA's deliberations, not as adversaries. *See Nat'l Institute of Military Justice v. U.S. Dep't of Defense*, 404 F. Supp. 2d 325 (D.D.C. 2005) (finding that comments from non-agency attorneys did not waive deliberative process privilege because their comments informed the agency's decision making process); *United States v. Allsteel, Inc.*, 1988 WL 139361, at *2 (N.D. Ill. Dec. 21, 1988) (meeting documents for meeting between state and federal officials properly withheld has "intra-agency" document). The explanations contained in the *Vaughn* index and Sevier declaration well-establish that FEMA communicated with these outside agencies in a consulting capacity and thus properly withheld those communications pursuant to Exemption 5.

### *2. Whether Withheld Documents Were Deliberative*

Next, CREW argues that FEMA withheld communications that were *not* actually deliberative.[5] (Pl. Opp'n at 9-10.) Again, I disagree. To establish that it withheld documents pursuant to the deliberative process privilege, the agency must only identify "what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980); *Judicial Watch v. Reno*, 2001 WL 1902811, *3 (D.D.C. Mar. 30, 2001). It does not need to state the specific decision to which the material relates. *Coastal States Gas Corp.*, 617 F.2d at 868; *Judicial Watch*, 2001 WL 1902811 at *3. Here, however, the *Vaughn* index and Sevier declaration set forth that the withheld materials concerned deliberations regarding the ongoing response to Hurricane Katrina. (Sevier Decl. ¶ 33-34, 44, 47-49). CREW's response, by comparison, is, at best, unpersuasive.

For example, CREW argues that describing documents as concerning "personnel" decisions in the *Vaughn* index, without more, does not adequately indicate that the withheld communications are deliberative.[6] (Pl. Opp'n at 10.) As the Sevier declaration explains, however, these personnel decisions, along with the other issues discussed in the withheld emails, "arose in the context of larger policy deliberations about how to most effectively respond to the extraordinarily difficult challenges that arose in the wake of Hurricane

---

[5] Documents 4-5, 1415, 1416-17, 1474-80, 16, 62, 61, 1203-07, 1436-37, 1639-41, 1655, 1657-58, 1753-58, 1781, 1590-1609, 1370-78, 1384-85 and 1514-19.

[6] Documents 2-3, 40-43, 59, 1397-14, 1426-28, 1441-46, 1627-28, 1771-73, 1804-95, 1865-77, 1905-06.

11

Katrina." (Sevier Decl. ¶ 33.) These communications were thus part of the overall deliberations on how to effectively respond to Hurricane Katrina and other catastrophic events. *See Quarles v. Dep't of the Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990) (materials are predecisional where they are "prepared in order to assist in arriving at . . . decisions").

CREW's concerns about Document 1474-80 regarding the appropriate response to fires is similarly unavailing, since gauging the appropriate response to a specific type of problem is clearly part of the ongoing, deliberative process about how to respond to a natural disaster. (Sevier Decl. ¶ 33); *Hornbostel*, 305 F. Supp. 2d at 31 (finding work plans, status reports, briefings, opinions, paper and proposals exempt as related to formulation of policy decisions).

Additionally, FEMA appropriately withheld "predictive opinions about possible participants in [teleconference] discussions" (Doc. 1416-17) as reflecting how the decision to include certain individuals in discussions about the response to Hurricane Katrina was reached, which was part of the ongoing decisions on how to respond to the damage caused by Hurricane Katrina. *See Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 90 F. Supp. 2d 9, 14 (D.D.C. 2000) (finding lists of potential companies to participate in missions properly withheld because weighing reasons to include as part of overall policy).

Finally, CREW alleges the deliberative status of certain "briefings and reports about events occurring in the aftermath of Hurricane Katrina, time lines and a list of matters in a situation report" because they did not involve the contemplation of any agency policies. (Pl. Opp'n at 12.) Not so, however, here. While the deliberative process privilege does not

exempt documents that contain purely factual material, "unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations," *In re Sealed Case*, 121 F.3d at 737 (citations omitted), "in some instances, 'the disclosure of even purely factual material may so expose the deliberative process within an agency' that the material is appropriately held privileged." *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir.1992).[7] Here, a review of the *Vaughn* index for the "briefings and reports" reveals that some of these documents consist of reports regarding various problems relating to the *ongoing* response to Katrina and *suggesting* solutions and approaches and *draft* situation reports. (*See, e.g.*, Docs. 61, 1203-07, 1655.) FEMA thus properly withheld those briefings and reports as communications regarding the analysis of the ongoing policy of the Government's response to Katrina. *Reno*, 2001 WL 1902811 at *3; *see Hornbostel v. Dep't of the Interior*, 305 F. Supp. 2d 21, 31 (D.D.C. 2003) (finding "emails exchanging thoughts and opinions about various legal and policy decisions" and briefings and reports exempt from FOIA disclosure as "part of the group thinking and preliminary actions encompassed by the policy making process in an agency"); *Judicial Watch, Inc. v. Reno*, 2001 WL 1902811, *4 (D.D.C. Mar. 30, 2001) (where documents contain facts bearing on formulation or exercise of agency policy-oriented judgment, deliberative).[8]

---

[7] CREW's challenge to the redactions in Documents 4-5 and 1415 are similarly without merit. The *Vaughn* index indicates that material was withheld as "debate regarding whether to set up an Interagency Incident Management Group" and nothing in the unredacted portions of Doc. 1415 indicate otherwise.

[8] Our Circuit has stated that "[t]o the extent that predecisional materials, even if 'factual' in form, reflect an agency's preliminary positions or ruminations about how to exercise discretion

Accordingly, for all of these reasons, the Court finds that FEMA has met its burden in establishing that the documents were appropriately exempt pursuant to the deliberative process privilege.

### B. The Presidential Communications Privilege

Finally, FEMA relies on the presidential communications privilege to withhold certain documents requested by CREW. Like the deliberative process privilege, the presidential communications privilege protects executive branch decisionmaking. While the deliberative process privilege applies to executive officials generally, the presidential communications privilege applies to the President. *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir. 1997). Specifically, the presidential communications privilege applies only to "communications in performance of a President's responsibilities . . . and made in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1997) (internal citations and formatting omitted). In contrast to the deliberative process privilege, documents withheld subject to the presidential communications privilege can be withheld in their entirety, and the privilege covers postdecisional, as well as predecisional, matters. *In re Sealed Case*, 121 F.3d at 744-45.

---

on some policy matter, they are protected under Exemption 5." *Petroleum Information Corp. v. U.S. Dept' of the Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992). Since the draft timeline (Doc. 1560-09) and list of matters for a situation report (Doc. 1370-78, 1384-85, 1514-19) were developed as part of FEMA's ongoing efforts to respond to Katrina, the inclusion or exclusion of facts necessarily contain opinion regarding which facts were important to the deliberations. *See Bloomberg v. Securities & Exchange Comm'n*, 357 F. Supp. 2d 156, 169 (D.D.C. 2004) (finding exempt documents that distilled facts from meetings thus reflecting the impressions of agency officials).

The presidential communications privilege is premised on "the need for confidentiality to ensure that presidential decision making is of the highest caliber, informed by honest advice and full knowledge." *U.S. v. Nixon*, 418 U.S. 683, 708 (1974). It extends "beyond communications directly involving and documents actually viewed by the President, to the communications and documents of the President's immediate White House advisers and their staffs," *i.e.*, documents "solicited and received" by the President or his Office. *See Judicial Watch, Inc. v. Dep't of Justice* 365 F.3d 1108, 1114 (D.C. Cir. 2004) ("[W]e hold that the presidential communications privilege applies only to those pardon documents 'solicited and received' by the President or his immediate advisers who have 'broad and significant responsibility for investigating and formulating the advice given the President.'"); *see also In re Sealed Case*, 121 F.3d at 758 ("[The privilege should apply only to communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate."). Expanding the presidential communications privilege beyond the President is necessary to allow his advisers to "investigate the factual context of a problem in detail, obtain input from all others with significant experience in the area, and perform detailed analysis of several different policy options." *See In re Sealed Case*, 121 F.3d at 750. It does not, however, extend to all documents authored by individuals within the Executive branch, such as staff outside the White House in the various executive agencies. *See Judicial Watch*, 365 F.3d at

15

1114, 1123 (finding that privilege did not extend to "all agency documents prepared in the course of developing the Deputy Attorney General's pardon recommendations for the President" where no indication the documents reached the White House and underwent various stages of intermediate review); *see also In re Sealed Case*, 121 F.3d at 752 (extending presidential communication privilege to documents generated by White House Counsel office staff and other presidential advisers, and documents created and received under those advisers's direction, but finding the privilege overcome by a sufficient showing of need). For the following reasons, FEMA's invocation of this privilege is appropriate here.

First, notwithstanding CREW's argument to the contrary, there is every indication that the majority of these communications are related to presidential decision-making.[9] (Pl. Opp'n at 16-17 & n.12.) Indeed, Bagnal's declaration makes clear that:

> *[T]he President's advisers or staff made, solicited and received communications from FEMA and other agency officials* for the purposes of assessing the conditions on the ground, resolving inconsistent and conflicting information to the extent possible, and making decisions regarding responses to requests for Federal government support. . . . Information gathered through these communications was considered and, whether included or excluded from the final rendition of advice, it played a role in *the formulation of advice and recommendations to the President regarding how best to accommodate and support requests for emergency assistance from FEMA as well as State and local entities.*

(Bagnal Decl. ¶ 12 (emphasis added).) More specifically, many of the withheld communications were authored by, or requested and received by, the President's

---

[9] Documents 4-5, 17, 48-50, 1366-68, 1369, 1415, 1419-24, 1441-46, 1505, 1507, 1619, 1630-32, 1636-38 and 1913.

immediate White House advisers, and their staffs, who were formally charged with advising the President and providing him with recommendations in the wake of the hurricane. (Bagnal Decl. ¶¶ 13-16.) *See In re Sealed Case*, 121 F.3d at 852 (privilege protects reports monitoring a course of action). Absent a specific challenge to the substance of the Bagnal declaration, FEMA has easily met its burden in establishing a basis for withholding the documents.[10]

Moreover, the Court rejects CREW's position that FEMA must name the White House advisers participating in the communications in order to *properly* invoke the presidential communications privilege.[11] (Pl. Opp'n at 17.) Whether the privilege applies

---

[10] As an initial matter, CREW challenges whether FEMA properly invoked the presidential communications privilege. A member of this Court has held that the President does not need to personally invoke the presidential communications privilege to withhold documents pursuant to FOIA Exemption 5. *Lardner v. U.S. Dep't of Justice*, 2005 WL 758267, * 7 (D.D.C. Mar. 31, 2005) (Bates, J.) (finding proper invocation of presidential communications privilege where invoked by attorney-adviser in the Office of the Pardon Attorney); *see also Loving v. U.S. Dep't of Defense*, 2007 WL 2137759, *5 (D.D.C. Jul. 26, 2007) (Huvelle, J.); *cf. Judicial Watch*, 365 F.3d at 1114 (noting that whether President must personally invoke presidential communications privilege remains an open question). In the declaration submitted, Joel B. Bagnal, Deputy Assistant to the President for Homeland Security on the Homeland Security Council staff, a component of the Executive Office of the President, declared that he was "aware that there are 265 pages of documents withheld by FEMA in whole or in part" pursuant to the presidential communications privilege and that "[t]he decisions to withhold this material, which a member of the Office of Counsel to the President also reviewed" are reflected in the *Vaughn* Index. (Bagnal Decl. ¶ 13; *see also* ¶ 1, 3.) The Court finds Bagnal's invocation of the privilege, as a member of the Homeland Security Council Staff, a component of the Executive Office of the President, sufficient.

[11] Documents 1389-96, 1416-17, 1506, 1520-21, 1531-46, 1620-22, 1639-41, 1664-70, 1675-90, 1695-96, 1703-48, 1757-58, 1816-17, 1818-28, 1839-40, 1845-46, 1883, 1911-12, 1914, 1917-22, 1923 and 1926-28.

17

depends on the nature of the adviser's responsibilities; not his or her name. *See In re Sealed Case*, 121 F.3d at 752; *see also Judicial Watch*, 365 F.3d at 1114. The crux of whether the communication should be protected is whether the communications were "authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate." *See In re Sealed Case*, 121 F.3d at 752. Since Bagnal states in his declaration that the "President's immediate advisers and their respective staffs" had "broad and significant responsibilities for gathering information and formulating advices and recommendations to be transmitted to the President" (Bagnal Decl. ¶ 14), the communications with the White House advisers or their staff are in this Court's judgment exempt from production under the presidential communications privilege.

CREW's final argument that relaying past or intended presidential communications do not fall within the confines of the privilege, however, raises different concerns. (Pl. Opp'n at 15-16.) The "core" of the presidential communications privilege is the protection of the President's "need for confidentiality in the communications of his office." It is possible that revealing those communications between the President and his advisers would frustrate the purpose of the privilege. *Judicial Watch*, 365 F.3d at 1114-15 (quoting *In re Sealed Case*, 121 F.3d at 742); *see also Association of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) (noting in dicta that the presidential communications privilege "attaches not only to direct communications with

18

the President, but also to discussions between his senior advisers[, who] . . . must be able to hold confidential meetings to discuss advice they secretly will render to the President"). The Court is aware, however, of our Circuit Court's direction that the presidential communications privilege should not extend to documents prepared within executive agencies that are not solicited and received by White House advisers or their staff. In light of that, the Court finds that communications solely between agency officials that were withheld as "intended" for White House advisers or "revealing" communications with White House advisers were not properly exempt under the presidential communications privilege.[12] *See Judicial Watch*, 365 F.3d at 1114 (declining to extend presidential communications privilege where no indication that material "otherwise reached" the White House). Although Bagnal states in his affidavit that "it can be fairly inferred" that these withheld communications "ultimately [were] transmitted" to the White House advisers or the President, this is, without more, insufficient to meet FEMA's burden.[13] Accordingly, the Court DENIES summary judgment, without prejudice, as to those communications that were not actually transmitted to the White House advisers or their staff, and GRANTS summary judgment as to the communications withheld under

---

[12] Documents 4-5, 17, 48-50, 1366-68, 1369, 1379, 1380, 1397-14, 1415, 1419-24, 1436-37, 1441-46, 1447-49, 1474-80, 1482, 1485-89, 1504, 1505, 1619, 1627-28, 1629, 1650-52, 1660-63, 1897-1902 and 1903-04.

[13] Although FEMA states that these documents were also withheld pursuant to the deliberative process privilege, it is not clear from the *Vaughn* index whether the same material withheld under the presidential communications privilege was also withheld under the deliberative process privilege or whether the deliberative process privilege applied to different portions of the withheld material.

the presidential communications privilege that were actually shared with the President, or his White House advisers or their staff.

## CONCLUSION

For all of the foregoing reasons, the Court GRANTS defendant's Motion for Summary Judgment for the documents withheld under the deliberative process privilege, the attorney-client privilege, the work product privilege and the presidential communications privilege for those documents actually transmitted to the President, or his White House advisers or their staff. The Court DENIES, without prejudice, defendant's Motion for Summary Judgment for these documents withheld under the presidential communications privilege that were not actually transmitted to either the President, or his White House advisers or their staff. An appropriate Order will issue with this Memorandum Opinion.

*[signature]*
RICHARD J. LEON
United States District Judge