IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, 11 Dupont Circle, N.W. Washington, D.C. 20036<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Washington, DC 20528<br><br>Defendant. | Civil Action No. 06-173 (RJL) |

## SUPPLEMENTAL DECLARATION OF JOEL B. BAGNAL

I, Joel B. Bagnal, hereby declare as follows:

1. My name is Joel B. Bagnal, and I currently hold the position of Deputy Assistant to the President for Homeland Security on the Homeland Security Council ("HSC") staff within the White House Office. In this capacity, I am responsible for advising and assisting the President of the United States on all homeland security matters, including matters involving emergency response, preparedness and recovery policy. Previously, and at the time of Hurricane Katrina, I held the position of Special Assistant to the President for Homeland Security on the HSC staff, and in that capacity I was integrally involved in coordinating the Federal response to Hurricane Katrina.

2. I submit this declaration in support of Defendant United States Department of Homeland Security's ("DHS") renewed motion for summary judgment in the above-captioned matter. I base this declaration on my personal knowledge, information made available to me in

- 1 -

the performance of my official duties, and my knowledge of the issues being litigated in the above-captioned case.

3. In my original declaration, which is attached hereto as Exhibit A, I described five categories of communications that meet the requirements for protection under the presidential communications privilege and that were therefore withheld by defendant on that basis under Exemption 5. *See* Bagnal Decl. ¶ 15. These communications included e-mail communications that were authored by or solicited and received by the President's immediate advisers and their respective staffs. They also included, however, communications of the President, and his immediate advisers and their respective staffs "referred to or reflected in internal FEMA communications." *See id.* ¶ 15.e. With respect to this latter category, the withheld communication for purposes of the presidential privilege is not the e-mail itself (which I understand has been released, albeit in redacted form). Instead, it is the communication "referred to or reflected in" the text of such e-mails, which have been redacted in order to avoid disclosing the content of earlier communications with the White House.

4. These materials reveal actual communications with the White House. In particular, these e-mails memorialize, summarize, describe or otherwise reflect the content of privileged conversations and/or discussions between agency officials and the President, his immediate White House advisers or their staff. While there is no indication that the e-mails were themselves sent to or from the White House, the material redacted nonetheless would, if disclosed, reveal the substance of actual privileged communications with the White House that occurred prior to the creation of these e-mails. For example, one e-mail chain at Bates No. 1379 contains an e-mail from then-FEMA Director and DHS Under Secretary, Michael Brown, to two other senior FEMA officials in which Director Brown summarizes a conversation he had with the

President in the wake of Hurricane Katrina. Defendant redacted this e-mail chain to the extent necessary to avoid disclosing the substance of this conversation with the President.

5. To the extent that such communications with the President, his immediate advisers, and their respective staffs are memorialized in internal agency e-mails, the descriptions and concerns in my original declaration are no less applicable than they are to the other categories of White House communications identified therein. *See generally*, Bagnal Decl. ¶¶ 8-16. In particular, disclosure of the advice, opinions, recommendations, and other information of the President, his immediate advisers and their respective staffs that are memorialized in internal agency e-mails could inhibit the frank and candid deliberation of ideas and expression of views within the White House and between the White House and agency officials that are necessary in order to enable the President to fulfill his duties as Commander in Chief and as Chief Executive with supervisory responsibility with regard to the Executive Branch. *See* Bagnal Decl. ¶ 16. And, as stated before, this principle holds true with heightened force in circumstances such as preparing for and responding to a catastrophic incident such as Hurricane Katrina, when advisers and their respective staffs seek to gather, assess, and transmit information for purposes of informing the President's decisions. *See id.*

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washington, District of Columbia, this 25 day of January 2008.

_____
JOEL B. BAGNAL
Deputy Assistant to the President for
Homeland Security

**EXHIBIT A TO SUPPLEMENTAL
DECLARATION OF JOEL B. BAGNAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, 11 Dupont Circle, N.W. Washington, D.C. 20036<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Washington, DC 20528<br><br>　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)　Civil Action No. 06-173 (RJL)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF JOEL B. BAGNAL

I, Joel B. Bagnal, hereby declare as follows:

1. My name is Joel B. Bagnal, and I currently hold the position of Deputy Assistant to the President for Homeland Security on the Homeland Security Council ("HSC") staff within the White House Office. In this capacity, I am responsible for advising and assisting the President of the United States on all homeland security matters, including matters involving emergency response, preparedness and recovery policy. Previously, and at the time of Hurricane Katrina, I held the position of Special Assistant to the President for Homeland Security on the HSC staff, and in that capacity I was integrally involved in coordinating the Federal response to Hurricane Katrina.

2. I submit this declaration in support of Defendant United States Department of Homeland Security's ("DHS") motion for summary judgment in the above-captioned matter. I base this declaration on my personal knowledge, information made available to me in the performance of my official duties, and my knowledge of the issues being litigated in the above-

captioned case.

### A. *Homeland Security Council ("HSC")*

3. HSC was established on October 8, 2001, pursuant to Executive Order 13228, as amended, and is part of the White House Office component of the Executive Office of the President. HSC and its staff perform a policy coordination and advisory role for the President, ensuring coordination of all homeland security-related activities among the Federal departments and agencies and promoting the effective development and implementation of all homeland security policies.

4. HSC's staff includes the Assistant to the President for Homeland Security and Counterterrorism ("Homeland Security Advisor"), the Deputy Assistant to the President for Homeland Security, several Special Assistants to the President (who are also Senior Directors), and a number of Directors, all of whom report to the Homeland Security Advisor on various policy areas. In my capacity as Deputy Assistant to the President for Homeland Security, I report to the Homeland Security Advisor on issues pertaining to emergency preparedness and response for purposes of advising and assisting the President in his decisions on matters relating to preparing for and responding to natural disasters, including Hurricane Katrina in late August and early September 2005.

### B. *Federal Emergency Response, Generally*

5. Although its role traditionally has been limited when responding to natural disasters, the Federal government has developed a comprehensive incident response and management system to enable it to work effectively together with State and local governments and the private sector to prepare for, respond to, and recover from severe domestic incidents. On February 28, 2003, the President, through Homeland Security Presidential Directive 5 ("HSPD-5"), directed

the Secretary of Homeland Security to create a National Incident Management System ("NIMS") which would serve this coordination and management role in times of severe domestic incident. The President also directed the Secretary of Homeland Security to develop and administer an integrated National Response Plan ("NRP"), using the NIMS, to provide the structure and mechanisms for national level policy and operational direction for Federal support to State and local incident managers. The NIMS was completed in March 2004, the NRP was completed in December 2004, and together they provided the foundation for how the Federal government organized itself in connection with the response to Hurricane Katrina.

6. When State and local governments request Federal assistance in response to a natural disaster, the NRP provides the Federal government with a systematic and coordinated approach to incident management at the field, regional, and Federal agency headquarters levels, establishing protocols for such activities as reporting incidents, issuing alerts and notification, coordinating response actions, and mobilizing resources. The effectiveness of the NRP in action presupposes effective and accurate communication of information throughout the relevant chains of command and among all parties involved at the Federal, State, and local levels.

7. The declaration of Adrian Sevier, Acting Deputy Chief Counsel at the Federal Emergency Management Agency ("FEMA"), more fully explains FEMA's role in emergency response situations. I understand, however, that FEMA, a component within DHS, is the primary agency charged with coordinating Federal assistance during natural disasters. Under the NRP, FEMA assumes the lead role in coordinating, managing, and reporting about on-site operational response, relief, and recovery efforts of the other relevant components of the Federal government. The other Federal government components assist FEMA by contributing operational assets and/or capabilities to the disaster response.

### C. *Hurricane Katrina*

8. Pursuant to the Homeland Security Act of 2002 and HSPD-5, the Secretary of Homeland Security is the principal Federal official for domestic incident management. Thus, Secretary Chertoff was the principal decision-maker for the Federal response to Hurricane Katrina. Secretary Chertoff, in turn, designated Under Secretary and FEMA Director Michael Brown as the Principal Federal Official ("PFO") to coordinate the hurricane response on the ground at the situs of the storm. Under Secretary Brown was charged with facilitating Federal support to the unified command structure, coordinating the overall Federal incident management, and serving as the primary point of contact and communications hub for Secretary Chertoff, DHS, other Federal agencies, and the White House.

9. FEMA thus monitored the approach of the storm and held frequent communications through such media as video teleconferences with DHS headquarters, FEMA headquarters and regional offices, the National Hurricane Center, various State and local officials, and White House advisers, including but not limited to HSC staff. Prior to the storm's landfall, the President and a number of his advisers and their respective staffs participated in these and other communications for purposes of assessing and preparing to respond to the damage anticipated by the storm. For instance, the President participated in a video teleconference on August 28, 2005, during which he and other participants discussed the progression of the storm and anticipated response needs based on then-discernible information. The President offered Federal government assistance and assured Federal, State and local officials that he was prepared to provide all available resources and assets to assist both during and after the storm in response to requests for support. The President or his advisers and their respective staffs also participated in subsequent briefings, and the President had conversations with FEMA and other Federal officials

and received updates from his advisers regarding their communications with FEMA and other Federal, State, and local officials.

10. The pre- and post-storm communications were intended to apprise the President, his advisors and their respective staffs of the storm's progress, the severity of destruction, and the needs of the responders on the ground that were the subject of requests for assistance from State governments. The communications were also intended to enable the President's advisers and their respective staffs to formulate advice and recommendations for the President in his decisions regarding how best to accommodate requests for Federal support, both in his capacity as Commander in Chief and as Chief Executive supervising the Federal response to Hurricane Katrina. The days immediately following the storm's landfall produced a highly volatile and unpredictable environment requiring the President and his advisers and their respective staffs from various offices within the White House to diversify their communications outreach in order to gather credible information and formulate a coordinated response to FEMA's requests for support.

11. The success of this effort was made simultaneously more difficult and more critical when the storm devastated regional power and communications infrastructure across the Gulf Coast, causing widespread outages, incapacitating landline and cellular telephone services, and crippling dozens of 911 emergency call centers. Authoritative and coordinated reporting from the field was, at times, difficult to obtain. Conflicting reports were transmitted from a combination of media, government, and private sources, resulting in confusion and uncertainty in assessing the situation and increasing potential for collateral damage from the storm. This, in turn, limited search, rescue, and recovery efforts.

12. The communications in which the President or his advisers and their respective staffs

participated presented an opportunity to ensure that dedicated Federal assets were in place to help the victims of Hurricane Katrina. Moreover, the President's advisers or staff made, solicited and received communications from FEMA and other agency officials for the purposes of assessing the conditions on the ground, resolving inconsistent and conflicting information to the extent possible, and making decisions regarding responses to requests for Federal government support. Throughout, the President relied upon his closest advisers and their respective staffs, including among others HSC staff, to gather and transmit to him reliable information, advice, and recommendations. In turn, the President's advisers and their respective staffs solicited information and guidance from multiple sources, to the extent available, including Federal emergency response officials, other Federal officials, and individuals outside the government who were equipped, based on prior experiences, to provide information and advice under difficult circumstances. Information gathered through these communications was considered and, whether included or excluded from the final rendition of advice, it played a role in the formulation of advice and recommendations to the President regarding how best to accommodate and support requests for emergency assistance from FEMA as well as State and local entities.

### D.    *Material Withheld Under Presidential Communications Privilege*

13. I am aware that the Plaintiff now seeks the release of communications between and among FEMA, other DHS officials, and other Federal officials, on the one hand, and the President, his advisers and their respective staffs, on the other, some of which might also reflect internal White House communications. I have reviewed the declaration of Adrian Sevier of FEMA, in which he describes various documents, all of which I understand Mr. Sevier or one or more members of his staff have personally reviewed. I am aware that there are 265 pages of documents withheld by FEMA in whole or in part under Exemption 5 of the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552(b)(5), because they are protected under the presidential communications privilege (and, in some instances, other applicable privileges as well). The decisions to withhold this material, which a member of the Office of Counsel to the President also reviewed, are reflected in the index prepared by FEMA pursuant to Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).

14. The subject electronic mail communications among FEMA or other DHS officials and the President's immediate advisers and their respective staffs conveyed information updates, status reports, advice, recommendations and proposed strategies. The withheld communications were authored by or solicited and received by the President's immediate advisers or their respective staffs formally charged with providing advice and recommendations to the President. These advisers held broad and significant responsibilities for gathering information and formulating advice and recommendations to be transmitted to the President on issues related to the preparation for and response to Hurricane Katrina. The communications relayed information regarding developments on the ground and predicate facts for advice and recommendations concerning possible action to be taken by the President in the fulfillment of his duties and, specifically, to aid his decisions in responding to requests for Federal support. Given the circumstances at that time, those communications necessarily varied in form, scope, substance, and participant(s). In the midst of these fast moving and fluid circumstances, there was no formal communications protocol. Rather, the communications structure was informal in order to ensure effective information gathering and to permit flexibility to mobilize support in aid of responders on the ground. Further, other than telephone or video teleconferences in which White House officials participated, the vast majority of communications were conducted principally via electronic mail.

15. In particular, the subject communications include:

a. internal communications between and among the President's immediate advisers and their respective staffs;

b. communications consisting of information updates, status reports, advice and recommendations, between and among Federal officials, including FEMA officials, and the President's immediate advisors and their respective staffs;

c. communications and information by Federal officials, including FEMA officials, that were intended to be transmitted, and it can be fairly inferred ultimately were transmitted, either to the President, or to the President's immediate advisers and their respective staffs;

d. communications between an individual outside the Federal Executive Branch, who acted in a consulting capacity in this context and provided information, advice and guidance for the purpose of assisting the President, and his immediate advisers and their respective staffs; and

e. communications of the President, and his immediate advisers and their respective staffs referred to or reflected in internal FEMA communications.

16. Disclosure of the advice, opinions, recommendations, and other information in those documents could inhibit the frank and candid deliberation of ideas and expression of views within the White House that is necessary in order to enable the President to fulfill his duties as Commander in Chief and as Chief Executive with supervisory responsibility with regard to the Executive Branch. This principle holds true with heightened force in circumstances such as preparing for and responding to a catastrophic incident such as Hurricane Katrina, when advisers and their respective staffs seek to gather, assess, and transmit information for purposes of

informing the President's decisions. The disclosure of such communications would inhibit precisely the type of fully informed, candid advice necessary to address and respond effectively to a future catastrophic incident.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washington, District of Columbia, this 20th day of February 2007.

JOEL B. BAGNAL
Deputy Assistant to the President for
Homeland Security